UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re SHENGDATECH, INC. SECURITIES LITIGATION | : | Master No. 1:11-cv-01918-TPG |
| | : | CLASS ACTION |
| This Document Relates To: | : | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | : | |

Lead Plaintiffs Edward Schaul and Donald Yaw ("Plaintiffs") allege the following based upon the investigation of Plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by ShengdaTech, Inc. ("ShengdaTech" or the "Company") and its predecessors, as well as regulatory filings and reports, press releases and other public statements issued by the Company and the Individual Defendants (defined below), media reports about the Company, documents filed in the Company's bankruptcy proceedings in the U.S. Bankruptcy Court, District of Nevada. *See In re ShengdaTech, Inc.*, No. BK-11-52649 (Bankr. D. Nev. 2011) and documents in support of the allegations found in *Delaware Public Employees Retirement System v. KPMG, et al.*, Case No. 2:12-cv-00961 (D. Nev.). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all purchasers of the common stock of ShengdaTech between May 6, 2008 and March 15, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. ShengdaTech developed, manufactured, marketed and sold Nano-Precipitated Calcium Carbonate ("NPCC") products, which allegedly were used in a variety of products, such as tires, ink, paint, latex, paper, and polyethylene products. The Company was headquartered in China and purportedly derived a majority of its revenues from sales to other China-based customers. On August 19, 2011, ShengdaTech filed for bankruptcy protection and, accordingly, is not named as a Defendant in this action under the automatic stay (section 362(a) of the United States Bankruptcy Code). However, pursuant to the proposed Chapter 11 Plan of Reorganization, dated June 20, 2012 (as may be amended) (the "Plan"), filed in the ShengdaTech, Inc. bankruptcy case (Case No. 11-52649-BTB (Bankr. D. Nev. 2011)), Lead Plaintiffs' rights and claims against ShengdaTech,

Inc. are preserved and retained. In addition, Lead Plaintiffs will be entitled to proceed with their claims against ShengdaTech, Inc. to the extent of available insurance and other funds upon confirmation of the Plan. Therefore, Lead Plaintiffs anticipate further amending this Complaint to add ShengdaTech, Inc. as a defendant once the order confirming the Plan is entered by the Bankruptcy Court.

3. ShengdaTech did not go "public" on the United States markets in the traditional way, but instead became a publicly-traded Company by way of a "reverse merger" – purchasing a majority interest in a dormant shell company that was publicly traded on a major U.S. stock exchange. Reverse mergers have come under increasing scrutiny by U.S. securities regulators as numerous reverse-merger companies have imploded due to accounting improprieties. Indeed, in 2011, the SEC suspended trading in more than a dozen reverse-merger companies because of lack of current, accurate information about the companies. At least six of those companies were based in China, including ShengdaTech.

4. This case concerns a brazen accounting fraud. As detailed further herein, during the Class Period, Defendants engaged in a laundry list of accounting improprieties – falsified the Company's sales figures and sales amounts, falsely overstated the size of the Company's customer base, misstated the size of the Company's cash accounts, participated in undisclosed related party transactions, forged and presented counterfeit United States Certificates of Deposits ("CDs"), operated the Company with material deficiencies in the system of internal control over its financial reporting and issued financial statements that failed to comply with U.S. Generally Accepted Accounting Principles ("GAAP") and were, therefore, materially false and misleading.

5. In addition, as further evidence that the Company's financial statements were materially false and misleading, a comparison of ShengdaTech's SEC filings with the combined

results of ShengdaTech's indirect subsidiaries as reported to the Chinese Administration of Industry and Commerce ("AIC") – the business regulatory agency in China – illustrates that the Company was materially overstating its financial results during the Class Period. For example, for the period ending December 31, 2008, ShengdaTech reported $82.4 million in NPCC net sales and $36.03 million in net income to the SEC in its 10-K, but reported only $9.5 million in net sales and an approximately $2 million net loss to the AIC. For the period ending December 31, 2009, the Company reported net sales of $102.1 million and net income of $23.1 million as compared to net income of $6.07 million and a net loss of $6.2 million with the AIC.

6. U.S. GAAP and Chinese GAAP do not differ on revenue recognition. Specifically, Chinese GAAP, which is governed by Accounting Standards for Enterprises No. 14, provides that revenue cannot be recognized unless: "(1) The significant risks and rewards of ownership of the goods have been transferred to the buyer by the enterprise; (2) The enterprise retains neither continuous management right that usually keeps relation with the ownership nor effective control over the sold goods; (3) The relevant amount of revenue can be measured in a reliable way; (4) The relevant economic benefits may flow into the enterprise; and (5) The relevant costs incurred or to be incurred can be measured in a reliable way." Thus, there is no reason why the Company reported net income and net sale numbers to the SEC and investors that were drastically different from the accumulated net income and net sale numbers of its indirect subsidiaries, which were filed with the AIC, since all of the Company's revenues were derived from those indirect subsidiaries.

7. Defendants' fraud began to unravel on March 3, 2011. On that date, KPMG LLP ("KPMG"), the Company's independent certified public accounting firm, provided written notice to the Company's Audit Committee explaining that it would not be able to complete its audit for the 2010 fiscal year until certain discrepancies and issues were resolved. Those issues included, among

other things, that: (i) KPMG was unable to confirm sales amounts, sales terms, and outstanding balances; and (ii) KPMG uncovered certain related party transactions, which were not disclosed. KPMG was ShengdaTech's auditor from November 1, 2008 until its resignation in April 2011. During this period, KPMG audited the Company's financial statements for the fiscal years ending December 31, 2008 and 2009. KPMG's first audit report for 2008 found a material internal control weakness. However, the 2009 report did not contain any adverse opinion and did not call into question any of ShengdaTech's accounting or financial reporting practices. Had KPMG undertaken an audit that complied with GAAP and conducted the necessary due diligence, it undoubtedly would have discovered that ShengdaTech's SEC filings and financial statements were completely false.

8. On March 15, 2011, ShengdaTech issued a press release announcing that it had appointed a special committee of the Board of Directors ("Special Committee") to investigate "potentially serious discrepancies and unexplained issues relating to the Company and its subsidiaries' financial records identified by the Company's auditors" in the course of their examination of ShengdaTech's consolidated financial statements for the year ended December 31, 2010. The Company further announced that: (i) the Company's Audit Committee retained O'Melveny & Myers LLP ("OMM") as independent outside counsel, which had initiated an internal investigation; (ii) the SEC had been notified about the commencement of the internal investigation; and (iii) the Company would not file its 2010 Form 10-K in a timely manner.

9. In response to these announcements, trading in ShengdaTech common stock was suspended. At the time of the trading suspension, ShengdaTech common stock traded at $3.55 per share.

10. On April 29, 2011, KPMG formally resigned as ShengdaTech's auditor.

11. On June 10, 2011, trading in ShengdaTech common stock resumed and the price of ShengdaTech common stock declined to $0.25 per share, a decline of over 90% from its last close.

12. On August 19, 2011, ShengdaTech filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

13. In connection with ShengdaTech's bankruptcy proceedings, ShengdaTech disclosed the findings of the Special Committee's investigation and other material information. As revealed in the Company's bankruptcy filings, investors have learned that:

(a) certain of ShengdaTech's financial records, under the "direction and knowledge of former management," including Defendant X Chen (defined below), "may have been falsified in whole or in part and that serious issues remain unanswered regarding the financial condition of [ShengdaTech] and its overall business operations";

(b) the Special Committee removed management, including Defendant X Chen, and appointed an independent party as Chief Restructuring Officer;

(c) the Special Committee's efforts to verify ShengdaTech's cash accounts were "thwarted and unsuccessful." In that regard, the managers of ShengdaTech's Chinese subsidiaries: (i) stalled or otherwise attempted to derail trips to the Company's financial institutions; (ii) refused to cooperate with OMM and PricewaterhouseCoopers LLP ("PwC"); (iii) attempted to steer the team to specific persons at the banks, rather than permit the OMM and PwC teams to speak with other identified individuals; and (iv) departed and refused to assist the OMM and PwC teams when the OMM and PwC teams declined to meet with particular bank employees chosen by the managers;

(d) the Special Committee has been unable to authenticate the veracity of certain CDs held in the name of Faith Bloom Limited ("Faith Bloom"), ShengdaTech's wholly-owned

subsidiary. The bank, which allegedly issued the CDs, has been "unable to verify them and, in fact, has no record of issuing them to Faith Bloom";

(e) the Special Committee's investigation has been "obstructed by [Defendant X Chen] and former managers who have been acting in concert with him";

(f) the Special Committee's findings "question the accuracy of payments allegedly made to [ShengdaTech] by various customers and the amounts of sales actually made"; and

(g) the Special Committee's investigation uncovered that ShengdaTech "engaged in transactions with entities owned by [Defendant X Chen], but which were not reported to be related parties, and the sales to those entities appear to have been vastly overstated."

14. As a result of the foregoing, ShengdaTech informed investors that the Company's previously issued financial reports for the years ending December 31, 2008 and 2009 should no longer be relied upon.

**JURISDICTION AND VENUE**

15. The claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

17. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

18. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

19. Lead Plaintiffs Edward Schaul and Donald Yaw each purchased ShengdaTech common stock during the Class Period as set forth in the accompanying certifications and incorporated by reference herein, and have been damaged thereby.

20. Defendant Xiangzhi Chen ("X Chen") was, at all relevant times, Chairman of the Company's Board of Directors and Chief Executive Officer ("CEO") of ShengdaTech. He served as a director on the Company's Board of Directors and as the Company's President since 2006.

21. Defendant Andrew Weiwen Chen ("Andrew Chen") was appointed as ShengdaTech's Chief Financial Officer ("CFO") on April 15, 2009 and served the Company in that capacity until September 30, 2010, when he resigned.

22. Defendant Anhui Guo ("Guo") was the Company's CFO prior to Defendant Andrew Chen. She then became the Company's Chief Operating Officer ("COO"). On September 30, 2010, following the resignation of Defendant Andrew Chen, the Company's Board of Directors appointed Defendant Guo as acting CFO. At all relevant times, Defendant Guo served as a director of the Company.

23. Defendant Dongquan Zhang ("Zhang") served as a director of the Company since February 23, 2007. Defendant Zhang signed the Company's Forms 10-K for the years ending 2006 - 2009.

24. Defendant A. Carl Mudd ("Mudd") served as a director of the Company since February 23, 2007. Defendant Mudd signed the Company's Forms 10-K for the years ending 2006 - 2009.

25. Defendant Sheldon B. Saidman ("Saidman") served as a director of the Company since February 23, 2007. Defendant Saidman signed the Company's Forms 10-K for the years ending 2006 – 2009.

26. The defendants referenced above in ¶¶20-25 are referred to herein as the "Individual Defendants."

27. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

28. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers of ShengdaTech, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly

disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

29. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

30. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with ShengdaTech, each of the Individual Defendants had access to the adverse undisclosed information about ShengdaTech's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about ShengdaTech and its business materially false and misleading.

31. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC

filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

32. Defendant KPMG is a limited liability partnership headquartered in New York, New York, which provides audit, tax and other advisory services. KPMG's Hong Kong, China office audited the Company's financial statements for the fiscal years ended December 31, 2008, 2009 and 2010.

33. The Individual Defendants and KPMG are collectively referred to herein as "Defendants."

34. Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of ShengdaTech common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding ShengdaTech's financial reporting, business, operations and management and the intrinsic value of ShengdaTech common stock; (ii) enabled Company insiders to sell over $9.8 million of ShengdaTech common stock to the unsuspecting public; (iii) allowed ShengdaTech to complete two note offerings raising over $200 million at artificially inflated prices; and (iv) caused Plaintiffs and the Class to purchase ShengdaTech common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

35. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common

stock of ShengdaTech between May 6, 2008 and March 15, 2011, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

36. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ShengdaTech common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ShengdaTech or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

38. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

39. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of ShengdaTech;

(c) whether Defendants failed to include material facts in the financial statements issued during the Class Period, making those filings materially false and misleading;

(d) whether the price of ShengdaTech common stock was artificially inflated during the Class Period; and

(e) to what extent the members of the Class have sustained damages and the proper measure of damages.

40. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### ShengdaTech Goes "Public" Through a Reverse Merger

41. In March 2006, Faith Bloom, a British Virgin Islands company controlled by Defendant X Chen, consummated a reverse merger with Zeolite Exploration Company ("Zeolite), a shell company incorporated in Nevada whose principal business activity, at the time of the transaction, was to "seek a suitable reverse acquisition candidate through acquisition, merger or other suitable business combination method."

42. As a result of the reverse merger, Defendant X Chen was appointed CEO, president and Chairman of the Board of Zeolite, Defendant Guo was appointed CFO of Zeolite and Zeolite's then director and CEO, Timothy Halter, resigned.

43. In January 2007, Defendant X Chen amended Zeolite's articles of incorporation and renamed the company ShengdaTech, Inc.

44. Faith Bloom remained a wholly-owned subsidiary of Zeolite, and then ShengdaTech, and was the direct parent company of various subsidiaries based in China.

45. Since January 2007, there have been over 600 "backdoor" or "reverse merger" registrations. Over 150 of these registrations have been by companies from China.

46. In a reverse merger, a private company seeking to go public merges with a dormant public shell company. Before the transaction, the public shell company no longer has substantive operations, but its public company registration remains in effect. The transaction allows the former private company to go public without any of the scrutiny from regulators, underwriters and investors that companies undergo when they go public though a traditional IPO.

47. Generally, once the reverse merger is completed: (i) the board of directors of the U.S. company resigns and the Chinese board takes over; (ii) the company immediately changes its name; and (iii) at some point, the new company seeks to raise fresh capital either through a private placement and/or secondary offering.

48. Reverse mergers have come under increasing scrutiny. In April 2011, SEC commissioner Luis Aguilar, commenting on the Chinese securities fraud epidemic, stated, in pertinent part, as follows:

> While the vast majority of these companies may be legitimate businesses, a growing number of them have accounting deficiencies or are outright vessels of fraud.

49. In June 2011, the SEC issued a warning about investing in companies that enter the U.S. market through reverse mergers. The SEC warned of "systemic concerns" with the quality of the auditing of Chinese firms' financial reporting as well as the limitations on the ability of the SEC to enforce the securities laws and for investors to recover losses tied to fraudulent disclosures.

50. In November 2011, the SEC approved tougher new exchange rules for companies that enter the U.S. market through reverse mergers. The new rules prohibit a reverse-merger company from listing until the company has been in the U.S. over-the-counter market or on another regulated U.S. or foreign exchange for at least a year. The SEC said the company also must file all required reports, including audited financial statements, with the commission. The company also must maintain a requisite minimum share price for 30 of 60 trading days immediately prior to listing.

51. In 2011, the SEC suspended trading in more than a dozen reverse-merger companies because of lack of current, accurate information about the companies. At least six of those companies were based in China, including ShengdaTech.

**ShengdaTech's Financial Reporting During the Class Period Was Materially False and Misleading and Violated GAAP**

52. During the Class Period, ShengdaTech falsely represented that its financial results were reported in accordance with GAAP. Pursuant to Regulation S-X [17 C.F.R. §210.4-01(a)(1)], financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

53. On May 5, 2011, ShengdaTech indicated that the financial statements it issued during the Class Period should no longer be relied upon. Specifically, the 8-K the Company filed with the SEC (the "May 2011 Form 8-K") on that date disclosed, in pertinent part, as follows:

> On April 29, 2011, we were also informed by KPMG, our former independent accounting firm, that disclosures should be made and action should be taken to prevent future reliance on their previously issued audit reports related to the consolidated balance sheets of ShengdaTech, Inc. and its subsidiaries as of December 31, 2008 and 2009, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended and the effectiveness of internal control over financial reporting as of December 31, 2008 and 2009.

54. The May 2011 Form 8-K also disclosed that KPMG had "doubts" about representations management provided to KPMG in connection with its audits of ShengdaTech's

2008 and 2009 annual financial statements and the effectiveness of internal control over financial reporting of the Company.

55. Additionally, the May 2011 Form 8-K revealed that KPMG informed the Company's Audit Committee of certain "concerns" that arose during its audit of the Company's consolidated financial statements as of and for the year ended December 31, 2010, which included "serious discrepancies and unexplained issues" relating to, among others: (i) the Company's bank balances; (ii) transactions with major suppliers; (iii) VAT invoices and payments; (iv) sales and payments for sales by third parties; (v) sales to the Company's second largest customer; (vi) discrepancies between KPMG's direct calls to customers and confirmations returned by mail; and (vii) concerns raised by directly confirming customer sales and accounts receivables.

56. In addition to the foregoing, after the Class Period, ShengdaTech admitted that:

- the Special Committee of its Board of Directors hired independent counsel to conduct an investigation into concerns associated with improper financial reporting;
- the Special Committee removed ShengdaTech's management, including Defendant X Chen, from their respective positions with the Company; and
- the Special Committee appointed an independent party to oversee the Company's business.

57. On or about September 1, 2011, ShengdaTech filed its "[Proposed] Findings of Fact and Conclusions of Law" with the United States Bankruptcy Court for the District of Nevada asserting, in part, that:

> KPMG gave an oral report and then provided written notice to the Debtor's Audit Committee that, when auditing the Debtor's financial statements for the fiscal year ending December 31, 2010, it discovered "potentially serious discrepancies and unexplained issues," including the inability to confirm sales amounts, sales terms, and outstanding balances, and undisclosed related party transactions.
>
> * * *
>
> Soon after the investigation began, additional problems began to surface, including the inability of KPMG to verify the Debtor's cash accounts.

* * *

> The Special Committee also has been unable to authenticate the veracity of certain U.S. certificates of deposits ("COs"). . . . The Special Committee has been unable to verify the authenticity of those COs and despite making repeated requests for such information . . . . The Special Committee has learned that the bank which issued the CDs has been unable to verify them and, in fact, has no record of issuing them to [ShengdaTech's wholly-owned subsidiary] Faith Bloom.
>
> * * *
>
> The investigation so far has determined that certain of the financial records of the Debtor may have been falsified in whole or in part and that serious issues remain unanswered regarding the financial condition of the Debtor and its overall business operations. Investigative findings also call into question the accuracy of payments allegedly made to the Debtor by various customers and the amounts of sales actually made. Additionally, the Debtor is reported to have engaged in transactions with entities owned by [Defendant] Chen but which were not reported to be related parties, and the sales to those entities appear to have been vastly overstated.

[Citations omitted.]

58. The above facts and admissions evidence a pattern and practice of intentional misconduct during the Class Period by ShengdaTech's most senior executives to misstate the Company's financial reporting.

59. Defendants had the responsibility to present ShengdaTech's business activities in accordance with Section 13 of the Exchange Act of 1934, which provides:

> Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall –
>
> A. make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> B. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> > i. transactions are executed in accordance with management's general or specific authorization;
> >
> > ii. transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally

accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;

iii. access to assets is permitted only in accordance with management's general or specific authorization; and

iv. the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

60. The above facts and admissions also evidence that ShengdaTech's financial reporting during the Class Period violated numerous provisions of GAAP.[1]

61. For example, GAAP provides that revenue should not be recognized until it is realized or realizable and earned. The conditions for revenue recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price is fixed or determinable, collectability of the sales price is reasonably assured and when the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue. Generally, revenue should not be recognized until an exchange has occurred and the earnings process is complete. *See* SEC Staff Accounting Bulletin ("SAB") No. 104; FASB Statement of Financial Accounting Standards ("SFAS") No. 48; Accounting Research Bulletin No. 43; Accounting Principles Board Opinion No. 10; and American Institute of Certified Public Accountants ("AICPA") Statement of Position 97-2.

---

1 On June 3, 2009, the Financial Accounting Standards Board ("FASB") approved the Accounting Standards Codification (the "Codification") as the source of authoritative GAAP for financial statements issued for periods after September 15, 2009. Given the Class Period, references herein to GAAP refer to those standards in existence before the effective date of the Codification, the substance of which were incorporated into the Codification and continued to be authoritative, in all material respects, though the date of ShengdaTech's last publicly issued financial statements, the periods ended September 30, 2010.

62. In its financial statements for the year ended December 31, 2008, filed with the SEC on Form 10-K, ShengdaTech disclosed the following with respect to its policy of revenue recognition:

> The Company recognizes revenues, when the customer takes ownership and assumes risk of loss, collection of relevant receivable is probable, persuasive evidence of an arrangement exists and the sales price is fixed or determinable. Written sales agreements or customer purchase orders, which specify price, product, and quantity, are used as evidence of an arrangement. For domestic sales, customer acceptance is evidenced by a carrier or customer signed shipment notification form. For export sales, products are considered delivered when the goods have reached the port of arrival. In the PRC, value added tax ("VAT") of approximately 13 – 17% on invoiced amount is collected on behalf of tax authorities. Revenue is recorded net of VAT. VAT collected from customers, net of VAT paid for purchases, is recorded as a liability and included in "accrued expenses and other payables" in the consolidated balance sheets.

63. In addition, GAAP, in SFAS No. 5, requires financial statements to recognize and report a charge to income when information existing at the date of the financial statements indicates that it is probable (*e.g.*, a likely) that an asset has been impaired or a liability has been incurred; and the amount of such loss can be reasonably estimated. Further, Chapter 3 of Accounting Research Bulletin ("ARB") No. 43 provides that the objective of providing for reserves against receivables is to assure that "[a]ccounts receivable net of allowances for uncollectible accounts . . . are effectively stated as the amount of cash estimated as realizable."

64. In its financial statements for the year ended December 31, 2008, filed with the SEC on Form 10-K, ShengdaTech disclosed:

> Accounts receivable are recorded at the invoiced amount. Amounts collected on trade accounts receivable are included in net cash provided by operating activities in the consolidated statements of cash flows. Management reviews accounts receivable on a periodic basis and records allowances when there is a doubt as to the collectibility of the balance. In evaluating the collectibility of accounts receivable balances, management considers various factors, including historical losses, current market conditions and customers' financial condition, the amount of accounts receivables in dispute, and the accounts receivables aging and payment patterns. The Company historically has not had any write-offs and all accounts receivable are current and due within 90 days as of the balance sheet dates. As a result, no

> allowances for doubtful accounts has been recorded for any of the periods presented herein because management believes all accounts receivable are fully collectible. The Company does not have any off-balance-sheet credit exposure related to its customers.

65. ShengdaTech has now indicated that the financial statements it issued to investors during the Class Period – which were signed by the Individual Defendants – violated the above provisions of GAAP and its publicly stated policies of accounting for revenue and accounts receivable during the Class Period.

66. In addition, ShengdaTech's financial statements for the year ended December 31, 2008, disclosed, in pertinent part, as follows:

> Cash consists of cash on hand and cash at bank. As of December 31, 2008 and 2007, RMB 315,092,101 and RMB 191,093,944 (equivalent to $45,970,661 and $26,126,789), respectively, and U.S. dollar deposits of $67,589,228 and $236,625, respectively, were held at major financial institutions located in the PRC. The remaining balance was held primarily at major financial institutions located in the Hong Kong Special Administrative Region (the "HK SAR"). Management believes that these major financial institutions are of high credit quality.

67. This disclosure was materially false and misleading, as ShengdaTech has now indicated.

68. GAAP, in SFAS No. 57, also requires financial statements to disclose material related party transactions because, among other things, they cannot be presumed to have been carried out on an arm's-length basis. As ShengdaTech has now indicated, its financial statements during the Class Period improperly failed to disclose related party transactions in conformity with GAAP.

69. The FASB Statement of Concepts ("Concepts Statement") No. 1 provides that a fundamental objective of financial reporting is to provide useful information about an entity's financial performance. In addition, Concepts Statement No. 2 provides that financial reporting should be reliable in that it represents what it purports to represent.

70. During the Class Period, Defendants caused or permitted ShengdaTech to issue financial statements that violated these concepts and GAAP in numerous respects. In failing to file financial statements with the SEC which conformed to GAAP, Defendants caused or permitted ShengdaTech to repeatedly disseminate financial statements that materially misstated the Company's financial resources and performance during the Class Period.

71. In addition, while the Company's internal and disclosure controls were materially deficit and not operating effectively during the Class Period, Defendants caused or permitted ShengdaTech to make representations to the contrary in its interim and annual reports filed with the SEC.

**KPMG's Fraudulent Conduct**

72. In the performance of their audits of ShengdaTech's financial statements, Defendant KPMG owed ShengdaTech a duty to act with reasonable care and competence and perform the services it rendered pursuant to professional standards. However, KPMG violated numerous professional standards and acted with such lack of care, that it was indifferent to numerous red flags warning it of the multi-year financial fraud alleged herein.

73. Similarly, Defendant KPMG knew, or was reckless in not knowing, that it issued false audit opinions on ShengdaTech's false and misleading financial statements for the years ended December 31, 2008 and 2009 (the "Financial Statements").

74. In connection with its audits of ShengdaTech's Financial Statements, KPMG had access to the Company's corporate information and accounting books and records. KPMG's personnel were also regularly present at ShengdaTech's headquarters and had access to its employees via face-to-face meetings, e-mail and telephone. Given their intimate knowledge of ShengdaTech's business, KPMG knew of, or was reckless in not knowing of, the numerous accounting irregularities and improprieties alleged herein, and that the Company's Financial

Statements, and related financial information, were materially false and misleading because, among other things, they violated GAAP in numerous respects.

75. To help ensure KPMG's loyalty, ShengdaTech was obligated to pay KPMG more than ***$1.2 million*** in fees since being retained by ShengdaTech on November 11, 2008. The KPMG partners who were responsible for the services rendered to ShengdaTech were particularly motivated to appease ShengdaTech and Defendants because their remuneration was closely tied to the fees generated on the ShengdaTech engagements. In addition, the Hong Kong office of KPMG impelled its partners to establish and maintain a reputation for having a strong presence in China. Accordingly, the partners of KPMG were pressured to compromise themselves by helping their firms create and maintain this reputation

**KPMG's False and Misleading Audit Reports**

76. KPMG knew, or was reckless in not knowing, that it falsely represented that ShengdaTech's Financial Statements were presented in conformity with GAAP and that its audits were performed in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB").[2]

77. KPMG issued the following false and misleading audit report, dated March 31, 2009, on ShengdaTech's internal controls as of December 31, 2008 and its Financial Statements for the year ended December 31, 2008:

---

[2] The PCAOB is a private-sector corporation created by the Sarbanes Oxley Act ("SOX") to oversee the auditors of public companies. Section 103 of SOX directs the PCAOB to establish auditing, quality control, ethics, and independence standards and rules to be used by registered public accounting firms in the preparation and issuance of audit reports.

The Board of Directors and Shareholders

ShengdaTech, Inc.:

We have audited ShengdaTech, Inc. and subsidiaries' internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). ShengdaTech, Inc. and subsidiaries' management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Report On Internal Control Over Financial Reporting*. Our responsibility is to express an opinion on ShengdaTech, Inc. and subsidiaries' internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. Material weaknesses have been identified and included in management's assessment related to the lack of adequate policies, procedures and personnel to address the accounting for and disclosures of non-routine transactions and the Company's internal control over the accounting for income taxes.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of ShengdaTech, Inc. and subsidiaries as of December 31, 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the year then ended. These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2008 consolidated financial statements, and this report does not affect our report dated March 31, 2009, which expressed an unqualified opinion on those consolidated financial statements.

In our opinion, because of the effect of the aforementioned material weaknesses on the achievement of the objectives of the control criteria, ShengdaTech, Inc. and subsidiaries have not maintained effective internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

[Emphasis in original.]

78. KPMG also issued the following false and misleading unqualified audit report, dated March 15, 2010, on ShengdaTech's internal controls as of December 31, 2009 and its Financial Statements for the year ended December 31, 2009:

The Board of Directors and Shareholders

ShengdaTech, Inc.:

We have audited ShengdaTech, Inc.'s internal control over financial reporting as of December 31, 2009, based on criteria established in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). ShengdaTech, Inc.'s management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, ShengdaTech, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in *Internal Control-Integrated Framework* issued by COSO.

The Company acquired Anhui Chaodong Nanomaterials Science and Technology Co., Ltd. (Chaodong) during 2009, and management excluded from its assessment of the effectiveness of ShengdaTech, Inc.'s internal control over financial reporting as of December 31, 2009, Chaodong's internal control over financial reporting associated with total assets of $4,593,970 and nil revenue, included in the consolidated financial statements of the ShengdaTech, Inc. and subsidiaries as of and for the year ended December 31, 2009. Our audit of internal control over financial reporting of ShengdaTech, Inc. also excluded an evaluation of the internal control over financial reporting of Chaodong.

> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of ShengdaTech, Inc. and subsidiaries of December 31, 2009 and 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended, and our report dated March 15, 2010 expressed an unqualified opinion on those consolidated financial statements.

[Emphasis in original.]

79. The above-noted audit reports were materially false and misleading because ShengdaTech's Financial Statements violated GAAP in numerous respects. Indeed, the myriad of ways in which ShengdaTech's Financial Statements violated GAAP, coupled with the duration of such violations and ShengdaTech's numerous undisclosed internal control deficiencies, are indicative of KPMG's scienter in the "auditing" of such financial statements. In fact, ShengdaTech has now indicated, as KPMG knew or recklessly disregarded, that in addition to violating GAAP, the Company also violated its publicly disclosed accounting policies and practices.

80. In addition to the foregoing, during the Class Period, Article 10 of Regulation S-X [17 C.F.R. §210.10 01(d)] required KPMG to review, in accordance with professional standards, the 2009 and 2010 quarterly Financial Statements ShengdaTech filed with the SEC on Form 10-Q.

81. In certifying ShengdaTech's Financial Statements, Defendant KPMG falsely represented that its audits were conducted in accordance with the standards of the PCAOB, which require that:[3]

(a) the audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor;

---

[3] Prior to the creation of the PCAOB, the AICPA promulgated U.S. auditing standards. To the extent they have not been superseded or amended by the PCAOB, the auditing standards issued by the AICPA have been adopted by the PCAOB as its interim standards to be used on a transitional basis.

(b) in all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors;

(c) due professional care is to be exercised in the performance of the audit and the preparation of the report;

(d) the work is to be adequately planned and assistants, if any, are to be properly supervised;

(e) a sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of the tests to be performed;

(f) sufficient competent evidential matter is to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit; and

(g) the report shall either contain an expression of an opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

82. KPMG's audit opinions on ShengdaTech's Financial Statements falsely represented that it performed its audits in accordance with the PCAOB's standards.

83. During the Class Period, AU §326 required KPMG to:

- Obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit;
- Consider whether specific audit objectives have been achieved in evaluating evidential matter;
- Be thorough in the search for evidential matter and unbiased in its evaluation;

- Design audit procedures to obtain competent evidential matter; and
- Consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the client's financial statements.

84. In violation of the above standard, KPMG did not obtain sufficient competent evidential matter in the performance of its audits.

85. In addition, AU §316 required KPMG to plan and perform its audits in a manner that reasonably assured ShengdaTech's Financial Statements were free from misstatements caused by error or fraud. This mandate included evaluating the business rationale for significant, unusual transactions and events. In fact, AU §316 required KPMG to "gain an understanding of the business rationale for such transactions and whether that rationale (or the lack thereof) suggest[ed] that the transactions may have been entered into to engage in fraudulent financial reporting or conceal misappropriation of assets."

86. The requirements of AU §316 were designed to put KPMG on notice of material financial misstatement risk factors arising from fraudulent financial reporting, which were present at ShengdaTech, including:

- A failure by management to display and communicate an appropriate attitude regarding internal control and the financial reporting process. Specific indicators might include:

  (i) inadequate monitoring of significant controls;

  (ii) management failing to correct known reportable conditions on a timely basis;

  (iii) management continuing to employ an ineffective accounting, information technology, or internal auditing staff; and

  (iv) management setting unduly aggressive financial targets and expectations for operating personnel;

- Strained relationship between management and the current or predecessor auditor. Specific indicators might include:

  (i) frequent disputes with the current or predecessor auditor on accounting, auditing, or reporting matters; and

  (ii) domineering management behavior in dealing with the auditor, especially involving attempts to influence the scope of the auditor's work;

- Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm;

- Significant, unusual, or highly complex transactions, especially those close to year end, that pose difficult "substance over form" questions; and

- Significant pressure to obtain additional capital necessary to stay competitive considering the financial position of the entity – including need for funds to finance major research and development or capital expenditures.

87. Each of the above risk factors, which were present at ShengdaTech during the Class Period, were red flags warning KPMG about the risk of material misstatement in the Company's financial statements. Nonetheless, KPMG ignored these red flags and failed to adequately plan and perform its audit procedures in a manner that was reasonably designed to identify the numerous financial improprieties alleged herein. Such failures permitted ShengdaTech to issue materially false and misleading Financial Statements over a multi-year period.

88. In addition, Auditing Standard No. 5 required KPMG to plan and perform the audit to obtain evidence sufficient to reasonably determine the existence of material weaknesses in ShengdaTech's internal controls. The standard also provides that a direct relationship exists between the degree of risk associated with a particular area of a company's internal control over financial reporting and the amount of audit attention that should be devoted to that area. In addition, the standard provides that there is usually a higher risk that internal controls will fail to prevent or detect misstatements caused by fraud than the risk of a failure to prevent or detect an error and that auditors need to focus more attention on the areas of highest risk.

89. Nonetheless, KPMG ignored these standards during the course of its audits and issued unqualified opinions on ShengdaTech's Financial Statements.

90. Now, ShengdaTech's limited internal investigation has revealed the existence of numerous undisclosed material weaknesses in its system of internal control during the Class Period, which contributed to the financial fraud alleged herein.

91. KPMG, as auditors, were obligated to assess ShengdaTech's internal financial and accounting controls and determine whether such controls were effective. KPMG was also required to evaluate whether ShengdaTech's deficient internal controls might lead to or contribute to the risk of fraud not being detected. Nonetheless, KPMG turned a blind-eye toward such deficiencies.

92. The standards of the PCAOB also required KPMG to examine related party transactions to ensure that they were properly accounted for so as to reflect their economic substance rather than form. According to AU §334, KPMG was required to:

- Obtain an understanding of the business purpose of the related party transactions;
- Examine invoices, executed copies of agreements, contracts, and other pertinent documents;
- Determine whether the transaction has been approved by the board of directors or other appropriate officials;
- Test for reasonableness the compilation of amounts to be disclosed, or considered for disclosure, in the financial statements;
- Arrange for the audits of inter-company account balances to be performed as of concurrent dates, even if the fiscal years differ, and for the examination of specified, important, and representative related party transactions by the auditors for each of the parties, with appropriate exchange of relevant information; and
- Inspect or confirm and obtain satisfaction concerning the transferability and value of collateral.

93. KPMG violated the requirements of AU §334 and failed to determine that ShengdaTech transacted with related parties, including entities affiliated with Defendant X Chen.

94. In addition to the foregoing violations of PCAOB standards, KPMG violated at least the following provisions of the PCAOB in auditing ShengdaTech's financial statements:

(a) the first general standard, which requires that audits be performed by persons having adequate technical training and proficiency;

(b) the second general standard, which requires that the audit be performed by persons having adequate knowledge of the subject matter;

(c) the third general standard, which requires that the auditor perform the engagement only if he or she has reason to believe that the subject matter is capable of evaluation against criteria that are suitable and available to users;

(d) the fourth general standard, which requires that independence in mental attitude is to be maintained by the auditor in all matters related to the audit;

(e) the fifth general standard, which requires due professional care is to be exercised in the planning and performance of the audit;

(f) the first standard of fieldwork, which requires that the audit be adequately planned and assistants, if any, shall be properly supervised;

(g) the second standard of fieldwork, which requires that sufficient evidence be obtained to provide a reasonable basis for the conclusion that is expressed in the report; and

(h) the first standard of reporting, which requires the auditor to issue a report on the subject matter or the assertion or withdraw from the attest engagement. KPMG was required to state that either no opinion could be issued by them on ShengdaTech's Financial Statements or else issue an adverse opinion stating that such Financial Statements were not fairly presented in conformity with GAAP. KPMG's failure to make such a qualification, correction, modification

and/or withdrawal of its audit opinions was a violation of PCAOB standards, including the standards of reporting.

95. As KPMG knew or recklessly ignored, it falsely represented that it conducted its audits of ShengdaTech's Financial Statements in accordance with each of the above-noted auditing standards.

96. KPMG's failure to adequately perform its audit procedures to identify the improprieties alleged herein, and its failure to report such improprieties, permitted ShengdaTech's accounting irregularities and improprieties to go unabated and allowed ShengdaTech to issue materially misstated Financial Statements over a multi-year period.

97. Defendant KPMG owed a duty to ShengdaTech to perform its auditing services with reasonable care and competence. As a worldwide firm of Certified Public Accountants, auditors and business consultants, KPMG was well aware of its duties and obligations in serving as ShengdaTech's independent auditor. Indeed, KPMG's website proclaims, in part, that:

> At KPMG, our approach to delivering audit services – whether a financial statement audit, an integrated audit, or other attestation services – is always risk-based, industry-specific, and tailored to our clients' particular operational structures.
>
> Our KPMG Audit Methodology (KAM), used by KPMG LLP here in the United States and by KPMG International member firms around the world, helps ensure that our audit services comply with changing regulations and professional standards. KAM relies on a multidisciplinary approach, calling upon industry and subject-matter professionals with the required knowledge, skills, and experience to perform specific engagements.
>
> Our ability to deliver high-quality audit services is based on our teams' strong understanding of the business processes, accounting policies, internal controls, and financial reporting issues specific to each of our clients and their respective industries and sectors.
>
> Proactive coordination and communication – on a day-to-day basis and in regularly scheduled meetings – with management and those charged with governance is a vital component of our approach to delivering audit services. We work to establish a clear communication plan that focuses discussions on management's approach to identifying risks to reliable financial reporting. That plan enables KPMG to

understand how clients' management reaches its conclusions and management to understand how we reach ours.

98. During the Class Period, the personnel at KPMG's Hong Kong office abandoned their duties as independent auditors and turned a blind eye to the numerous red flags and violations of GAAP and PCAOB standards alleged herein.

99. KPMG knowingly or recklessly issued unqualified audit opinions on ShengdaTech's Financial Statements to protect the lucrative business relationship it enjoyed with ShengdaTech and consented to the inclusion of its unqualified opinions on the Financial Statements in ShengdaTech's Forms 10-K filed with the SEC during the Class Period, which reports it knew, or was reckless in not knowing, were materially false and misleading.

**ShengdaTech's SEC Filings During the Class Period Are Inconsistent with the Combined Results of ShengdaTech's Indirect Subsidiaries as Reported to the Chinese AIC**

100. A comparison of ShengdaTech's SEC filings with the combined results of ShengdaTech's indirect subsidiaries as reported to the Chinese AIC illustrates that the Company was materially overstating its financial results during the Class Period.

101. Similar to a company's SEC filings, a company's AIC filings include balance sheets, income statements, and cash flow statements. Both SEC filings and AIC filings need to be audited. Moreover, in terms of revenue recognition, there are no differences between U.S. GAAP and Chinese GAAP. For example, for revenue recognition, Chinese GAAP provides that "[n]o revenue from selling goods may be recognized unless":

> (1) The significant risks and rewards of ownership of the goods have been transferred to the buyer by the enterprise; (2) The enterprise retains neither continuous management right that usually keeps relation with the ownership nor effective control over the sold goods; (3) The relevant amount of revenue can be measured in a reliable way; (4) The relevant economic benefits may flow into the enterprise; and (5) The relevant costs incurred or to be incurred can be measured in a reliable way.

102. Thus, there is no reason why the Company's consolidated financial statements to the SEC should differ from the combined financial statements of ShengdaTech's subsidiaries to the AIC since all of the Company's revenues came from those subsidiaries.

103. However, in fact, the financial statements of ShengdaTech's subsidiaries filed with the AIC showed much less revenue and net income than the financial statements filed by ShengdaTech with the SEC. For example, for the period ending December 31, 2008, ShengdaTech reported $82.4 million in NPCC net sales and $36.03 million in net income to the SEC in its 10-K, but reported only $9.5 million in net sales and an approximately $2 million net loss to the AIC. For the period ending December 31, 2009, the Company reported net sales of $102.1 million and net income of $23.1 million as compared to net income of $6.07 million and a net loss of $6.2 million with the AIC.

**Materially False and Misleading Statements**
**Issued During the Class Period**

104. The Class Period begins on May 6, 2008. On that date, ShengdaTech filed with the SEC its Form 10-Q for the first quarter of 2008, the period ended March 31, 2008 (the "March 2008 Form 10-Q"), which was signed by Defendants X Chen and Guo. The March 2008 Form 10-Q disclosed a restatement of financial statements by the Company to correct an overstatement of advances paid to suppliers and an understatement of property and equipment in the amount of $17,186,677.

105. In the March 2008 Form 10-Q, Defendants stated as follows with respect to the Company's financial controls and procedures:

> Evaluation of disclosure controls and procedures.
>
> Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures as required by Exchange Act Rule 13a-15(b) as of the end of the period covered by this report. Based on that

evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective.

106. Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Guo submitted the following false and misleading certifications:

I, [Defendants X Chen and Guo], certify that:

1. I have reviewed this quarterly report on Form 10-Q of ShengdaTech, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

107. On May 14, 2008, the Company filed an Amended Form 10-K for the year ended December 31, 2007 and an Amended Form 10-Q for the quarter ended March 31, 2008. The March 2008 Form 10-Q discussed the restatement and stated, in pertinent part, as follows:

*Restatement of Financial Statements* – Subsequent to March 2008, the Company realized that the December 31, 2007 consolidated financial statements needed to be revised to correct an overstatement of advances paid to suppliers and an understatement of property and equipment in the amount of $17,186,677. The Company concluded that advances made for production equipment should be treated as construction in progress within property and equipment. This correction was not considered material in accordance with SAB 108 for the year ended December 31, 2007 but is considered significant. As a result, the Company corrected the financial statements for December 31, 2007. The corrected consolidated balance sheet is included in these financial statements. The correction of the December 31, 2007 financial statements had no effect on the previously reported net income.

* * *

Our independent auditor has advised our management and Board of Directors that there were significant deficiencies in our internal control over financial reporting as of December 31, 2007. The identified significant deficiencies relate to lack of disclosure regarding changes in equity, specifically relating to the issuance of shares from the exercise of a stock warrant, for which we have adopted policies and procedures that have remedied this deficiency, and misclassification in the balance sheet of advances to suppliers relating to construction in progress. Our auditor does not consider either significant deficiency, either alone or in the aggregate, to constitute a material weakness. Management believes that should additional deficiencies occur, a potential misapplication of generally accepted accounting principles or potential misstatement in our financial statements could occur. Enhancing our internal controls will continue as we grow and development of systems of internal control that might be deemed necessary can and will result in increased costs to us.

[Emphasis in original.]

108. On May 7, 2008, ShengdaTech issued a press release announcing its financial results for the first quarter of 2008, the period ended March 31, 2008. For the quarter, the Company reported revenues of $28.6 million, and net income from continuing operations of $7.4 million, or $0.14 per diluted share. Defendant X Chen, commenting on the results, stated, in pertinent part, as follows:

> We are pleased to report year-over-year growth in revenue and net income due to continued strong market demand for our NPCC products and chemical products. In the first quarter of 2008, we added eleven new domestic customers including three tire manufacturers, two PVC producers, two latex producers and four adhesive manufacturers. We also successfully added three new international customers in Vietnam, Malaysia and Thailand, for NPCC used in PVC, polyethylene and paper. In addition, our existing NPCC lines all reached full operating capacity this quarter, plus, we completed construction of three new stainless steel NPCC production lines at the end of the quarter, increasing annual capacity by 60,000 metric tons.

With regard to the Company's financial condition, Defendants stated, in pertinent part, as follows:

> As of March 31, 2008, ShengdaTech had $18.4 million in cash and cash equivalents, $13.0 million in working capital and $0.8 million in long-term payables. Net cash provided by operating activities for the period was $15.3 million. Shareholders' equity stood at $100.3 million, up from $89.0 million at year end 2007.

109. On May 14, 2008, the same day that it announced its restatements, the Company issued a press release announcing its intentions to offer an aggregate of $100 million of senior convertible notes due 2018 in an offering to qualified institutional buyers ("2008 Note Offering"). The Company purportedly used approximately $56 million of the net proceeds to expand its NPCC production capacity and purportedly used the remaining proceeds for potential coal-based chemical acquisitions, strategic investments and to fund working capital requirements.

110. On August 15, 2008, ShengdaTech issued a press release announcing its financial results for the second quarter of 2008, the period ended June 30, 2008. For the quarter, the Company reported revenues of $39.8 million, and net income from continuing operations of $10.0 million, or

$0.18 per diluted share. Defendant X Chen, commenting on the second quarter results, stated, in pertinent part, as follows:

> We are pleased to report growth of 75% in revenue and 66% in net income due to continued strong market demand for our NPCC and chemical products. During the second quarter of 2008, we made a significant breakthrough in the development of our new NPCC product, 'NPCCA301,' for use in automobile undercoating paints. We added six new domestic customers including one new tire manufacturer, three adhesive producers, and a paper manufacturer. We successfully expanded our international customers by adding four new clients, a Korean tire manufacturer, Vietnamese and Israeli polyethylene manufacturers, and an automobile undercoating company in Singapore. In addition, our new NPCC lines, with a total capacity of 60,000 metric tons, reached 70% operating capacity this quarter. The planned acquisition of Jinan Fertilizer will strengthen our position in the coal-based chemical sector, and once due diligence now underway is completed, we anticipate a relatively seamless transition of our existing chemical facility to the new location.

With regard to the Company's financial condition, Defendants stated, in pertinent part, as follows:

> As of June 30, 2008, ShengdaTech had $138.2 million in cash and cash equivalents, $133.8 million in working capital and $115.0 million in long-term convertible senior notes. Net cash provided by operating activities was $25.2 million. Shareholders' equity stood at $113.0 million, up from $89.0 million at year end 2007.
>
> In the second quarter of 2008, ShengdaTech generated $115.0 million in gross proceeds from the sale of 6.00% senior convertible notes due 2018, including full exercise of the over-allotment option. The Company plans to use the net proceeds from the offering to fund the announced NPCC expansion in Zibo, Shandong Province, which will add to the current NPCC production capacity, to finance the planned acquisition of Jinan Fertilizer, and to provide cash for working capital requirements.

111. On November 10, 2008, ShengdaTech filed with the SEC its Form 10-Q for the third quarter of 2008, the period ended September 30, 2008 (the "September 2008 Form 10-Q"), which was signed by Defendants X Chen and Guo and disclosed:

> a) Evaluation of disclosure controls and procedures.
>
> Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e) or 15d-15(e)) as required by Exchange Act Rule 13a-15(b) or 15d-15(b) as of the end of the third quarter of 2008. ***Based on that evaluation, the Chief***

> ***Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective.***

[Emphasis added.]

112. In addition, the September 2008 Form 10-Q included representations about the Company's disclosure and internal controls and Defendants X Chen's and Guo's false and misleading certifications thereon.

113. On November 10, 2008, the Company issued a press release announcing its financial results for the third quarter of 2008, the period ended September 30, 2008. For the quarter, the Company reported revenues of $49.3 million, and net income from continuing operations of $9.9 million, or $0.17 per diluted share. Defendant X Chen, commenting on the third quarter results, stated, in pertinent part, as follows:

> We are pleased to report another quarter of year-over-year growth in revenue and net income driven by growing demand for our NPCC and chemical products. During the quarter, we expanded our domestic NPCC customer base with 22 new customers, including two new tire manufacturers, two adhesive producers, twelve PE manufacturers, three PVC producers, and three paint manufacturers. We also added nine new international NPCC customers, including an adhesive producer in India, a PE manufacturer in Israel, a paint manufacturer and two PVC producers in Thailand, and four new tire manufacturers in Philippines, Iran, South Korea and Malaysia. Our new NPCC lines in Shaanxi Province are now running at full utilization and provide us with the capacity we need to fill the growing worldwide demand for NPCC.

With regard to the Company's financial condition, the press release stated, in pertinent part, as follows:

> As of September 30, 2008, ShengdaTech had $132.4 million in cash and cash equivalents, $131.7 million in working capital and $115.0 million in long-term convertible senior notes. Shareholders' equity stood at $123.3 million, up from $89.0 million at year-end 2007. For the first nine months of 2008, the Company generated net cash flow from operating activities of $34.5 million.
>
> During the quarter, the Company invested approximately $30 million, to purchase land use rights and workshops for its new NPCC facility in Zibo, Shandong Province. The Company expects capital expenditures of approximately $26 million over the next 12 months to expand capacity and improve margin, which will be funded from cash on hand and cash flow from operations.

114. On November 13, 2008, ShengdaTech issued a press release announcing that, on November 11, 2008, the Company dismissed Hansen Barnett Maxwell, P.C. as its independent registered public accounting firm and retained KPMG to serve as its independent registered public accounting firm.

115. On April 1, 2009, ShengdaTech filed with the SEC its Form 10-K for 2008, the year ended December 31, 2008 (the "2008 Form 10-K"), which was signed by Defendants X Chen, Guo, Mudd, Saidman and Zhang. With regard to the Company's financial results, for the year, ShengdaTech reported net sales of $149.4 million, including $82.4 million in sales of NPCC products, and net income of $40.0 million. In connection with the 2008 Form 10-K, Defendant KPMG issued its audit report for the year ended December 31, 2008. In its report, Defendant KPMG stated, in pertinent part, as follows:

> In our opinion, because of the effect of the aforementioned material weaknesses on the achievement of the objectives of the control criteria, ShengdaTech, Inc. and subsidiaries have not maintained effective internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

[Emphasis in original.]

Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Guo submitted false and misleading certifications, which were virtually identical to the certifications referenced above at ¶106.

116. On April 2, 2009, ShengdaTech issued a press release announcing its financial results for the fourth quarter and year end of 2008, the period ended December 31, 2008. For the quarter, the Company reported revenues of $31.8 million, and net income from continuing operations of $12.7 million, or $0.11 per diluted share. For the year, ShengdaTech reported revenue of $149.4 million, NPCC revenue of $82.4 million, and net income of $40.0 million, or $0.60 per

diluted share. Defendant X Chen, commenting on the Company's fourth quarter results, stated, in pertinent part, as follows:

> We are excited to report another year of strong financial performance despite the fact that we ceased production at our Bangsheng Chemical facility mid way through the quarter. We continue to generate ever-increasing interest in NPCC from domestic and international companies. We are working closely with our potential customers to develop and test a wide range of applications using NPCC that will improve their products and reduce their production costs.
>
> In 2008, we successfully met our capacity expansion plan to reach 190,000 metric tons of annual NPCC production. All NPCC facilities are currently operating at full capacity as we expand and increase our market penetration. During 2008, we added 47 domestic and international customers, including 12 tire manufacturers, 4 PVC producers, 14 PE producers, 4 in latex and adhesives, 1 ink manufacturer, 9 coating manufacturers, 1 in automobile undercoating paint, and 2 paper manufacturers.

With regard to the Company's financial condition, Defendants stated, in pertinent part, as follows:

> As of December 31, 2008, ShengdaTech had $114.3 million in cash, $112.7 million in working capital and $95.3 million in long-term convertible senior notes. Shareholders' equity stood at $135.8 million, up from $89.0 million at year-end 2007. In 2008, the Company generated net cash flow from operating activities of $38.9 million.
>
> In November 2008, the Company repurchased an aggregate of $19.8 million face value of its 6.0% Convertible Senior Notes due 2018, for consideration of approximately $9.9 million, plus accrued interest in cash. These repurchases reduced the dilution of ShengdaTech's common stock outstanding by nearly 2.0 million shares.

117. The statements referenced above in ¶¶105-106, 108, 110-111, 113, 115-116 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a) that the Company's 2008 SEC filings were inconsistent with the combined AIC filings of ShengdaTech's indirect subsidiaries; specifically, for the period ending December 31, 2008, ShengdaTech reported $82.4 million in net sales and $36.03 million in net income to the SEC in its 10-K, but reported only $9.5 million in net sales and an approximately $2 million net loss to the AIC;

(b) that the Company was falsifying sales figures and sales amounts;

(c) that ShengdaTech's financial statements, during 2008 were not fairly presented in conformity with U.S. GAAP and were materially false and misleading;

(d) that the Company was maintaining, in essence, two sets of financial books, one for the U.S. regulators and investors and one for the Chinese regulators and investors;

(e) that ShengdaTech was exaggerating the size of the Company's customer base;

(f) that the Company's cash accounts were materially overstated because they included CDs, which did not exist;

(g) that ShengdaTech was participating in undisclosed related party transactions;

(h) that ShengdaTech was operating with material deficiencies in the system of internal control over its financial reporting; and

(i) that based on the foregoing, investors were unable to ascertain the true financial condition of the Company.

118. On April 15, 2009, the Company announced that Defendant Guo had resigned from her position as CFO and that the Company's Board of Directors appointed her as COO. Defendant Andrew Chen replaced Defendant Guo as CFO.

119. On May 11, 2009, ShengdaTech filed with the SEC its Form 10-Q for the first quarter of 2009, the period ended March 31, 2009 (the "March 2009 Form 10-Q"), which was signed by Defendants X Chen and Andrew Chen. With regard to the Company's financial controls and procedures, Defendants stated, in pertinent part, as follows:

> (a) Disclosure Controls and Procedures.
>
> The Company carried out an evaluation, under the supervision and with the participation of management, including the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures as of March 31, 2009 pursuant to Exchange Act Rule 13a-15b. ***Based on our evaluation, our Chief Executive Officer and Chief***

> ***Financial Officer have concluded that the Company's disclosure controls and procedures were not effective at March 31, 2009 due to the fact that the material weaknesses in the Company's internal control over financial reporting described in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 have not been remediated as of March 31, 2009, although steps have been taken toward remediation during the first quarter of 2009.***

[Emphasis added.]

Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Andrew Chen submitted false and misleading certifications, which were virtually identical to the certifications referenced above at ¶106.

120. On May 11, 2009, ShengdaTech issued a press release announcing its financial results for the first quarter of 2009, the period ended March 31, 2009. For the quarter, the Company reported revenues of $20.7 million, and net income from continuing operations of $5 million, or $0.08 per diluted share. Defendant X Chen, commenting on the Company's first quarter results, stated, in pertinent part, as follows:

> ***We are pleased to report strong financial performance from our NPCC business during the first quarter of 2009.*** Despite the challenging economic environment in 2008 and early 2009, we continued to experience a high level of demand for our products. Our NPCC products' superior quality, increased purity, and improved functionality have resulted in growing interest from a wide range of industrial companies, particularly for our PE (polyethylene), adhesive and latex applications. While demand for NPCC products used in tires and PVC was affected by the economic slowdown, we have recently seen signs of improvement in those markets as the Chinese economy begins to recover. [Emphasis added.]

With regard to the Company's financial condition, the press release stated, in pertinent part, as follows:

> As of March 31, 2009, ShengdaTech had $114.2 million in cash and $115.1 million in working capital. As of March 31, 2009, shareholders' equity reached $152.5 million, up 3.7% from shareholder's equity of $147.0 million as of December 31, 2008. Please refer to Table 6 for the impact on shareholder's equity as of December 31, 2008 due to the adoption of FSP APB 14-1. In the first quarter of 2009, the Company generated net cash flow from operating activities of $6.9 million.

> In February 2009, the Company repurchased an aggregate of $5.2 million face value of its 6.0% Convertible Senior Notes due 2018, for consideration of approximately $2.5 million, plus accrued interest of $72,144 in cash. The Company is not actively seeking to repurchase additional notes and has no plan for early extinguishment of the notes.

121. On August 10, 2009, ShengdaTech filed a Form 8-K with the SEC and disclosed the following restatements with respect to the Company's statements of cash flows for the six-month and nine-month periods ended June 30, 2008 and September 30, 2008, in pertinent part, as follows:

> In connection with the preparation of the Quarterly Report on Form 10-Q for the six months ended June 30, 2009 of ShengdaTech, Inc. and its subsidiaries (collectively, the "Company"), the Company determined its previously issued unaudited condensed consolidated statements of cash flows for six-month and nine-month periods ended June 30, 2008 and September 30, 2008, respectively, should be restated to correct errors in the classification of cash flows. As a result, we restated the unaudited condensed consolidated statements of cash flows for six months ended June 30, 2008 and reflected such classification errors in the Company's Quarterly Reporting on Form 10-Q for the six months ended June 30, 2009, which is expected to be filed on or about August 10, 2009.
>
> The correction for the six months ended June 30, 2008 includes the following items:
>
> • to decrease cash flows provided by operating activities by $4,457,872,
>
> • to decrease cash flows used in investing activities by $3,701,519, and
>
> • to increase cash flows provided by financing activities by $756,353.
>
> The correction for the nine months ended September 30, 2008 includes the following items:
>
> • to decrease cash flows provided by operating activities by $4,287,695,
>
> • to decrease cash flows used in investing activities by $3,704,417, and
>
> • to increase cash flows provided by financing activities by $583,278.

122. On August 10, 2009, ShengdaTech filed with the SEC its Form 10-Q for the second quarter of 2009, the period ended June 30, 2009 (the "June 2009 Form 10-Q"), which was signed by Defendants X Chen and Andrew Chen. With regard to the Company's financial controls and procedures, Defendants stated, in pertinent part, as follows:

> (a) Disclosure Controls and Procedures.
>
> The Company carried out an evaluation, under the supervision and with the participation of management, including the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of June 30, 2009. ***Based on our evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective at June 30, 2009 due to the fact that the material weaknesses in the Company's internal control over financial reporting described in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 have not been remediated as of June 30, 2009, although steps have been taken toward remediation during the second quarter of 2009.***

[Emphasis added.]

Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Andrew Chen submitted false and misleading certifications, which were virtually identical to the certifications referenced above at ¶106.

123. On August 10, 2009, ShengdaTech issued a press release announcing its financial results for the second quarter of 2009, the period ended June 30, 2009. For the quarter, the Company reported revenues of $26 million, and net income from continuing operations of $6.5 million, or $0.12 per diluted share. Defendant X Chen, commenting on the Company's second quarter results, stated, in pertinent part, as follows:

> ***We are pleased to report strong revenue growth and high profitability from our NPCC business in the second quarter of 2009.*** During the quarter, the Chinese economy showed signs of recovery with positive growth recorded by both the automobile and construction industries, which have begun responding to the Chinese government's RMB 4 trillion ($586 billion) stimulus policy. ***We experienced strong demand for our NPCC products, especially from our tire and PVC customers***, who combined accounted for 65.6% of NPCC revenue during the quarter . . . [i]n addition, we are pleased to announce that our Zibo NPCC production facility is on schedule to commence production at the end of the month and will begin to ship products to the customers in early September.

[Emphasis added.]

With regard to the Company's financial condition, the press release stated, in pertinent part, as follows:

> As of June 30, 2009, ShengdaTech had $111.0 million in cash and $112.2 million in working capital. As of June 30, 2009, shareholders' equity was $159.1 million, up 8.2% from shareholder's equity of $147.0 million as of December 31, 2008. For the first six months of 2009, the Company generated net cash flow from operating activities of $14.9 million.

124. On November 9, 2009, ShengdaTech filed with the SEC its Form 10-Q for the quarter ended September 30, 2009 (the "September 2009 Form 10-Q"), which was signed by Defendants X Chen and Andrew Chen. With regard to the Company's financial controls and procedures, Defendants stated, in pertinent part, as follows:

> (a) Disclosure Controls and Procedures.
>
> The Company carried out an evaluation, under the supervision and with the participation of management, including the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of September 30, 2009. ***Based on our evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective at September 30, 2009 due to the fact that the material weaknesses in the Company's internal control over financial reporting described in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 have not been remediated as of September 30, 2009, although steps have been taken toward remediation during the third quarter of 2009.***
>
> (b) Changes in internal control over financial reporting.
>
> There was no change in our internal control over financial reporting that occurred in the third quarter of 2009 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added.]

Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Andrew Chen submitted false and misleading certifications, which were virtually identical to the certifications referenced above at ¶106.

125. On November 9, 2009, ShengdaTech issued a press release announcing its financial results for the third quarter of 2009, the period ended September 30, 2009. For the quarter, the Company reported revenues of $25.4 million, and net income from continuing operations of $4.6 million, or $0.09 per diluted share. Defendant X Chen, commenting on the Company's third quarter results, stated, in pertinent part, as follows:

> The third quarter of 2009 marked an important period for ShengdaTech, as we successfully implemented our NPCC expansion strategy with the acquisition of Chaodong in Anhui Province. We also began shipping first production products to customers from our newly built NPCC facility in Zibo. ***During the quarter, we expanded our domestic NPCC customer base with 19 new customers, including seven new polyethylene (PE) manufacturers, six adhesive manufacturers, five tire manufacturers, and one PVC manufacturer.*** Our new NPCC lines in Zibo have ramped up quickly to meet the growing market demand for our products and are on track to reach 80% capacity utilization by year end, and 100% of the plant's 60,000-metric-ton capacity early next year.

[Emphasis added.]

With regard to the Company's financial condition, the press release stated, in pertinent part, as follows:

> As of September 30, 2009, ShengdaTech had $105.5 million in cash and $109.3 million in working capital. As of September 30, 2009, shareholders' equity was $163.9 million, up 11.5% from shareholder's equity of $147.0 million as of December 31, 2008. For the first nine months of 2009, the Company generated net cash flow from operating activities of $17.6 million.

126. On March 15, 2010, ShengdaTech filed with the SEC its Form 10-K for 2009, the year ended December 31, 2009 (the "2009 Form 10-K"), which was signed by Defendants X Chen, Guo, Mudd, Saidman and Zhang. For the year, ShengdaTech reported net sales of $102.1 million and net income of $23.1 million. With regard to the Company's financial controls and procedures, Defendants stated, in pertinent part, as follows:

> (a) Disclosure Controls and Procedures.
>
> Disclosure controls and procedures (as defined in Rules 13a – 15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) are

designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. This information is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. Our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. Based on the evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 31, 2009.

(b) Management's report on internal control over financial reporting.

Internal control over financial reporting (as defined in Rules 13a - 15(f) and 15d-15(f) under the Exchange Act) is a process that is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles, and includes those policies and procedures that:

- Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the Company,

- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures are being made only in accordance with authorizations of management and the board of directors of the Company, and

- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

Based on our evaluation of internal control over financial reporting as of December 31, 2009, management has determined that our internal control over financial reporting was effective. We acquired Chaodong in December 2009, and management excluded from its assessment of the effectiveness of our internal control over financial reporting as of December 31, 2009. Chaodong's internal control over financial reporting associated with total assets of $4,593,970 and nil revenue, which was included in the consolidated financial statements of the Company. We also did not assess the effectiveness of the internal control over financial reporting of

Chaodong. The Company's evaluation of the effectiveness of our internal control over financial reporting is based on the criteria established in COSO's Internal Control – Integrated Framework.

Our independent registered public accounting firm, KPMG has audited the effectiveness of the Company's internal control over financial reporting as of December 31, 2009, as stated in their report, which appears below.

(c) Changes in internal control over financial reporting.

As previously reported under "Item 4 – Controls and Procedures" in our quarterly report on Form 10-Q for the quarter ended September 30, 2009, management concluded that our internal control over financial reporting was not effective based on the material weaknesses identified in the Company's internal control over financial reporting described in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2008. Management has continued to work on remediation efforts since the filing of that report.

During the quarter ended December 31, 2009, changes in our internal control over financial reporting occurred related to the two previously reported material weaknesses as follows:

- Management had concluded that for non-routine transactions and related disclosures, we did not maintain adequate policies and procedures and lacked personnel possessing adequate technical accounting expertise to ensure that those transactions are properly accounted for and disclosed in our consolidated financial statements. As of December 31, 2009, management has concluded that the severity of this previously reported material weakness has been sufficiently reduced and remediated such that the previously reported material weakness is no longer a material weakness. We have designed adequate policies and procedures and hired and trained enough technically-qualified personnel to properly account for and disclose non-routine transactions. In addition, as part of the 2009 period-end financial closing procedures, management utilized a monthly monitoring process. Based on these reviews, which are part of the control process, non-routine transactions and related disclosure controls are deemed to be operating effectively.

- Management had concluded that we did not design and maintain effective policies and procedures to ensure adequate maintenance of tax records, timely reconciliation of income tax accounts and adequate analysis and review of deferred tax calculations. As a result, we did not maintain effective internal control over the accounting for income taxes and related financial statement disclosures. As of December 31, 2009, management has concluded that the severity of this previously reported material weakness has been sufficiently reduced and remediated such that the previously reported material weakness is no longer a material weakness. We have designed policies and procedures to ensure the maintenance of tax records, timely reconciliation of income tax accounts and adequate analysis and review of deferred tax calculations and hired qualified third party specialists to perform these

> procedures. In addition, as part of the 2009 period-end financial closing procedures, management utilized a monthly monitoring process. Based on these reviews, which are part of the control process, tax records, timely reconciliation of income tax accounts and adequate analysis and review of deferred tax calculations and related disclosure controls are deemed to be operating effectively.

Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Andrew Chen submitted false and misleading certifications, which were virtually identical to the certifications referenced above at ¶106.

127. In connection with the 2009 Form 10-K, Defendant KPMG issued its audit report for the year ended December 31, 2009. Unlike its report for 2008, KPMG found no material weaknesses in ShengdaTech's internal controls. In its report, Defendant KPMG stated, in pertinent part, as follows:

> In our opinion, ShengdaTech, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in Internal Control—Integrated Framework issued by COSO.

128. On March 16, 2010, ShengdaTech issued a press release announcing its financial results for the fourth quarter and year end of 2009, the period ended December 31, 2009. For the quarter, the Company reported revenues of $30.1 million and net income from continuing operations of $6.7 million, or $0.12 per diluted share. For the year, the Company reported revenues of $102.1 million and net income of $23.1 million. Defendant X Chen, commenting on the Company's year end results, stated, in pertinent part, as follows:

> Our NPCC products are rapidly penetrating deeper into our existing end-market industries and expanding into new markets resulting in strong demand and increasing sales volumes. To meet this growing demand, phase I of our new Zibo NPCC Facility quickly ramped up to 100% utilization rate in January 2010. Currently, our NPCC operations are producing at full capacity of 250,000 MT per annum. During 2009, we added 57 new domestic customers, including 21 PE producers, 13 tire manufacturers, 12 PVC producers, and 11 adhesive manufacturers. Unfortunately, we also lost a number of customers who fell victim to prevailing world-wide economic conditions and simply were unable to continue their operations. However, our net gain of 17 customers easily offset the lost tonnage from our troubled former customers. We believe that our net gains will accelerate as global economic

> conditions improve. Just as we have done in previous years, we plan to sell out our total production capacity in 2010.

With regard to the Company's financial condition, the press release stated, in pertinent part, as follows:

> As of December 31, 2009, ShengdaTech had $116.0 million in cash, $116.3 million in working capital and $79.3 million in long-term convertible notes. Shareholders equity was $170.6 million, up from $147.0 million at year end 2008. In 2009, the Company generated net cash flow from continuing operations of $28.0 million.

129. Following the Company's 2009 fourth quarter and year end earnings announcement, Defendants held a conference call with analysts and investors, wherein Defendants made positive statements about the Company and its prospects, including, but not limited to, its revenues, income, growth drivers and operations. In that regard, Defendants X Chen and Andrew Chen stated, in pertinent part, as follows:

> Defendant X Chen: I am very pleased to announce that ShengdaTech exceeded our planned financial growth in 2009, reflecting strong demand for our products, successful execution of our aggressive capacity expansion strategy and our progress in achieving greater penetration in our end-user markets. We are proud of the recognition we have received during the year, including the 2008 China Frost & Sullivan Award for Growth Excellence and being named on the Forbes Magazine's fifth annual list of Asia's "200 Best under a Billion" for the year 2009. Both [these] awards acknowledge our commitment to excellence, and recognize our continued revenue and profit growth, as well as ShengdaTech's ability to manage a progressive and highly successful enterprise. Now Mr. Crocker Coulson will discuss some additional remarks on our operations on my behalf.

* * *

> [Crocker Coulson on behalf of Defendant X Chen]: Revenue for the full-year 2009 increased 23.9% to $102 million compared to $82.4 million in 2008. Net income from continuing operations in 2009 was $23.6 million with diluted earnings per share of $0.43. I'm very pleased to announce that even through the global downturn, thanks to faster than anticipated improvement in market conditions for NPCC products with high margin, combined with our ability to maintain our selling prices, we exceeded our revenue and EPS guidance for the full year of 2009.
>
> Now I'd like to move on to discussing our fourth-quarter results. We closed the year with strong revenue growth generating $30.1 million in revenue, up 23.3% year-over-year, and with gross profit of $11.9 million, up 19.4% year-over-year, with a

gross margin of 39.8%. Our double-digit top-line growth was the result of continued market demand for our NPCC products in our existing end markets which contributed to a higher sales volume.

* * *

During the quarter we were very excited to announce that we've added 25 new domestic customers, including seven PVC producers, seven adhesive and latex manufacturers, six tire manufacturers and five polyethylene producers. In comparison to the third quarter of 2009, revenue increased 18.4% as a result of higher sales volume, while selling prices remained relatively unchanged. This was mainly due to the positive impact from a strengthening economic environment in

China, and the additional capacity at Zibo, which allowed us to meet the incremental needs of both new and existing customers.

* * *

Our NPCC application for polyethylene, or PE, was our largest end market during the quarter, accounting for 32.4% of the quarter's revenue; a significant increase from only 7.8% in the same period last year.

* * *

Our NPCC tire application has a very compelling value proposition, as its use in tire manufacturing is capable of delivering 10% to 20% overall improvement in performance, as measured by increased traction, wave resistance, tear resistance, tensile strength and aging resistance. And reduces tire manufacturing costs by about $20 to $30 per metric ton. We remain very positive about our presence in the vertical market and are the largest NPCC supplier in China's tire industry, with current penetration of approximately 26% of market demand. We now supply NPCC to three of China's top tire manufacturers. Based on industry research, the market for NPCC for use in tire manufacturing in China is expected to grow from 557 million tires in 2007 to 1 billion tires by 2012. As anticipated, due to the global downturn, sales to the PVC industry declined 16.5% on a year-over-year basis. Our target prospects for this application have narrowed.

* * *

We have a very strong pipeline of new customers. We're currently working with 76 prospective customers, including 59 domestic customers, of which 42 are in the testing phase, and 17 international customers, all of whom are in the testing phase.

* * *

Defendant Andrew Chen: First, let's go to our quarterly results. Revenue increased to $30.1 million; up 23.3% from $24.4 million in the fourth quarter of 2008. Total volume of NPCC sold during fourth quarter of 2009 was up 26.5%, to 62,146 metric

> tons, from 49,143 metric tons in the fourth quarter of 2008. The average selling price of NPCC products declined 2.6% to $484 per metric ton from $497 per metric ton in the fourth quarter of 2008, caused primarily by changes in product mix. NPCC for use in PE, tires and PVC represented the majority of NPCC sales, at 32.4%, 26.7% and 20.6% of total NPCC revenue respectively. NPCC use in adhesives and latex increased to 14.4% of total NPCC revenue, compared to 9.4% of total revenue in the fourth quarter of 2008. NPCC use in paper, oil, ink, paint and automobile undercoating paint combined to generate 5.9% of NPCC revenue. Our gross profit for fourth quarter of 2009 was $11.9 million, up 19.4%, from $10 million in the fourth-quarter 2008. Total gross margin was 39.8%, compared with 41.1% during the fourth quarter of 2008.
>
> * * *
>
> Operating income for the fourth quarter of 2009 was $9.6 million, up 17.8%, from $8.1 million in the same period a year ago.
>
> * * *
>
> Net income from continuing operations in the fourth quarter of 2009 was $6.7 million, down 31.8% from $9.9 million in the same period last year. Which included $5.5 million in gain, as a result of repurchasing of senior notes during the quarter.
>
> * * *
>
> As of December 31, 2009, ShengdaTech had $116 million in cash, and $116.3 million in working capital, and $79.3 million in long term convertible senior notes. Shareholders' equity was $170.6 million, up from $147 million at year-end 2008. In 2009, we generated net cash flow from operating activities of $28 million. We're confident in our ability to generate positive cash flows from our business operations. Such ability, when combined with our strong cash position, will sufficiently support our planned business expansion in 2010.
>
> * * *
>
> Our positive outlook is based on our proprietary production technology, strong capability in new applications development, the well-established value proposition for NPCC, positive growth outlook of NPCC business sector, and most importantly, our highly experienced management team. We have a strong pipeline of new applications for NPCC products, and a well-qualified research team to ensure successful execution, accelerating our growth in the coming years.

130. The statements referenced above in ¶¶119-129 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a) that the Company's 2009 SEC filings were inconsistent with the combined AIC filings of ShengdaTech's indirect subsidiaries; specifically, for the period ending December 31, 2009, the Company reported net sales of $102.1 million and net income of $23.1 million as compared to net income of $6.07 million and a net loss of $6.2 million with the AIC;

(b) that the Company was falsifying sales figures and sales amounts;

(c) that ShengdaTech's financial statements, during 2009 were not fairly presented in conformity with U.S. GAAP and were materially false and misleading;

(d) that the Company was maintaining, in essence, two sets of financial books, one for the U.S. regulators and investors and one for the Chinese regulators and investors;

(e) that ShengdaTech was exaggerating the size of the Company's customer base;

(f) that the Company's cash accounts were materially overstated because they included CDs, which did not exist;

(g) that ShengdaTech was participating in undisclosed related party transactions;

(h) that ShengdaTech was operating with material deficiencies in the system of internal control over its financial reporting; and

(i) that based on the foregoing, investors were unable to ascertain the true financial condition of the Company.

131. On May 10, 2010, ShengdaTech filed with the SEC its Form 10-Q for the first quarter of 2010, the period ended March 31, 2010 (the "March 2010 Form 10-Q"), which was signed by Defendants X Chen and Andrew Chen. With regard to the Company's financial controls and procedures, Defendants stated, in pertinent part, as follows:

> (a) Disclosure Controls and Procedures.
>
> Disclosure controls and procedures (as defined in Rules 13a – 15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act")) are designed to ensure that information required to be disclosed in our reports filed under

> the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. This information is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. ***Our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. Based on the evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of March 31, 2010.***
>
> (b) Changes in internal control over financial reporting.
>
> There was no change in our internal control over financial reporting that occurred in the first quarter of 2010 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added.]

132. Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Andrew Chen submitted false and misleading certifications, which were virtually identical to the certifications referenced above at ¶106.

133. On May 11, 2010, ShengdaTech issued a press release announcing its financial results for the first quarter of 2010, the period ended March 31, 2010. For the quarter, the Company reported revenue from continuing operations of $30.2 million and net income from continuing operations of $6.7 million, or $0.12 per diluted share. Defendant X Chen, commenting on the Company's first quarter results, stated, in pertinent part, as follows:

> We are delighted to report another strong record-breaking quarter for our NPCC business evidenced by robust top-line growth coupled with improved margins. Our investments in R&D and end-market development continue to bear fruit, as we shift our product mix to more value-added NPCC applications to meet the rising demand from high-end-product markets, where we can justify greater pricing flexibility and realize sustainable growth potential.
>
> As a nano-technology leader in the specialty chemical sector in China, we remain proactive in new-product development and in expanding our application base. Our engineers work closely with our customers to design solutions for them to enhance their product functionalities and reliabilities and to lower their costs as well. This is the value proposition that has successfully set us apart from other product offerings in this space. By extending our record of complete customer satisfaction into many

> more manufacturing sectors, we expect rapidly growing opportunities in our addressable markets for NPCC.

With regard to the Company's financial condition, the press release stated, in pertinent part, as follows:

> As of March 31, 2010, the Company had cash of $117.3 million, compared with $116.0 million as of December 31, 2009. Days Sales Outstanding (DSO), a measure of receivables collection, for the first quarter was 61 days as compared to 60 days in the fourth quarter of 2009. We exclude cash sales in our calculation of accounts receivable turnover days. As of the end March 2010, there were no overdue accounts receivables. Total shareholders' equity rose to $177.3 million at March 31, 2010, from $170.6 million at December 31, 2009.

134. Following the 2010 first quarter announcement, Defendants held a conference call with analysts and investors, wherein Defendants made positive statements about the Company and its prospects, including, but not limited to, its revenues, expenses, income, margins, markets, growth, orders, average selling prices, and customers. In that regard, Defendants X Chen and Andrew Chen stated, in pertinent part, as follows:

> Defendant X Chen: We are very pleased to report to our shareholders that with the recovery of the global economy, our Company's sales grew strongly, coupled with significant profits. Under the joint efforts of management and employees, the increase of our NPCC segment has reached a new record high.
>
> * * *
>
> As a nanotechnology leader, we will continue to focus on new product development and on meeting the demands of our customers. Our advantages in raw material resources, low labor cost, the world leading technology of membrane dispersion and strong R&D team are all our natural resources and advantages in China, which are incomparable by other competitors in the world.
>
> Currently, we are receiving returns on our investment in the development of new products. In 2010, on the base of existing overseas returnees and other domestic excellent researchers, we will continue to strengthen the R&D force to make the number of the R&D team reach hundreds of professionals. We will continuously focus on developing new value add products, not only in applications of adhesives, rubber, plastic, paint, oil paint, paper, road way, etc., but also in the exploratory applications of food, cosmetics, electronics, electricity and others.

Meanwhile, we will expand our production capacity, explore and occupy new markets, and make customer made solutions to meet there specific requirements so as to attract new customers, gain more market share by technology, and generate rich rewards by product quality. Time has shown that we are confident in continuously renewing our records and increasing our shareholder value.

* * *

Defendant Andrew Chen: Revenues from continuing operations in the 2010 first quarter increased 46.2% to $30.2m from $20.7m in the first quarter of 2009. The revenue increase was due primarily to the Company's expanded production capacity to meet the growing market demand, as well as an increase in the average selling price. During our first quarter of 2010, sales volume was 62,313 metric tons, an increase of 19,344 metric tons from the first quarter of 2009, resulting from the production capacity added to the Zibo Facility. In addition, the average selling price for our products was $485 per metric ton, an increase of $4 per metric ton from the average selling price of $481 per metric ton in the first quarter last year. The increase in average selling price was mainly due to changes in our pricing strategy, in our product mix, based on market demands.

For the first quarter of 2010, sales for PE and latex applications increased by 18,365 and 5,296 metric tons respectively, compared to the same quarter of 2009 due to increased sales in these applications to existing customers, as well as new customers' orders. Sales for tires, PVC, paper, and ink applications decreased by 820 metric tons, 2,014 metric tons, 338 metric tons, and 1,389 metric tons respectively, due primarily to specific customers' needs and demand and timing of their purchases. Gross profit increased 49.6% to $12.7m from $8.5m in the same period of 2009. Gross margin for the quarter was 42% as compared with 41.1% in the same quarter of 2009. The improved gross margin was mainly attributable to a greater number of tons sold and a higher average selling price as more value added products, commanding justifiable higher prices, were shipped during this quarter. Selling, general and administrative expenses amounted to $2m, an increase of $0.4m from $1.6m in the first quarter of 2009. As a percentage of total revenues, SG&A expenses decreased to 6.6% for the first quarter of 2010, from 7.6% in the first quarter of 2009.

* * *

Operating income for the first quarter of 2010 was $10.7m, up 55% from $6.9m in the first quarter a year ago. Operating margin rose to 35.4%, compared with 33.4% in the first quarter of 2009. The increase in operating income and operating margin in the first quarter of 2010 was mainly due to higher sales, gross profit, and gross margin compared to the first quarter of 2009.

* * *

Net income from continuing operations in the first quarter of 2010 was $6.7m, reflecting a 25.2% year over year increase from $5.4m in the same period last year.

> Fully diluted earnings per share from continuing operations for the first quarter of 2010 were $0.12, compared with fully diluted earnings from continuing operations per share of $0.09 in the same quarter of 2009. Fully diluted weighted average share outstanding were 54,207,633 in the first quarter of 2010, down from 67,432,169 in the same quarter last year, primarily due to the fact that a number of potential common shares related to the Company's convertible debt were anti-dilutive during the first quarter of 2010 and therefore were excluded from the diluted earnings per share calculation.
>
> As of March 31, 2010, the Company had cash balance of $117.3m compared with $116m at the end of March 2009. Days sales outstanding, DSO, a measure of receivable collection activity, for the first quarter was 61 days, as compared to 60 days in the fourth quarter of 2009. We exclude cash sales in our calculation of accounts receivable turnover in days. As of the end of March 2010, there was no overdue accounts receivable.
>
> Total shareholders' equity rose to $177.3m at March 31, 2010 from $170.6m at December 31, 2009. Net cash flow provided by operating activities for the first quarter of 2010 increased to $12m from $7.3m for the same quarter of 2009, mainly due to the increased sales revenue, as well as improved cash management.

135. On June 15, 2010, ShengdaTech filed with the SEC a Form S-3 registration statement (the "Registration Statement") to register $150,000,000 of ShengdaTech common stock, debt securities, warrants and units.

136. On August 9, 2010, ShengdaTech filed with the SEC its Form 10-Q for the second quarter of 2010, the period ended June 30, 2010 (the "June 2010 Form 10-Q"), which was signed by Defendants X Chen and Andrew Chen. With regard to the Company's financial controls and procedures, Defendants stated, in pertinent part, as follows:

> (a) Disclosure Controls and Procedures.
>
> Disclosure controls and procedures (as defined in Rules 13a – 15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act")) are designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. This information is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. Our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure

> controls and procedures as of the end of the period covered by this report. ***Based on the evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of June 30, 2010.***
>
> (b) Changes in internal control over financial reporting.
>
> There was no change in our internal control over financial reporting that occurred in the second quarter of 2010 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added.]

137. Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Andrew Chen submitted false and misleading certifications, which were virtually identical to the certifications referenced above at ¶106.

138. On August 10, 2010, ShengdaTech issued a press release announcing its financial results for the second quarter of 2010, the period ended June 30, 2010. For the quarter, the Company reported revenue from continuing operations of $33.2 million, a 28% increase over the prior year period, and net income from continuing operations of $7.1 million, or $0.13 per diluted share. Defendant X Chen, commenting on the Company's second quarter results, stated, in pertinent part, as follows:

> Our growth continued in the second quarter of 2010 as our enhanced R&D efforts have created much higher value-added products, which are generating robust sales. Our solid financial performance also comes from the economies-of-scale contributed by our increases in production capacity. We will continue to target the high-end markets and industries ideal for our nano-technology applications.
>
> We believe that with our increased production capacity and on-going acquisition of limestone mining rights, along with our strong R&D support, we are well-positioned to achieve high gross margins. We remain confident in the industry's growth prospects and we are well positioned to sustain our demonstrated leadership and record of success in this sector.

With regard to the Company's financial condition, the press release stated, in pertinent part, as follows:

> As of June 30, 2010, the Company had cash of $110.6 million, compared with $116.0 million at the end of December 2009. The Company's cash position at June 30, 2010 exceeds total liabilities. Days Sales Outstanding (DSO), a measure of

receivables collection activity, were 60 days in the six months ended June 30, 2010 and 53 days in six months ended December 31, 2009. As of the end of June 2010, there was no overdue accounts receivable. Total shareholders' equity rose to $185.3 million at June 30, 2010, from $170.6 million at December 31, 2009.

Net cash flow provided by operating activities increased to $20.4 million during the six months ended June 30, 2010, from $15.1 million for the same period of 2009, primarily due to the increased sales. The Company continued to invest in expanding its capacity in the second quarter of 2010. It spent a total of almost $26.0 million, of which $3.8 million was the payment for the Company's December 2009 acquisition of Anhui facility, $16.2 million was for additional land use rights for the Anhui Facility, and the remainder was for the purchase of plant and equipment and mining rights.

Mr. Andrew Chen, the Company's Chief Financial Officer, commented, "As our superior product line, with our patent-protected membrane-dispersion technology, enables us to gain market penetration and strengthen pricing power, we continue to exercise prudent cash management and focus on cash-flow generation. With our leading position in the industry, notable financial accomplishments, outstanding business growth, and a track record of effective execution of our comprehensive strategic plan, we believe we will continue to deliver increasing value to our shareholders and the investment community."

139. Following the 2010 second quarter announcement, Defendants held a conference call with analysts and investors, wherein Defendants made positive statements about the Company and its prospects, including, but not limited to, its revenues, expenses, income, margins, markets, growth, average selling prices, and customers. In that regard, Defendants X Chen and Andrew Chen, stated, in pertinent part, as follows:

Defendant X Chen: Good morning, everyone. Welcome to our second-quarter conference call. We are very pleased to report to our shareholders that our Company sales continued to grow strongly, with significant profits for the period ended June 30, 2010. The market demand for our NCC -- I'm sorry, NPCC products is much higher since, not only can we reduce the production costs and improve the quality of the end products for customers, but also, as functional materials, we can provide better advantages for the products of customers to help gain more market share with higher profits. Therefore, the overall market demand continues to grow fast for NPCC in China.

* * *

In 2009 we were ranked number one in NPCC sales in China, with a gross margin that is nearly double the industry standard, due to our higher-valued products

justifying higher prices. ShengdaTech expects to continue to be the largest manufacturer of NPCC in China for 2010 and beyond. Currently we already have products in a number of different industries, such as Tire and Rubber, Paint, Paper, Latex, Polypropylene, Polyethylene, PVC, Ink, Plastics, Automobile Undercoating, Adhesives and Sealants, where our products are currently proving their value. In order to achieve these savings and performance goals, and to attract more customers, we will continue to design and tailor each NPCC product for each specific application.

* * *

Simply put, our unwavering goal is to make ShengdaTech's R&D the best NPCC research center in the world, allowing us to produce the best products. We have continued to move forward with our capacity expansion program to meet the market demand for 2010 and beyond.

* * *

We will also continue to build our R&D capabilities to develop more value-added products. And we will further strengthen our international marketing and sales team for the future. By the end of June 2010 our international sales and marketing force had increased to 20, from four at the end of 2009. Besides the focus on domestic markets, we shall also continue to invest in international marketing and operations. It is estimated by Frost & Sullivan, a global research firm, that of the 1,875,000 metric tons of NPCC demand, 1,143,000 metric tons are beyond China, which indicates that ShengdaTech has great opportunities. We expect to see better performance by the end of 2010 or the first quarter of 2011, and will establish ourselves in the large, global international market.

* * *

Defendant Andrew Chen: As key highlights in our filing, we are reporting that in the second quarter of 2010 we continued our sales growth in both volume and average selling price compared with a year ago in the same quarter. This increase reflects both continuing strong demand for our NPCC products, and that customers are willing to pay higher prices for products that lower their cost and provide greater end-user product performance.

* * *

Net revenues from continuing operations in the second quarter of 2010 increased by 27.7%, to $33.2m, from $26m in the second quarter of 2009. The net revenue increase is a result of expanded production capacity to meet the growing market demand, as well as an increase in average selling price. For the three months ended June 30, 2010, sales increased by $7.2m compared to the same period last year. The increase was mainly due to a rise in sales volumes of 14,067 metric tons, resulting in a $6.8m sales gain from the increased production of the Zibo, Shandong facility and the modest production from the mid-quarter startup of the Anhui facility.

* * *

For the three months ended June 30, 2010 sales of polyethylene, or PE, and Latex applications increased by 15,810 and 5,234 metric tons respectively, compared to the three months ended June 30, 2009. Sales of Paint and Automobile Undercoating applications remained stable compared to the three months ended June 30, 2009. Sales for Tires, PVC, Paper and Ink applications for the three months ended June 30, 2010 decreased by 3,881, 1,280, 268, and 1,852 metric tons respectively, primarily due to specific customers' needs and demands, and timing of their purchases. In addition, our sales process has adopted a strict customer screening program that evaluates customer credit and payment capacity as qualification criteria. As a result, certain customers were filtered out, particularly in these application areas. We believe that this process will be an effective means to qualify current and future customers, and will help in identifying credit-worthy customers with higher-end applications. Gross profit increased 19.7%, to $13.6m, from $11.4m in the same period of 2009.

* * *

Turning into our six months' result from continuing operations, total revenue for the first six months of 2010 increased by 35.9% year over year, to $63.5m, from $46.7m in the first six months last year. Gross profit for the first six months of 2010 was $26.3m, up 32.5% from the gross profit of $19.9m in the same period last year. Gross margin was 41.5% for the first six months of 2010. Income from operations was $22.2m, up 35.4%, from $16.4m in the first six months of 2009. And the operating margin for the first six months of 2010 was 34.9%, in line with the same period of 2009. Net income from continuing operations for the first nine (sic -- see press release) months of 2010 was $13.8m, with diluted earnings per share of $0.25. Turning into our financial section, as of June 30, 2010 the Company had cash of $110.6m, compared with $116m at the end of December 2009. The Company's cash position at June 30, 2010 exceeds total liabilities.

* * *

Total shareholders' equity rose to $185.3m at June 30, 2010, from $170.6m at December 31, 2009. Net cash flow provided by operating activities increased to $20.4m during the first -- the six months ended June 30, 2010, from $15.1m for the same period of 2009, primarily due to the increased sales.

* * *

Our superior product line, with our patent-protected membrane dispersion technology, enables us to gain market penetration and strengthen our pricing power. We continue to exercise prudent cash management and focus on cash flow generation. With our leading position in the industry, notable financial accomplishments and record of outstanding business growth, we believe that our stock is undervalued. Nonetheless, we will continue to produce superior financial

performance while growing our business with the effective execution of our comprehensive strategic plan. By doing so, we hope to demonstrate our true value to our shareholders and the investment community. We remain confident that we will stay on track and produce financial results consistent with our guidance expectations. The Company therefore maintains its 2010 guidance on revenue and net income from continuing operations, to be in the range of $123m to $126m, and $25m to $27m, respectively.

Your support is appreciated. And we believe ShengdaTech has never been better positioned to build on its already successful operations, while increasing our value to our shareholders.

140. On October 1, 2010, ShengdaTech filed a Form 8-K with the SEC disclosing that on September 30, 2010, Defendant Andrew Chen resigned as the Company's CFO "for personal reasons" and that the Company's Board of Directors appointed Defendant Guo, COO, to serve as acting CFO until such time that ShengdaTech hired a new CFO.

141. On November 8, 2010, ShengdaTech filed with the SEC its Form 10-Q for the third quarter of 2010, the period ended September 30, 2010 (the "September 2010 Form 10-Q"), which was signed by Defendants X Chen and Guo. With regard to the Company's financial controls and procedures, Defendants stated, in pertinent part, as follows:

(a) Disclosure Controls and Procedures.

Disclosure controls and procedures (as defined in Rules 13a – 15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) are designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. This information is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. Our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. ***Based on the evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of September 30, 2010.***

> (b) Changes in internal control over financial reporting.
>
> There was no change in our internal control over financial reporting that occurred in the third quarter of 2010 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added.]

Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Guo submitted false and misleading certifications, which were virtually identical to the certifications referenced above at ¶106.

142. On November 8, 2010, ShengdaTech issued a press release announcing its financial results for the third quarter of 2010, the period ended September 30, 2010. For the quarter, the Company reported revenue from continuing operations of $34.4 million, a 36% increase over the prior year period, and net income from continuing operations of $7.0 million, or $0.13 per diluted share. Defendant X Chen, commenting on the Company's first quarter results, stated, in pertinent part, as follows:

> Our strong revenue and net income growth in the third quarter of 2010 was led by continued capacity expansion fueled by growth in customer demand. Demand for our NPCC products continues to rise as we further penetrate our existing end-markets and expand into new markets. We are aggressively ramping up capacity utilization at our new NPCC facility in Anhui Province and are in advanced negotiations with prospective customers in this high-potential, prospect-rich economic region.
>
> One of our leading competitive advantages in the NPCC market is our ability to introduce new, value-added product applications for NPCC. For example, in the third quarter of 2010, we recognized our first sales of our new NPCC application for asphalt and expect orders to accelerate in the coming months. We plan to patent protect this application to capitalize on this market opportunity and reap maximum benefits from our intensive and extensive research efforts.

With regard to the Company's financial condition, the press release stated, in pertinent part, as follows:

> As of September 30, 2010, the Company had cash of $120.6 million, compared with $116.0 million at the end of December 2009. The Company's cash position at September 30, 2010 exceeds total liabilities. The Company has a credit policy extending 30 to 90 day credit terms to customers who meet its credit evaluation criteria. It reported accounts receivables of $6.1 million as of September 30, 2010, as

compared to $4.6 million as of December 31, 2009. Days Sales Outstanding ("DSO"), a measure of receivables collection effectiveness were 60 days in the nine months ended September 30, 2010. As of September 30, 2010, there was no overdue accounts receivable. Total shareholders' equity rose to $196.4 million at September 30, 2010, from $170.6 million at December 31, 2009.

Net cash flow provided by operating activities increased to $31.4 million during the nine months ended September 30, 2010, up from $17.7 million for the same period of 2009, primarily due to the effective collection of accounts receivable and less income tax payments made because of a difference in the timing of payments during the nine months period ended September 30, 2010 as compared to the same period last year. The Company continued to invest in expanding capacity in the third quarter of 2010. For the nine months ended September 30, 2010, it spent approximately $28.4 million, of which $3.8 million was for the payment for the Company's December 2009 acquisition of the Anhui facility, $14.7 million for additional land use rights for the Anhui facility, $9.4 million for the purchase of equipment and the construction for Phase II production lines of the Zibo facility, and the remainder $0.5 million for the purchase of equipment and plant reconstruction for the Anhui facility.

Mr. Chen concluded, "We believe we can continue to run our operations efficiently and reinvest our operating cash flow in our business. We are confident that our products, customer relationships, expanded international sales force, innovative new applications and aggressive capacity expansion plans will allow us to continue our penetration into new markets and capture greater market share of the rapidly growing NPCC market. When combining our notable achievements to date with the progressive strategic plans in place, we believe that the management team is well positioned to continue our record of highly favorable financial performance for years to come."

143. Following the 2010 third quarter announcement, Defendants held a conference call with analysts and investors, wherein Defendants made positive statements about the Company and its prospects, including, but not limited to, its revenues, expenses, income, margins, markets, growth, average selling prices, and customers. In that regard, Defendant X Chen stated, in pertinent part, as follows:

Defendant X Chen: I'm pleased again to report that in the third quarter our revenue and net income continued to activate strong growth as we made significant progress to advance our NPCC business, while building momentum by increasing capacity utilization at our new Anhui facility, reaching success in delivering initial sales of our new NPCC applications for asphalt, and in strengthening our international sales and marketing department. I'm proud to report that ShengdaTech achieved robust results in the quarter, highlighted by net sales from continuing operations growing

35.6% to $34.4m, and the net income from continuing operations increasing 45.3% to $7m.

* * *

[Crocker Coulson on behalf of Defendant X Chen]: To begin with, I'd like to highlight that we continued to achieve record NPCC revenues with each progressing quarter, reflecting the robust market demand for our products. ShengdaTech continues to make measurable progress in successfully executing our plans to aggressively expand our capacity, accelerate research and development efforts, and provide world-class sales and technical service. During the third quarter net sales increased by $9m compared to the same period last year, primarily due to a rise in sales volume of 17,675 metric tons to reach 70,164 metric tons, up from 52,489 metric tons in the prior year period. Our strong sales volume growth resulted mainly from the increased production capacity at our Zibo facility and to a smaller extent the start-up tonnage in the new Anhui facility. Sales of plastics, adhesive and rubber applications increased by S6.9m, S2.4m and S0.6m respectively, as compared to the year ago period. Sales of our paint, ink and paper applications declined by $0.8m due to specific customer needs and the timing of their purchases. Sales of automobile undercoating applications remain stable from the prior year period.

* * *

During the third quarter we added 12 new domestic customers, of which two new customers were asphalt manufacturers using this latest high potential NPCC application. Our NPCC application for asphalt represents an outstanding market opportunity.

* * *

In addition, we continue to explore opportunities in the international market by expanding our international sales and marketing department. We currently have 35 international customers in the testing phase, including nine in the Asia Pacific region, 12 in Europe, and 14 in North America. During the third quarter this year, the international sales accounted for only 1% of our net sales, mainly due to the continuing impact of the financial crisis in these developed economies. We expect to see international sales pick up as the global economy shows some early recovery signs and manufacturers are bouncing back and will begin to recognize the cost savings and quality improvement they can get from using our products.

* * *

Our total net revenues from continuing operations in Q3 increased by 35.6%, to $34.4m, up from $25.4m a year ago. This growth was largely due to higher sales volume as a result of our expanded production capacity, improved capacity utilization to meet the growing market demand, as well as increases in average selling prices. Our gross profit increased 39% to $14m, from $10.1m in the same period in 2009. Gross margin increased by 1%, from 39.7% a year ago to 40.7% in

> Q3. The increase was mainly due to the increase in average selling prices on NPCC products, partially offset by an increase in raw material costs and other production expenses. SG&A was at $2.5m, up $0.6m from $1.9m in Q3 of '09.
>
> * * *
>
> Our cash position as of September exceeds total liabilities. Days sales outstanding, which is a measure of receivables collection effectiveness, was at 60 days in the nine months ended September 30, 2010. As of September 30, there was no overdue accounts receivable. Shareholders' equity rose to $196.4m from $170.6m at December 31, 2009. Net cash provided from operating activities increased to $31.4m, and that's up from $17.7m for the same period in 2009, primarily due to the increased sales levels.
>
> * * *
>
> We maintain our 2010 guidance for revenue and net income from continued operations to be in the range of $123m to $126m for revenues, and $25m to $27m for net income.
>
> * * *
>
> In closing, we believe the Company's overall strategy, which includes our planned capacity expansion over the next few years, is going to let us capture an increasing market share of the rapidly growing NPCC market. We take a lot of pride in developing forward-looking technologies that help our customers develop new products for their customers. And this is a fundamental platform for our growth. We remain very confident that ShengdaTech is well positioned to continue our record of highly favorable financial performance in the years to come.

144. On December 9, 2010, ShengdaTech issued a press release announcing plans to offer an aggregate of $90 million of senior convertible notes due 2015 in a private offering. The Company also announced that it intended to grant the initial note purchasers an option to purchase an additional $30 million of such notes.

145. On December 10, 2010, ShengdaTech announced that it entered into a purchase agreement with Morgan Stanley & Co. relating to the Company's sale of a $130 million aggregate principal amount of the Company's 6.50% Senior Convertible Notes due 2015 in a private offering (the "2010 Note Offering"). ShengdaTech also announced its intention to use the net proceeds from the 2010 Note Offering to repurchase $67 million of the Company's 6.0% Convertible Senior Notes

due 2018 and to finance its NPCC production capacity expansion, research and development activities and other working capital requirements.

146. On December 15, 2010, the Company announced that it had issued a $130 million aggregate principal amount of the 2010 Notes in the 2010 Note Offering.

147. The statements referenced above in ¶¶131, 133-134, 136, 138-139, 141-143 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a) that ShengdaTech's financial statements during 2010 were not fairly presented in conformity with U.S. GAAP and were materially false and misleading;

(b) that the Company was falsifying sales figures and sales amounts;

(c) that ShengdaTech was exaggerating the size of the Company's customer base;

(d) that the Company's cash accounts were materially overstated because they included CDs, which did not exist;

(e) that ShengdaTech was participating in undisclosed related party transactions;

(f) that ShengdaTech was operating with material deficiencies in the system of internal control over its financial reporting;

(g) that the Company was maintaining, in essence, two sets of financial books, one for the U.S. regulators and investors and one for the Chinese regulators and investors;

(h) that based on the foregoing, investors were unable to ascertain the true financial condition of the Company.

148. On March 15, 2011, ShengdaTech issued a press release announcing that it had appointed the Special Committee to investigate "potentially serious discrepancies and unexplained issues relating to the Company and its subsidiaries' financial records identified by the Company's

auditors" in the course of their examination of ShengdaTech's consolidated financial statements for the year ended December 31, 2010. The Company further announced that: (i) the Company's Audit Committee retained OMM as independent outside counsel, which had initiated an internal investigation; (ii) the SEC had been notified about the commencement of the internal investigation; and (iii) the Company would not file its 2010 Form 10-K in a timely manner.

149. In response to this announcement, trading in ShengdaTech common stock was suspended.

150. On April 29, 2011, ShengdaTech filed with a Form 8-K with the SEC reporting that the NASDAQ determined that the continued listing of the Company's securities was no longer warranted and that Defendant Guo, the Company's COO, acting CFO, and director, resigned. The Form 8-K also disclosed that on April 19, 2011, ShengdaTech's Board of Directors received a letter from the Company's independent auditor, KPMG, indicating that, in the view of KPMG, senior management of the Company had not taken, and the Company's Board of Directors had not caused senior management to take, timely and appropriate remedial actions with respect to discrepancies and/or issues relating to the Company's financial records that were identified during the course of the audit for the year ended December 31, 2010, and that this failure to take remedial action was expected to cause KPMG's resignation from the audit engagement.

151. On May 5, 2011, ShengdaTech filed a Form 8-K with the SEC reporting that on April 29, 2011, KPMG informed ShengdaTech of its resignation as the Company's independent auditor. KPMG had served as the Company's independent registered public accounting firm since November 11, 2008. The Form 8-K also reported that KPMG previously informed the Company's Audit Committee of certain concerns arising during its incomplete audits of the Company's consolidated financial statements as of and for the year ended December 31, 2010, and the effectiveness of

internal control over financial reporting as of December 31, 2010. These concerns included serious discrepancies and unexplained issues relating to, among others: (i) the Company's bank balances; (ii) transactions with major suppliers; (iii) VAT invoices and payments; (iv) sales and payments for sales by third parties; (v) sales to the Company's second largest customer; (vi) discrepancies between KPMG's direct calls to customers and confirmations returned by mail; and (vii) concerns raised by directly confirming customer sales and accounts receivable. As a result of the foregoing, KPMG informed the Company that disclosures should be made and action should be taken to prevent future reliance on their previously issued audit reports related to the consolidated balance sheets of ShengdaTech and its subsidiaries as of December 31, 2008 and 2009, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended and the effectiveness of internal control over financial reporting as of December 31, 2008 and 2009.

152. On June 10, 2011, ShengdaTech common stock began trading on the pink sheets under the symbol SDTHQ.PK. The Company's stock opened at $0.55 per share and closed at $0.25 per share, a loss of over 90% from its closing price on March 14, 2011.

153. On August 19, 2011, ShengdaTech filed a voluntary petition in the United States Bankruptcy Court for the District of Nevada seeking relief under the provisions of Chapter 11 of Title 11 of the Bankruptcy Code.

154. The bankruptcy proceedings as well as the investigations by the SEC and the Special Committee are ongoing.

155. The market for ShengdaTech common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, ShengdaTech common stock traded at artificially inflated prices during the Class Period.

Plaintiffs and other members of the Class purchased or otherwise acquired ShengdaTech common stock relying upon the integrity of the market price of ShengdaTech common stock and market information relating to ShengdaTech, and have been damaged thereby.

156. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of ShengdaTech common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

157. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about ShengdaTech's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of ShengdaTech and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

158. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding ShengdaTech, their control over, and/or receipt and/or modification of ShengdaTech's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning ShengdaTech, participated in the fraudulent scheme alleged herein.

159. The Individual Defendants were motivated to engage in a fraudulent course of conduct in order to allow the Company to sell convertible securities in two note offerings to unsuspecting investors at artificially inflated prices. Specifically, and as discussed more fully herein, the 2008 Note Offering and the 2010 Note Offering provided the Company with over $200 million in fresh capital.

160. The Individual Defendants were further motivated to engage in this fraudulent course of conduct so that certain insiders could sell their personal shares of ShengdaTech at artificially inflated prices during the Class Period. Significantly, the alleged improprieties noted herein enabled certain Company insiders, including Defendant X Chen's wife, and a relative of Defendant Guo, to exercise and sell large amounts of their ShengdaTech common stock during the Class Period. For example, Kong Fan Ying, the wife of Defendant X Chen, who realized a gain of more than $4.5 million, filed a plan to sell 790,000 ShengdaTech shares on May 26, 2010. Moreover, Yongming Guo, a relative of Defendant Guo, filed plans to sell shares of ShengdaTech stock on five separate occasions, for a total of 836,991 shares, realizing a gain of more than $5.29 million:

| Insider | Date | Shares | Proceeds |
|---|---|---|---|
| KONG FAN YING | 05/26/10 | 790,000 | $4,542,500 |
| | | | |
| YONGMING GUO | 08/22/07 | 300,000 | $1,392,000 |
| | 09/04/07 | 9,991 | $49,456 |
| | 10/10/07 | 286,000 | $2,297,381 |
| | 10/29/07 | 1,000 | $8,200 |
| | 12/11/07 | 240,000 | $1,548,000 |
| | | | $5,295,037 |
| | | | |
| | **Total:** | **1,626,991** | **$9,837,537** |

161. Moreover, Defendants engaged in deceptive and fraudulent conduct that was designed to, and did, conceal the true financial condition of ShengdaTech. When auditing the Company's financial statements for the fiscal year ending December 31, 2010, KPMG reported discovering "potentially serious discrepancies and unexplained issues" relating to the Company's financial records. On March 2, 2011, KPMG contacted and informed the Company's Audit Committee regarding these potential discrepancies, and, on March 3, 2011, provided written notice to the Audit Committee detailing information relating to, among other things, the inability to confirm sales amounts, sales terms, and outstanding balances, and undisclosed related party transactions.

162. On March 4, 2011, one day after KPMG informed the Audit Committee of the potential issues it discovered, the Company held a special meeting of the Board of Directors and, by Board resolution, created the Special Committee to oversee an internal investigation.

163. On March 7, 2011, the Special Committee then engaged OMM to conduct an independent investigation into the potential issues raised by KPMG. In turn, OMM retained PwC to provide forensic accounting support for its investigation.

164. Soon after the investigation commenced, problems began to surface, including the inability of KPMG to verify the Company's cash accounts. Further efforts by OMM and PwC to verify the Company's cash accounts were unsuccessful. The Special Committee instructed teams of

professionals from OMM and PwC to visit financial institutions holding the Company's accounts in China in order verify the Company's cash accounts, but managers at ShengdaTech's Chinese subsidiaries obstructed those efforts. The Special Committee was informed that the managers of ShengdaTech's Chinese subsidiaries: (i) stalled or otherwise attempted to derail trips to the Company's financial institutions; (ii) refused to cooperate with OMM and PwC; (iii) attempted to steer the team to specific persons at the banks, rather than permit the OMM and PwC teams to speak with other identified individuals; and (iv) departed and refused to assist the OMM and PwC teams when the OMM and PwC teams declined to meet with particular bank employees chosen by the managers.

165. The Special Committee was also unable to authenticate the veracity of certain CDs. As part of the cash verification process, Defendant X Chen provided photocopies of CDs allegedly held in the name of Faith Bloom as evidence that the Company had certain cash on hand. The Special Committee was unable to verify the authenticity of those CDs and despite making repeated requests for such information, Defendant X Chen has been nonresponsive. The Special Committee learned that the bank, which issued the CDs, was unable to verify them and, in fact, has no record of issuing them to Faith Bloom.

166. In May 2011, the Special Committee then retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to take over the work commenced by OMM and work with PwC to assist with the investigation. Skadden's investigation involved company visits, interviews, and the imaging and review of accounting records and other electronic data.

167. Skadden and the Special Committee have been unable to complete the investigation because their efforts to do so have been obstructed by Defendant X Chen, among others. Specifically, Defendant X Chen refused to participate in meetings with the Board of Directors or be

interviewed by counsel for the Special Committee. Defendant Zhang also refused to participate in meetings with the Board and Special Committee.

168. Skadden's investigation determined that certain of the financial records of the Company may have been falsified in whole or in part and that serious issues remain unanswered regarding the financial condition of the Company and its overall business operations.

169. On August 19, 2011, Skadden presented its preliminary report and findings to the Special Committee. In its preliminary report, Skadden confirmed material irregularities and/or inaccuracies in the financial records of the Company. Among other things, the report called into serious question: (i) the accuracy of payments allegedly made to the Company by various customers or the sales allegedly made to those customers; and (ii) the undisclosed related party transactions the Company made with parties owned by Defendant X Chen. The report also suggests that the Individual Defendants vastly overstated the Company's sales.

**LOSS CAUSATION/ECONOMIC LOSS**

170. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of ShengdaTech common stock and operated as a fraud or deceit on Class Period purchasers of ShengdaTech common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were leaked to the market, the price of ShengdaTech common stock fell as a portion of the prior artificial inflation came out. As a result of their purchases of ShengdaTech common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

171. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of ShengdaTech's business and prospects. Defendants' false and misleading statements had the intended effect and caused ShengdaTech common stock to trade at

artificially inflated levels throughout the Class Period, reaching as high as $10.56 per share on June 27, 2008.

172. As a direct result of Defendants' prior misrepresentations and fraudulent conduct being leaked to the market, on March 15, 2011, trading in the Company's shares was suspended. The price of the Company's stock remained at $3.55 per share until June 10, 2011. On that date, ShengdaTech common stock began trading on the pink sheets under the symbol SDTHQ.PK. The Company's stock opened at $0.55 per share and closed at $0.25 per share, a loss of over 90% from its closing price on March 14, 2011. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of ShengdaTech common stock.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

173. At all relevant times, the market for ShengdaTech common stock was an efficient market for the following reasons, among others:

(a) ShengdaTech common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b) as a regulated issuer, ShengdaTech filed periodic public reports with the SEC and the NASDAQ;

(c) ShengdaTech regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) ShengdaTech was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of

their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

174. As a result of the foregoing, the market for ShengdaTech common stock promptly digested current information regarding ShengdaTech from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of ShengdaTech common stock during the Class Period suffered similar injury through their purchase of ShengdaTech common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

175. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of ShengdaTech who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Individual Defendants**

176. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

177. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the Class, as alleged herein; (ii) enable the Company to sell its common stock at artificially inflated prices; and (iii) cause Plaintiffs and the Class to purchase ShengdaTech's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

178. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for ShengdaTech common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

179. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of ShengdaTech as specified herein.

180. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ShengdaTech's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about ShengdaTech and its business operations and future prospects in the light

of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of ShengdaTech securities during the Class Period.

181. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his/her responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public, which they knew or recklessly disregarded was materially false and misleading.

182. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing ShengdaTech's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual

knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

183. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of ShengdaTech common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of ShengdaTech common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the Class acquired ShengdaTech common stock during the Class Period at artificially high prices and were damaged thereby.

184. At the time of said misrepresentations and omissions, Plaintiffs and the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the Class and the marketplace known the truth regarding the problems that ShengdaTech was experiencing, which were not disclosed by Defendants, Plaintiffs and the Class would not have purchased or otherwise acquired their ShengdaTech common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

185. By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

186. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT II

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against KPMG

187. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

188. During the Class Period, KPMG carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the Class, as alleged herein; (ii) enable the Company to sell its common stock at artificially inflated prices; and (iii) cause Plaintiffs and the Class to purchase ShengdaTech common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, KPMG took the actions set forth herein.

189. As set forth above, during the Class Period, KPMG issued false audit opinions on ShengdaTech's financial statements for the years ended December 31, 2008 and 2009.

190. KPMG had actual knowledge of its misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that it failed to ascertain and to disclose such facts, even though such facts were available to them. KPMG's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing ShengdaTech's operating condition and future business prospects from the investing public. As demonstrated by KPMG's false auditing opinions issued throughout the Class Period, KPMG, if it did not have actual knowledge of the misrepresentations and omissions alleged, was reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

191. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of ShengdaTech common

stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of ShengdaTech common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by KPMG, or upon the integrity of the market in which the securities trade, and/or on the absence of materially adverse information that was known to or recklessly disregarded by KPMG, but not disclosed in public statements made by KPMG during the Class Period, Plaintiffs and the Class acquired ShengdaTech common stock during the Class Period at artificially high prices and were damaged thereby.

192. At the time of said misrepresentations and omissions, Plaintiffs and the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the Class and the marketplace known the truth regarding the problems that ShengdaTech was experiencing, which were not disclosed by KPMG, Plaintiffs and the Class would not have purchased or otherwise acquired their ShengdaTech common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

193. By virtue of the foregoing, KPMG has violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

194. As a direct and proximate result of KPMG's wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT III

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

195. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

196. The Individual Defendants acted as controlling persons of ShengdaTech within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

197. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

198. As set forth above, ShengdaTech and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: October 15, 2012

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
MARIO ALBA JR.
EDWARD Y. KROUB

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
malba@rgrdlaw.com
ekroub@rgrdlaw.com

*Lead Counsel for Plaintiffs*