UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re SHENGDATECH, INC. SECURITIES LITIGATION | : | Master No. 1:11-cv-01918-LGS |
| | : | CLASS ACTION |
| This Document Relates To: | : | ANSWER OF SHENGDATECH, INC. TO THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | : | |

Defendant ShengdaTech, Inc. ("ShengdaTech" or the "Company"), by and through its attorneys, Greenberg Traurig, LLP, submits the following Answer of ShengdaTech Inc. to Third Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint").

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all purchasers of the common stock of ShengdaTech between May 6, 2008 and March 15, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

**ANSWER**: ShengdaTech admits that Plaintiffs are seeking to pursue remedies under the Securities Exchange Act of 1934 and seek to bring their claims as a federal securities class action on behalf of all purchasers of the common stock of ShengdaTech between May 6, 2007 and March 15, 2011, inclusive. The remaining allegations of Paragraph 1 are denied.

2. ShengdaTech developed, manufactured, marketed and sold Nano-Precipitated Calcium Carbonate ("NPCC") products, which were used in a variety of products, such as tires, ink, paint, latex, paper, and polyethylene products. The Company was headquartered in China and purportedly derived a majority of its revenues from sales to other China-based customers.

**ANSWER**: Admitted.

3. ShengdaTech did not go "public" on the United States markets in the traditional way, but instead became a publicly-traded Company by way of a "reverse merger" – purchasing a majority interest in a dormant shell company that was publicly traded on a major U.S. stock exchange. Reverse mergers have recently come under increased scrutiny by U.S. securities regulators as numerous reverse-merger companies have imploded due to accounting improprieties. Indeed, in 2011, the SEC suspended trading in more than a dozen reverse-merger companies because of lack of current, accurate information about the companies. At least six of those companies were based in China, including ShengdaTech.

**ANSWER**: ShengdaTech admits that it became a publicly-traded Company by way of a "reverse merger," that it was based in China, and that in 2011 trading in its shares was suspended by the SEC. ShengdaTech is without sufficient knowledge or information to admit or deny the allegations in Paragraph 3 regarding reverse-merger companies other than ShengdaTech and

whether a reverse merger is a "traditional way" of becoming a publicly-traded company, and therefore denies same. The remaining allegations of Paragraph 3 are denied.

4. This case concerns a brazen accounting fraud. As detailed further herein, during the Class Period, Defendants engaged in a laundry list of accounting improprieties in order to hide the fact that nearly every aspect of ShengdaTech's business was riddled with fraud. The Company: (i) falsified its reported sales; (ii) vastly overstated the amount of goods it purchased from Chinese suppliers; (iii) falsely overstated its customer base and the amount of business conducted with those purported customers; (iv) participated in undisclosed related party transactions; (v) forged and presented counterfeit United States Certificates of Deposits ("CDs"); (vi) misstated cash accounts held in certain Chinese banks; (vii) falsified information on value added tax ("VAT") invoices; (viii) operated the Company with, and improperly failed to disclose, material deficiencies in the system of internal control over its financial reporting; and (ix) issued materially false and misleading financial statements in violation of U.S. Generally Accepted Accounting Principles ("GAAP").

**ANSWER**: Paragraph 4 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, Paragraph 4 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 4. ShengdaTech denies any remaining allegations against it contained in Paragraph 4.

5. Unbeknownst to shareholders, in or about May 2010, during a meeting with a member of the Company's Audit Committee regarding KPMG Hong Kong's ("KPMG HK") (the Company's auditor during the Class Period) review of ShengdaTech's quarterly financial statements, KPMG HK's lead audit partner mentioned that, during its audit of the Company's 2009 financial statements, KPMG HK received a higher than usual number of confirmation replies – a "red flag" that it had inexplicably decided to ignore. The Audit Committee member requested that KPMG HK "look more closely at third party audit confirmations when auditing the 2010 Financial Statements." The high number of confirmation replies was but one obvious red flag that KPMG HK ignored during its audit of the Company's 2009 financial statements. KPMG HK was also told by a person familiar with the market for ShengdaTech's products that he/she believed that the "Company's reported sales [] exceeded the likely global demand for those products." Moreover, during the 2009 audit, KPMG HK "noticed several instances where customer names in the Company's accounting system did not match the names on invoices and/or related documents that purported to memorialize the Company's transactions."

**ANSWER**: ShengdaTech admits the allegations contained in the first two sentences of Paragraph 5 insofar as they relate to the actions of the Audit Committee of ShengdaTech. The

remaining allegations of Paragraph 5 contain allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer.

6. After KPMG HK belatedly began its investigation into these signs of fraud, it uncovered systemic and endemic problems with the Company's financial reports that it and the Director Defendants (defined below) did not investigate throughout the Class Period.

**ANSWER**: The allegations of Paragraph 6 are not directed against ShengdaTech and therefore no answer is required.

7. On March 3, 2011, KPMG HK provided a draft letter to the Audit Committee, which described the following issues that KPMG HK had discovered: (i) that KPMG HK was unable to confirm sales amounts, sales terms, and outstanding balances with third party customers; (ii) that "ShengdaTech management had misdirected, intercepted and/or otherwise interfered with [] confirmation requests and responses"; and (iii) that ShengdaTech's second largest customer was not located at the address that the Company provided to KPMG HK for at least five to six years, among other things.

**ANSWER**: ShengdaTech admits that KPMG HK provided a draft letter to the Audit Committee on or around March 3, 2011, states that the draft letter dated March 3, 2011 speaks for itself and denies any characterizations inconsistent therewith.

8. On March 14, 2011, KPMG HK conducted a call with members of the Company's Audit Committee and further informed them that: (i) Jiangsu Libao, a purported ShengdaTech customer, confirmed that it had purchased zero product from the Company in 2010, yet the Company's records indicated that ShengdaTech sold RMB 7,850,769 in product to Jiangsu Libao during this time; and (ii) the Bank of China, Tai'an Branch, stated that the account balances as of December 31, 2010 were RMB 89,949.48 and USD $67.61 and not the approximate RMB 13.3 million and USD $50,054.18 that the Company had recorded on its books through the year ending 2010.

**ANSWER**: Admitted.

9. On March 15, 2011, ShengdaTech issued a press release announcing that it had appointed a special committee of the Board of Directors ("Special Committee") to investigate "potentially serious discrepancies and unexplained issues relating to the Company and its subsidiaries' financial records identified by the Company's auditors" in the course of their examination of ShengdaTech's consolidated financial statements for the year ended December 31, 2010. The Company further announced that: (i) the Company's Audit Committee retained O'Melveny & Myers LLP ("OMM") as independent outside counsel, which had initiated an internal investigation; (ii) the SEC had been notified about the commencement of the internal investigation; and (iii) the Company would not file its 2010 Form 10-K in a timely manner.

**ANSWER**: ShengdaTech admits that on or around March 15, 2011 ShengdaTech issued a press release, states that the March 15, 2011 press release speaks for itself and denies any characterizations inconsistent therewith.

10. In response to these announcements, trading in ShengdaTech common stock was suspended. At the time of the trading suspension, ShengdaTech common stock traded at $3.55 per share.

**ANSWER**: ShengdaTech admits that trading in its common stock was suspended at or around the time of the March 15, 2011 press release referred to in Paragraph 9 and that at the time of the trading suspension ShengdaTech common stock traded at approximately $3.55 per share. ShengdaTech is without sufficient knowledge or information to admit or deny the remaining allegations of Paragraph 10 and therefore denies same.

11. In a document dated March 17, 2011 and entitled "Additional Matters Communicated to the Audit Committee," KPMG HK informed the Audit Committee of other improprieties, including: (i) that the Company submitted completely false accounts payable balances with two of the Company's purported top ten coal suppliers in 2010; (ii) that the Company grossly overstated account balances at the Agricultural Bank of China, Qianxian Branch; (iii) that the Company submitted false chops[1] for accounts at the Agricultural Bank of China, Qianxian Branch and at China Merchants Bank ("CMB") - Jinan Branch; and (iv) that the names on two of the Company's sales invoices and four purchase invoices did not match the name on the National Taxation Bureau of Shangdong ("NTBS") system.

**ANSWER**: ShengdaTech admits that KPMG HK provided the Audit Committee with a document dated March 17, 2011 entitled "Additional Matters Communicated to the Audit Committee," states that the document dated March 17, 2011 speaks for itself and denies any characterizations inconsistent therewith. ShengdaTech admits the first sentence of Footnote 1. The second sentence of Footnote 1 alleges a legal conclusion to which no answer is required and ShengdaTech therefore denies the allegations of the second sentence of Footnote 1.

12. On April 29, 2011, KPMG HK formally resigned as ShengdaTech's auditor.

---

[1] A "chop" is a stamp imprinted with a unique composition of Chinese characters, which are used in lieu of a signature. Only those persons who control a company's chop are able to withdraw money from its bank accounts.

**ANSWER**: Admitted.

13. On June 10, 2011, trading in ShengdaTech common stock resumed and the price of ShengdaTech common stock declined to $0.25 per share, a decline of over 90% from its last close.

**ANSWER**: Admitted.

14. On August 19, 2011, ShengdaTech filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

**ANSWER**: Admitted.

15. The Special Committee's investigation disclosed the following alarming findings:

(a) that certain of ShengdaTech's financial records, under the "direction and knowledge of former management," including Defendant X Chen (defined below), "may have been falsified in whole or in part and that serious issues remain unanswered regarding the financial condition of [ShengdaTech] and its overall business operations";

(b) that the Special Committee's efforts to verify ShengdaTech's cash accounts were "thwarted and unsuccessful." In that regard, the Special Committee concluded that ShengdaTech's bank accounts held substantially less cash in 2007-2009 than was reported in the Company's financial statements. In fact, these accounts contained less than $69 million as of the year ending 2008, and less than $36 million as of year ending 2009, significantly less than the over $114 million and $116 million reported in the Company's financial statements, respectively. The Company's 2010 quarterly financial statements overstated its reported cash balances in excess of $110 million. The Chinese subsidiaries' cash holdings were also greatly overstated;

(c) that the Special Committee contacted the purported customers of ShengdaTech's subsidiaries and discovered that many of ShengdaTech's reported sales were entirely fictitious. Specifically: (i) six purported customers never purchased product from one of the Company's subsidiaries (three of them never even heard of the subsidiary at all), but the Company accounted for sales to these six customers in excess of RMB 190 million; (ii) one of the customers only purchased RMB 15,000 of product from ShengdaTech, but the Company booked sales of over RMB 3.5 million; (iii) another customer stated that it had never received three invoices supposedly sent to it by Shaanxi Haize, a ShengdaTech subsidiary; (iv) yet another customer stated that it transacted at most RMB 700,000 to 800,000 in business a year with Shaanxi Haize, yet ShengdaTech's records showed invoices totaling over RMB 6 million in 2009 alone; and (v) in total, over ten customers transacted significantly less business with ShengdaTech than was recorded by the Company;

(d) that the Special Committee has been unable to authenticate the veracity of certain CDs held in the name of Faith Bloom Limited ("Faith Bloom"), ShengdaTech's wholly-owned subsidiary. The bank, which allegedly issued the CDs, has been "unable to verify them and, in fact, has no record of issuing them to Faith Bloom";

(e) that the Special Committee's investigation was "obstructed by [Defendant X Chen] and former managers who have been acting in concert with him"; and

(f) that ShengdaTech "engaged in transactions with entities owned by [Defendant X Chen], but which were not reported to be related parties, and the sales to those entities appear to have been vastly overstated."

**ANSWER**: ShengdaTech states that the Liquidating Trust Complaint referred to in Plaintiffs' Complaint speaks for itself and denies any characterizations inconsistent therewith. ShengdaTech admits subparagraphs (a), (d), (e) and (f) of Paragraph 15. With respect to subparagraph (b) of Paragraph 15, ShengdaTech admits that (1) the Special Committee's efforts to verify ShengdaTech's cash accounts were "thwarted and unsuccessful"; (2) that the Special Committee concluded that the bank accounts of ShengdaTech, of ShengdaTech's wholly-owned subsidiary that owned ShengdaTech's Chinese subsidiaries, Faith Bloom, and of those Chinese subsidiaries held substantially less cash in 2007-2009 than was reported in the Company's financial statement; (3) that those bank accounts contained less than $69 million as of the year ending 2008, and less than $36 million as of year ending 2009, which amounts are significantly less than the over $114 million and $116 million reported in the Company's financial statements for those years, respectively; (4) that the Company's 2010 quarterly financial statements reported cash balances in excess of $100 million and that those balances were overstated; and (5) that ShengdaTech's Chinese subsidiaries' cash holdings were also overstated.

With respect to subparagraph (c) of Paragraph 15, ShengdaTech admits the first sentence of subparagraph (c) and subparagraphs (c)(i) through (c)(iv). With respect to subparagraph (c)(v) of Paragraph 15, ShengdaTech admits that at least ten customers transacted significantly less business with ShengdaTech than was recorded by the Company. ShengdaTech is without sufficient knowledge or information to admit the remaining allegations contained in subparagraph (c)(v) of Paragraph 15 and therefore denies same.

The remaining allegations of Paragraph 15 are denied.

16. As a result of the foregoing, ShengdaTech informed investors that the Company's previously issued financial reports for the years ending December 31, 2008 and 2009 should no longer be relied upon.

**ANSWER**: ShengdaTech admits the allegations of Paragraph 16, except ShengdaTech denies the clause "As a result of the foregoing."

17. A comparison of ShengdaTech's SEC filings with the combined results of ShengdaTech's indirect subsidiaries as reported to the Chinese Administration of Industry and Commerce ("AIC") – the business regulatory agency in China – further evidences the fact that the Company was materially overstating its financial results during the Class Period. For example, for the period ending December 31, 2008, ShengdaTech reported $82.4 million in NPCC net sales and $36.03 million in net income to the SEC in its Form 10-K, but reported only $9.5 million in net sales, and an approximately $2 million net loss to the AIC. For the period ending December 31, 2009, the Company reported net sales of $102.1 million and net income of $23.1 million to the SEC as compared to net income of $6.07 million and a net loss of $6.2 million with the AIC.

**ANSWER**: ShengdaTech admits that it made SEC filings that contained combined results of its indirect subsidiaries and that its indirect subsidiaries made filings with the AIC. ShengdaTech states that the SEC and AIC filings speak for themselves and denies any characterizations inconsistent therewith.

## JURISDICTION AND VENUE

18. The claims asserted herein arise under and pursuant [sic] Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

**ANSWER**: ShengdaTech admits that Plaintiffs' claims purport to arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. The remaining allegations of Paragraph 18 insofar as they are directed against ShengdaTech are denied.

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

**ANSWER**: Admitted.

20. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

**ANSWER**: ShengdaTech admits the allegations of the first sentence of Paragraph 20. ShengaTech denies the allegations of the second sentence of Paragraph 20.

21. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**ANSWER**: Paragraph 21 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits the allegations contained in Paragraph 21.

## PARTIES

22. Lead Plaintiffs Edward Schaul and Donald Yaw each purchased ShengdaTech common stock during the Class Period as set forth in the accompanying certifications and incorporated by reference herein, and have been damaged thereby.

**ANSWER**: The last clause of Paragraph 22 alleges a legal conclusion to which no answer is required and ShengdaTech therefore denies the allegations of the last clause of Paragraph 22. ShengdaTech admits that the Lead Plaintiffs Edward Schaul and Donald Yaw submitted certifications relating to their purchases of common stock and states that the certifications speak for themselves and denies any characterizations that are inconsistent therewith. ShengdaTech is without sufficient knowledge or information to admit or deny the remaining allegations contained in Paragraph 22 and therefore denies same.

23. Defendant ShengdaTech developed, manufactured, marketed and sold NPCC products, which were used in a variety of products, such as tires, ink, paint, latex, paper, and polyethylene products. The Company was headquartered in China and purportedly derived a majority of its revenues from sales to other China-based customers. On August 19, 2011, ShengdaTech filed for bankruptcy protection and, accordingly, was not originally named as a defendant in this action by virtue of the automatic stay in place (Section 362(a) of the United States Bankruptcy Code). However, pursuant to the Chapter 11 Plan of Reorganization, (as

modified) dated August 30, 2012 (the "Plan"), filed in the ShengdaTech bankruptcy action (Case No. 11 52649-BTB (Bankr. D. Nev. 2011)), Plaintiffs and the putative class's claims against ShengdaTech are preserved and Plaintiffs are now entitled to proceed with this action against ShengdaTech. However, any recovery against ShengdaTech is limited to available insurance coverage and proceeds. The Plan was confirmed and approved by order of the Bankruptcy Court dated October 2, 2012 (the "Confirmation Order") and the Confirmation Order has become final. Therefore, Lead Plaintiffs have added ShengdaTech as a defendant in this Third Amended Complaint.

**ANSWER**: ShengdaTech is without sufficient knowledge or information to admit or deny the allegations concerning the reason why Plaintiffs did not originally name ShengdaTech as a defendant in this action and therefore denies same. The remaining allegations of Paragraph 23 are admitted.

24. Defendant Xiangzhi Chen ("X Chen") was, at all relevant times, Chairman of the Company's Board of Directors and Chief Executive Officer ("CEO") of ShengdaTech. He served as a director on the Company's Board of Directors (the "Board") and as the Company's President since 2006.

**ANSWER**: ShengdaTech admits that X Chen was Chairman of the Company's Board of Directors and CEO of ShengdaTech until August 19, 2011. ShengdaTech admits that X Chen served as a director on the Company's Board and as the Company's President from March 31, 2006 until August 19, 2011. The remaining allegations of Paragraph 24 are denied.

25. Defendant Andrew Weiwen Chen ("Andrew Chen") was appointed as ShengdaTech's Chief Financial Officer ("CFO") on April 15, 2009 and served the Company in that capacity until September 30, 2010, when he resigned.

**ANSWER**: Admitted.

26. Defendant Anhui Guo ("Guo") was the Company's CFO prior to Defendant Andrew Chen. She then became the Company's Chief Operating Officer ("COO"). On September 30, 2010, following the resignation of Defendant Andrew Chen, the Company's Board of Directors appointed Defendant Guo as acting CFO. At all relevant times, Defendant Guo served as a director of the Company.

**ANSWER**: Shengdatech denies the allegations contained in the last sentence of Paragraph 26 and that Guo was acting CFO at all relevant times after September 30, 2010.

ShengdaTech further states that Guo resigned from all of her company positions effective April 21, 2011. The remaining allegations of Paragraph 26 are admitted.

27. Defendant Dongquan Zhang ("Zhang") served as a director of the Company since February 23, 2007. Defendant Zhang signed the Company's Forms 10-K for the years ending 2006-2009. The Company's 2009 10-K states that Defendant Zhang's qualifications to serve on the Board "***include his extensive knowledge of the Company***," among other things (emphasis added). Defendant Zhang was a member of the Board's Audit[2], Compensation[3], and Nominating and Corporate Governance[4] Committees. He was also Chairman of the Nominating and Corporate Governance Committee. On October 8, 2011, Defendant Zhang resigned as a member of the Company's Board. Prior to Defendant Zhang's resignation, he hindered the Company's post-bankruptcy proceedings through his refusal to participate in any of the Board's post-bankruptcy meetings. Moreover, despite the Company's repeated statements attesting to Defendant Zhang's status as an independent Board member, it is apparent from Zhang's actions during the post-bankruptcy proceedings that he had a strong allegiance, and was beholden, to Defendant X Chen.

**<u>ANSWER</u>**: Paragraph 27 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits the allegations contained in the first five sentences of Paragraph 27, exclusive of any footnotes. With respect to Footnotes 2, 3 and 4, ShengdaTech admits that language substantially similar to the language quoted in Footnotes 2, 3 and 4 is contained in the Company's Form 10-K for 2009. ShengdaTech further states that the Company's Form 10-K for 2009 speaks for itself and denies any characterizations inconsistent therewith. ShengdaTech denies any remaining allegations against it contained in Paragraph 27.

28. Defendant A. Carl Mudd ("Mudd") served as a director of the Company since February 23, 2007 and was a member of the Board's Audit, Compensation, and Nominating and Corporate Governance Committees. He was Chairman of the Board's Audit Committee. Defendant Mudd is a Certified Public Accountant and, according to the Company's filings, is

---

[2] According to the Company's Form 10-K for 2009, the "Audit Committee held seven (7) meetings for year 2009 and the attendance rates for all committee members are 100%."

[3] According to the Company's Form 10-K for 2009, the "Compensation Committee held one (1) meeting for year 2009 and the attendance rates for all committee members was 100%."

[4] According to the Company's Form 10-K for 2009, the "Nominating and Corporate Governance Committee held one (1) meeting for year 2009 and the attendance rates for all committee members are 100%."

also considered an "audit committee financial expert" under SEC rules.[5] Defendant Mudd signed the Company's Forms 10-K for the years ending 2006 - 2009. The Company's 2009 10-K states that Defendant Mudd's qualifications to serve on the Board "***include his extensive knowledge of the Company***," among other things (emphasis added).

**ANSWER**: ShengdaTech admits the allegations contained in the first two sentences of Paragraph 28 and the fourth sentence of Paragraph 28. For its answer to the remaining allegations of Paragraph 28, ShengdaTech refers to the Company's Forms 10-K for the years ending 2006 – 2009 and states that the documents speak for themselves and denies any characterizations inconsistent therewith. Footnote 5 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Footnote 5. ShengdaTech further states that the SEC rules regarding designation as an "audit committee financial expert" speak for themselves and denies any characterizations inconsistent therewith.

29. Defendant Sheldon B. Saidman ("Saidman") served as a director of the Company since February 23, 2007 and was a member of the Board's Audit, Compensation, and Nominating and Corporate Governance Committees. Defendant Saidman signed the Company's Forms 10-K for the years ending 2006-2009. The Company's 2009 10-K states that Defendant Saidman's qualifications to serve on the Board "***include his extensive knowledge of the Company***," among other things (emphasis added).

**ANSWER**: ShengdaTech admits the allegations contained in the first two sentences of Paragraph 29. For its answer to the remaining allegations of Paragraph 29, ShengdaTech refers to the Company's 2009 Form 10-K and states that the documents speaks for itself and denies any characterizations inconsistent therewith.

30. The defendants referenced above in ¶¶27-29 are referred to herein as the "Director Defendants."

**ANSWER**: Admitted.

---

[5] The designation as an "audit committee financial expert" demonstrates that Defendant Mudd had a thorough understanding of the Audit Committee's oversight role, expertise in accounting matters. a deep understanding of financial statements, and the ability to ask the right questions to determine whether the company's financial statements were complete and accurate.

31. The defendants referenced above in ¶¶24-29 are referred to herein as the "Individual Defendants."

**ANSWER**: Admitted.

32. ShengdaTech represented that Defendants Zhang, Mudd, and Saidman were compensated for their positions at the Company as follows:

| | 2008 Cash | 2008 Cash and Options | 2009 Cash | 2009 Cash and Options |
|---|---|---|---|---|
| Mudd | $75,000 | $133,945 | $75,000 | $75,000 |
| Saidman | $35,000 | $35,000 | $35,000 | $35,000 |
| Zhang | $10,000 | $10,000 | $10,000 | $10,000 |

**ANSWER**: ShengdaTech admits that the 2008 and 2009 compensation of Defendants Zhang, Mudd and Saidman for their positions at the Company is set forth in filings with the SEC, states that those filings speak for themselves and denies any characterizations inconsistent therewith.

33. ShengdaTech's Board had five members. According to the Company's 2009 Definitive Proxy Statement filed on Form 14A (the "Proxy"), the Company's Board met sixteen times.

**ANSWER**: ShengdaTech admits that its Board had five members until Guo's resignation on April 21, 2011. ShengdaTech admits that it filed a Proxy on or around August 10, 2009, states that the Proxy filed on August 10, 2009 speaks for itself and denies any characterizations inconsistent therewith.

34. ShengdaTech's Audit Committee was directly responsible for the appointment, retention, compensation, and oversight of the work of any registered public accounting firm employed by the Company (including resolution of disagreements between management and the accounting firm regarding financial reporting) for the purpose of preparing or issuing an audit report or related work or performing other audit, review, or other services. Any registered public accounting firm retained by the Company would report directly to the Audit Committee, which had the ultimate authority and responsibility to evaluate and, where appropriate, replace the

independent registered public accounting firm. During the Class Period, the Audit Committee met with KPMG HK on a quarterly basis.

**ANSWER**: Admitted.

35. ShengdaTech's Compensation Committee was responsible for the administration of compensation for the Company's officers and employees.

**ANSWER**: ShengdaTech admits that ShengdaTech's Compensation Committee was responsible for approving the compensation for the Company's officers and employees. The remaining allegations of Paragraph 35 are denied.

36. ShengdaTech's Nominating and Corporate Governance Committee was responsible for nominating directors and oversaw the Company's purported adherence to its corporate governance standards.

**ANSWER**: ShengdaTech admits that ShengdaTech's Nominating and Corporate Governance Committee was responsible for nominating directors and oversaw the Company's adherence to its corporate governance standards. The remaining allegations of Paragraph 36 are denied.

37. Each of the Board's committee members acted recklessly by failing to monitor and check available and accessible information and ascertain the true affairs of the Company during the Class Period, thereby permitting the Company to conduct its massive fraud on Plaintiffs and the Class.

**ANSWER**: The allegations of Paragraph 37 are not directed against ShengdaTech and therefore no answer is required.

38. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

**ANSWER**: The allegations of Paragraph 38 are not directed against ShengdaTech and therefore no answer is required.

39. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers of ShengdaTech, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

**ANSWER**: The allegations of Paragraph 39 are not directed against ShengdaTech and therefore no answer is required.

40. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

**ANSWER**: The allegations of Paragraph 40 are not directed against ShengdaTech and therefore no answer is required.

41. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with ShengdaTech, each of the Individual Defendants had access to the adverse undisclosed information about ShengdaTech's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about ShengdaTech and its business materially false and misleading.

**ANSWER**: The allegations of Paragraph 41 are not directed against ShengdaTech and therefore no answer is required.

42. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

**ANSWER**: The allegations of Paragraph 42 are not directed against ShengdaTech and therefore no answer is required.

43. Defendant KPMG HK is a Hong Kong partnership and a member firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity. KPMG International is one of the largest professional services firms in the world and one of the "big four" auditors. KPMG HK provides audit, accounting, financial advisory, tax and risk management services and its corporate headquarters is located at 8th Floor, Prince's Building, 10 Chater Road, Central, Hong Kong. KPMG HK was the Company's auditor from November 11, 2008 through April 29, 2011 and audited the Company's financial statements for the fiscal years ended December 31, 2008, 2009 and 2010. KPMG HK signed the Company's audit reports that were incorporated into the Company's 2008 and 2009 Forms 10-K.

**ANSWER**: ShengdaTech admits that KPMG HK was the Company's auditor from November 11, 2008 through April 29, 2011 and audited the Company's financial statements for the fiscal years ended December 31, 2008, 2009 and 2010; and that KPMG HK signed the Company's audit reports that were incorporated into the Company's 2008 and 2009 Forms 10-K. The remaining allegations of Paragraph 43 are not directed against ShengdaTech and therefore no answer is required.

44. ShengdaTech, the Individual Defendants and KPMG HK are collectively referred to herein as "Defendants."

**ANSWER**: Admitted.

45. Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of ShengdaTech common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding ShengdaTech's financial reporting, business, operations and management and the intrinsic value of ShengdaTech common stock; (ii) enabled Company insiders to sell over $9.8 million of ShengdaTech common stock to

the unsuspecting public; (iii) allowed ShengdaTech to complete two note offerings raising over $200 million at artificially inflated prices; and (iv) caused Plaintiffs and the Class to purchase ShengdaTech common stock at artificially inflated prices.

**ANSWER**: Paragraph 45 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, Paragraph 45 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 45.

**CLASS ACTION ALLEGATIONS**

46. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of ShengdaTech between May 6, 2008 and March 15, 2011, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

**ANSWER**: Paragraph 46 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 46. ShengdaTech admits that Plaintiffs purport to bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of ShengdaTech between May 6, 2008 and March 15, 2011, inclusive, and who were damaged thereby, but excluding the Defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

47. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ShengdaTech common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ShengdaTech or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

**ANSWER**: Paragraph 47 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 47. ShengdaTech admits that ShengdaTech common stock was actively traded on the NASDAQ throughout the Class Period. ShengdaTech is without sufficient knowledge or information to admit or deny the allegations contained in Paragraph 47 regarding identification of and notice to record owners and other members of the Class and therefore denies same. The remaining allegations of Paragraph 47 are denied.

48. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

**ANSWER**: Paragraph 48 alleges a legal conclusion to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 48.

49. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

**ANSWER**: Paragraph 49 alleges a legal conclusion to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 49.

50. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of ShengdaTech;

(c) whether Defendants failed to include material facts in the financial statements issued during the Class Period, making those filings materially false and misleading;

(d) whether the price of ShengdaTech common stock was artificially inflated during the Class Period; and

(e) to what extent the members of the Class have sustained damages and the proper measure of damages.

**ANSWER**: Paragraph 50, including subsections (a) through (e), alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 50, including subsections (a) through (e).

51. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**ANSWER**: Paragraph 51 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 51.

## SUBSTANTIVE ALLEGATIONS

### ShengdaTech Goes "Public" Through a Reverse Merger

52. In March 2006, Faith Bloom, a British Virgin Islands company controlled by Defendant X Chen, consummated a reverse merger with Zeolite Exploration Company ("Zeolite), a shell company incorporated in Nevada whose principal business activity, at the time of the transaction, was to "seek a suitable reverse acquisition candidate through acquisition, merger or other suitable business combination method."

**ANSWER**: Admitted.

53. As a result of the reverse merger, Defendant X Chen was appointed CEO, president and Chairman of the Board of Zeolite, Defendant Guo was appointed CFO of Zeolite and Zeolite's then director and CEO, Timothy Halter, resigned.

**ANSWER**: ShengdaTech admits the allegations contained in Paragraph 53, except ShengdaTech states that it is without knowledge or information sufficient to admit or deny whether the acts referred to were "as a result of the reverse merger" and therefore ShengdaTech denies that portion of Paragraph 53.

54. In January 2007, Defendant X Chen amended Zeolite's articles of incorporation and renamed the company ShengdaTech, Inc.

**ANSWER**: Admitted.

55. Faith Bloom remained a wholly-owned subsidiary of ShengdaTech, and was the direct parent company of various subsidiaries based in China.

**ANSWER**: Admitted.

56. Since January 2007, there have been over 600 "backdoor" or "reverse merger" registrations. Over 150 of these registrations have been by companies from China.

**ANSWER**: ShengdaTech is without sufficient knowledge or information to admit or deny the allegations contained in Paragraph 56 and therefore denies same.

57. In a reverse merger, a private company seeking to go public merges with a dormant public shell company. Before the transaction, the public shell company no longer has substantive operations, but its public company registration remains in effect. The transaction allows the former private company to go public without any of the scrutiny from regulators, underwriters and investors that companies undergo when they go public though a traditional IPO.

**ANSWER**: ShengdaTech is without sufficient knowledge or information to admit or deny the allegations contained in Paragraph 57 and therefore denies same.

58. Generally, once the reverse merger is completed: (i) the board of directors of the U.S. company resigns and the Chinese board takes over; (ii) the company immediately changes its name; and (iii) at some point, the new company seeks to raise fresh capital either through a private placement and/or secondary offering.

**ANSWER**: ShengdaTech is without sufficient knowledge or information to admit or deny the allegations contained in Paragraph 58 and therefore denies same.

59. Reverse mergers have come under increasing scrutiny. In April 2011, SEC commissioner Luis Aguilar, commenting on the Chinese securities fraud epidemic, stated, in pertinent part, as follows:

> While the vast majority of these companies may be legitimate businesses, a growing number of them have accounting deficiencies or are outright vessels of fraud.

**ANSWER**: ShengdaTech is without sufficient knowledge or information to admit or deny the allegations contained in Paragraph 59 and therefore denies same.

60. In June 2011, the SEC issued a warning about investing in companies that enter the U.S. market through reverse mergers. The SEC warned of "systemic concerns" with the

quality of the auditing of Chinese firms' financial reporting as well as the limitations on the ability of the SEC to enforce the securities laws and for investors to recover losses tied to fraudulent disclosures.

**ANSWER**: ShengdaTech is without sufficient knowledge or information to admit or deny the allegations contained in Paragraph 60 and therefore denies same.

61. In November 2011, the SEC approved tougher new exchange rules for companies that enter the U.S. market through reverse mergers. The new rules prohibit a reverse-merger company from listing until the company has been in the U.S. over-the-counter market or on another regulated U.S. or foreign exchange for at least a year. The SEC said the company also must file all required reports, including audited financial statements, with the commission and must maintain a requisite minimum share price for 30 of 60 trading days prior to listing.

**ANSWER**: ShengdaTech is without sufficient knowledge or information to admit or deny the allegations contained in Paragraph 61 and therefore denies same.

62. In 2011, the SEC suspended trading in more than a dozen reverse-merger companies because of lack of current, accurate information about the companies. At least six of those companies were based in China, including ShengdaTech.

**ANSWER**: ShengdaTech admits that trading in its stock was suspended in 2011. ShengdaTech is without sufficient knowledge or information to admit or deny the remaining allegations contained in Paragraph 62 and therefore denies same.

**ShengdaTech's Financial Reporting During the Class Period Was Materially False and Misleading and Violated GAAP**

63. During the Class Period, ShengdaTech falsely represented that its financial results were reported in accordance with GAAP. Pursuant to Regulation S-X [17 C.F.R. §210.4-01(a)(1)], financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

**ANSWER**: Paragraph 63 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 63. To the extent an answer may be required, to the extent ShengdaTech admits its financial results may have been falsely represented to be in accordance with GAAP, ShengdaTech denies that it was aware during the Class Period that any representation was false and further states that it exercised reasonable

diligence during the Class Period to ensure its financial results were properly reported and presented in accordance with GAAP. ShengdaTech further states that Regulation S-X speaks for itself and denies any characterizations that are inconsistent therewith.

64. On May 5, 2011, ShengdaTech filed its Form 8-K with the SEC (the "May 2011 Form 8-K") announcing that KPMG HK requested that the Company disclose that KPMG HK's audit reports on the Company's financial statements for the year ended December 31, 2008 (the "2008 financial statements") and the year ended December 31, 2009 (the "2009 financial statements") (collectively, the "Financial Statements") should no longer be relied upon, stating, in pertinent part, as follows:

> On April 29, 2011, we were also informed by KPMG, our former independent accounting firm, that disclosures should be made and action should be taken to prevent future reliance on their previously issued audit reports related to the consolidated balance sheets of ShengdaTech, Inc. and its subsidiaries as of December 31, 2008 and 2009, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended and the effectiveness of internal control over financial reporting as of December 31, 2008 and 2009.

**ANSWER**: ShengdaTech admits that it filed the May 2011 Form 8-K with the SEC, states that the May 2011 Form 8-K speaks for itself and denies any characterizations that are inconsistent therewith. The remaining allegations of Paragraph 64 are denied.

65. The May 2011 Form 8-K also disclosed that KPMG HK had "doubts" about representations that management provided to KPMG HK in connection with its audits of the Financial Statements and the effectiveness of ShengdaTech's internal control over its financial reporting.

**ANSWER**: ShengdaTech admits that it filed the May 2011 Form 8-K with the SEC, states that the May 2011 Form 8-K speaks for itself and denies any characterizations that are inconsistent therewith. The remaining allegations of Paragraph 65 are denied.

66. Additionally, the May 2011 Form 8-K revealed that KPMG HK informed the Company's Audit Committee of certain "concerns" that arose during its audit of the Company's consolidated financial statements for the year ended December 31, 2010, which included "serious discrepancies and unexplained issues" relating to, among others: (i) the Company's bank balances; (ii) transactions with major suppliers; (iii) VAT invoices and payments; (iv) sales and payments for sales by third parties; (v) sales to the Company's second largest customer; (vi) discrepancies between KPMG HK's direct calls to customers and the confirmations returned

to KPMG HK by mail; and (vii) concerns raised by directly confirming customer sales and accounts receivables.

**ANSWER**: ShengdaTech admits that it filed the May 2011 Form 8-K with the SEC, states that the May 2011 Form 8-K speaks for itself and denies any characterizations that are inconsistent therewith. The remaining allegations of Paragraph 66 are denied.

67. In addition to the foregoing, after the Class Period, ShengdaTech admitted that:

- a Special Committee of its Board of Directors hired independent counsel to conduct an investigation into concerns associated with improper financial reporting;
- the Special Committee removed ShengdaTech's management, including Defendant X Chen, from their respective positions with the Company; and
- the Special Committee appointed an independent party to oversee the Company's business.

**ANSWER**: Admitted.

68. On or about September 1, 2011, ShengdaTech filed its "[Proposed] Findings of Fact and Conclusions of Law" with the United States Bankruptcy Court for the District of Nevada asserting, in part, that:

> KPMG gave an oral report and then provided written notice to the Debtor's Audit Committee that, when auditing the Debtor's financial statements for the fiscal year ending December 31, 2010, it discovered "potentially serious discrepancies and unexplained issues," including the inability to confirm sales amounts, sales terms, and outstanding balances, and undisclosed related party transactions.
>
> * * *
>
> Soon after the investigation began, additional problems began to surface, including the inability of KPMG to verify the Debtor's cash accounts.
>
> * * *
>
> The Special Committee also has been unable to authenticate the veracity of certain U.S. certificates of deposits ("CDs"). . . . The Special Committee has been unable to verify the authenticity of those CDs and despite making repeated requests for such information . . . . The Special Committee has learned that the bank which issued the CDs has been unable to verify them and, in fact, has no record of issuing them to [ShengdaTech's wholly-owned subsidiary] Faith Bloom.
>
> * * *

> The investigation so far has determined that certain of the financial records of the Debtor may have been falsified in whole or in part and that serious issues remain unanswered regarding the financial condition of the Debtor and its overall business operations. Investigative findings also call into question the accuracy of payments allegedly made to the Debtor by various customers and the amounts of sales actually made. Additionally, the Debtor is reported to have engaged in transactions with entities owned by [Defendant] Chen but which were not reported to be related parties, and the sales to those entities appear to have been vastly overstated.

[Citations omitted.]

**ANSWER**: ShengdaTech admits that on September 1, 2011, ShengdaTech filed "[Proposed] Findings of Fact and Conclusions of Law" ("Proposed Findings") with the United States Bankruptcy Court for the District of Nevada, states that the Proposed Findings speak for themselves and denies any characterizations inconsistent therewith.

69. The above facts and admissions evidence an ongoing practice of intentional misconduct by ShengdaTech's most senior executives aimed at misstating the Company's financial reports during the Class Period.

**ANSWER**: The allegations of Paragraph 69 are not directed against ShengdaTech and therefore no answer is required.

70. The Individual Defendants had the responsibility to present ShengdaTech's business activities in accordance with Section 13 of the Exchange Act of 1934, which provides:

> Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall –
>
> A. make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> B. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> i. transactions are executed in accordance with management's general or specific authorization;
>
> ii. transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally

accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;

iii. access to assets is permitted only in accordance with management's general or specific authorization; and

iv. the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

**ANSWER**: The allegations of Paragraph 70 are not directed against ShengdaTech and therefore no answer is required.

71. The above facts and admissions also evidence that ShengdaTech's financial reporting during the Class Period violated numerous provisions of GAAP.[6]

**ANSWER**: Paragraph 71, including Footnote 6, alleges a legal conclusion to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 71. To the extent an answer may be required, to the extent ShengdaTech's financial reporting may have violated one or more provisions of GAAP, ShangdaTech states that during the Class Period it reasonably believed its financial statements were in compliance with GAAP and further states that it exercised reasonable diligence during the Class Period to ensure its financial results were properly reported and presented in accordance with GAAP.

72. For example, GAAP provides that revenue should not be recognized until it is realized or realizable and earned. The conditions for revenue recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price is fixed or determinable, collectability of the sales price is reasonably assured and when the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue. Generally, revenue should not be recognized until an exchange has occurred and the earnings process is complete. *See* SEC Staff Accounting Bulletin ("SAB") No. 104; FASB Statement of Financial Accounting Standards ("SFAS") No. 48;

---

[6] On June 3, 2009, the Financial Accounting Standards Board ("FASB") approved the Accounting Standards Codification (the "Codification") as the source of authoritative GAAP for financial statements issued for periods after September 15, 2009. Given the Class Period, references herein to GAAP refer to those standards in existence before the effective date of the Codification, the substance of which were incorporated into the Codification and continued to be authoritative, in all material respects, though the date of ShengdaTech's last publicly issued financial statements, the periods ended September 20, 2010.

Accounting Research Bulletin No. 43; Accounting Principles Board Opinion No. 10; and American Institute of Certified Public Accountants ("AICPA") Statement of Position 97-2.

**ANSWER**: Paragraph 72 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 72. ShengdaTech further states that GAAP provisions, SEC Staff Accounting Bulletin No. 104, FASB Statement of Financial Accounting Standards No. 48; Accounting Research Bulletin No. 43; Accounting Principles Board Opinion No. 10; and American Institute of Certified Public Accountants Statement of Position 97-2 speak for themselves and denies any characterizations that are inconsistent therewith.

73. In fact, the Financial Statements, filed with the SEC on Forms 10-K, disclosed, in all material respects, the following with respect to its policy of revenue recognition, stating in pertinent part, as follows:

> The Company recognizes revenues, when the customer takes ownership and assumes risk of loss, collection of relevant receivable is probable, persuasive evidence of an arrangement exists and the sales price is fixed or determinable. Written sales agreements or customer purchase orders, which specify price, product, and quantity, are used as evidence of an arrangement. For domestic sales, customer acceptance is evidenced by a carrier or customer signed shipment notification form. For export sales, products are considered delivered when the goods have reached the port of arrival. In the PRC, value added tax ("VAT") of approximately 6 - 17% on invoiced amount is collected on behalf of tax authorities. Revenue is recorded net of VAT. VAT collected from customers, net of VAT paid for purchases, is recorded as a liability and included in "accrued expenses and other payables" in the consolidated balance sheets.

**ANSWER**: ShengdaTech admits that it filed Financial Statements on Form 10-K for the years ended December 31, 2009 and 2008, states that the Financial Statements speak for themselves and denies any characterizations that are inconsistent therewith. The remaining allegations of Paragraph 73 are denied.

74. In addition, GAAP, in SFAS No. 5, requires financial statements to recognize and report a charge to income when information existing at the date of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred, and the amount of such loss can be reasonably estimated. Further, Chapter 3 of Accounting Research Bulletin ("ARB") No. 43 provides that the objective of providing for reserves against receivables

is to assure that "[a]ccounts receivable net of allowances for uncollectible accounts . . . are effectively stated as the amount of cash estimated as realizable."

**ANSWER**: Paragraph 74 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 74. ShengdaTech further states that GAAP provisions, SFAS No. 5 and Chapter 3 of Accounting Research Bulletin No. 43 speak for themselves and denies any characterizations that are inconsistent therewith. The remaining allegations of Paragraph 74 are denied.

75. In this regard, the Financial Statements filed with the SEC on Forms 10-K, disclosed, in all material respects, the following with respect to its policy of accounting for accounts receivable, stating in pertinent part, as follows:

> Accounts receivable are recorded at the invoiced amount. Amounts collected on trade accounts receivable are included in net cash provided by operating activities in the consolidated statements of cash flows. Management reviews accounts receivable on a periodic basis and records allowances when there is a doubt as to the collectibility of the balance. In evaluating the collectibility of accounts receivable balances, management considers various factors, including historical losses, current market conditions and customers' financial condition, the amount of accounts receivables in dispute, and the accounts receivables aging and payment patterns. The Company historically has not had any write-offs and all accounts receivable are current and due within 90 days as of the balance sheet dates. As a result, no allowances for doubtful accounts has been recorded for any of the periods presented herein because management believes all accounts receivable are fully collectible. The Company does not have any off-balance-sheet credit exposure related to its customers.

**ANSWER**: ShengdaTech admits that it filed Financial Statements on Form 10-K for the years ended December 31, 2009 and 2008, states that the Financial Statements speak for themselves and denies any characterizations that are inconsistent therewith. The remaining allegations of Paragraph 75 are denied.

76. ShengdaTech has now indicated that the financial statements it filed with the SEC and issued to investors during the Class Period, which were signed by the Individual Defendants, violated the above provisions of GAAP and contradicted its publicly stated policies of accounting for revenue and accounts receivable during the Class Period.

**ANSWER**: ShengdaTech admits that it filed with the SEC and issued to investors various statements which speak for themselves and denies any characterizations inconsistent therewith. The remaining allegations of Paragraph 76 are denied.

77. In addition, the 2008 financial statements, disclosed, in pertinent part, as follows:

> Cash consists of cash on hand and cash at bank. As of December 31, 2008 and 2007, RMB 315,092,101 and RMB 191,093,944 (equivalent to $45,970,661 and $26,126,789), respectively, and U.S. dollar deposits of $67,589,228 and $236,625, respectively, were held at major financial institutions located in the PRC. The remaining balance was held primarily at major financial institutions located in the Hong Kong Special Administrative Region (the "HK SAR"). Management believes that these major financial institutions are of high credit quality.

**ANSWER**: ShengdaTech admits it filed Financial Statements on Form 10-K for the year ended December 31, 2008, states that the Financial Statements speak for themselves and denies any characterizations that are inconsistent therewith. The remaining allegations of Paragraph 77 are denied.

78. Similarly, the 2009 financial statements, disclosed, in pertinent part, as follows:

> Cash consists of cash on hand and cash at bank. As of December 31, 2009 and 2008, cash deposits of RMB 559,255,721 and RMB 315,092,101 (equivalent to $81,796,016 and $45,970,661), respectively, and U.S. dollar deposits of $33,741,126 and $67,589,228, respectively, were held at major financial institutions located in the PRC. The remaining balance is held primarily at major financial institutions located in the Hong Kong Special Administrative Region (the "HK SAR") and in the U.S. Management believes that these major financial institutions are of high credit quality.

**ANSWER**: ShengdaTech admits it filed Financial Statements on Form 10-K for the year ended December 31, 2009, states that the Financial Statements speak for themselves and denies any characterizations that are inconsistent therewith. The remaining allegations of Paragraph 78 are denied.

79. The disclosures in ¶¶77-78 were materially false and misleading, as ShengdaTech has now indicated.

**ANSWER**: Paragraph 79 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 79. To the extent an answer may be required, to the extent ShengdaTech's financial disclosures may have been false or misleading, ShengdaTech denies that it was aware during the Class Period any such disclosures were false or misleading and further states that it exercised reasonable diligence during the Class Period to ensure its financial disclosures were accurate. ShengdaTech further incorporates by reference its answers to Paragraphs 77 and 78, states that the Financial Statements referred to in Paragraphs 77 and 78 speak for themselves and denies any characterizations inconsistent therewith. The remaining allegations of Paragraph 79 are denied.

80. Further, GAAP, in SFAS No. 57, also requires that financial statements disclose material related party transactions because, among other things, they cannot be presumed to have been carried out on an arm's-length basis. As ShengdaTech has now indicated, its financial statements during the Class Period improperly failed to disclose related party transactions in conformity with GAAP.

**ANSWER**: Paragraph 80 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 80. ShengdaTech further states that GAAP provisions and SFAS No. 57 speak for themselves and denies any characterizations that are inconsistent therewith. Further answering the second sentence of Paragraph 80, ShengdaTech admits that it has filed and issued a number of public statements concerning its financial statements and refers to such statements, states that such statements speak for themselves and deny the allegations of the second sentence of Paragraph 80 to the extent they are inconsistent therewith. ShengdaTech further states that if one or more of its financial reports failed to properly disclose related party transactions, ShengdaTech was not aware during the Class Period that any such representations were false and further states that it exercised reasonable diligence during the Class Period to ensure its financial results were properly reported. The remaining allegations of Paragraph 80 are denied.

81. During the Class Period, the Individual Defendants caused or permitted ShengdaTech to issue financial statements that violated GAAP in numerous respects. In failing to file financial statements with the SEC that conformed to GAAP, the Individual Defendants caused or permitted ShengdaTech to repeatedly disseminate financial statements that materially misstated the Company's financial resources and performance during the Class Period.

**ANSWER**: Paragraph 81 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer.

82. In addition, while the Company's internal and disclosure controls were materially deficient and not operating effectively during the Class Period, the Individual Defendants caused or permitted ShengdaTech to make representations to the contrary in its interim and annual reports filed with the SEC. These materially false and misleading certifications were wrongfully certified by Defendants X Chen and Guo.

**ANSWER**: Paragraph 82 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. ShengdaTech denies any remaining allegations against it contained in Paragraph 82.

**KPMG HK's Fraudulent Conduct**

83. In the performance of their audits of ShengdaTech's financial statements, Defendant KPMG HK owed ShengdaTech a duty to act with reasonable care and competence and perform the services it rendered pursuant to professional standards. However, KPMG HK violated numerous professional standards and acted with such lack of care, that it was indifferent to numerous red flags warning it of the multi-year financial fraud alleged herein and knew, or was reckless in not knowing, that it issued false audit opinions on the Financial Statements.

**ANSWER**: The allegations of Paragraph 83 are not directed against ShengdaTech and therefore no answer is required.

84. In connection with its audits of the Financial Statements, KPMG HK had access to the Company's corporate information and accounting books and records. KPMG HK's personnel were also regularly present at ShengdaTech's headquarters and had access to its employees via face-to-face meetings, e-mail and telephone. Given its intimate knowledge of ShengdaTech's business, KPMG HK knew of, or was reckless in not knowing of, the numerous accounting irregularities and improprieties alleged herein, and that the Company's Financial Statements, and related financial information, were materially false and misleading because, among other things, they violated GAAP in numerous respects.

**ANSWER**: The allegations of Paragraph 84 are not directed against ShengdaTech and therefore no answer is required.

85. KPMG HK's extensive knowledge of ShengdaTech's business is demonstrated by the fees that the Company paid KPMG HK, which totaled more than $1.2 million since it was retained by ShengdaTech on November 11, 2008. The KPMG HK partners who were responsible for the services rendered to ShengdaTech were particularly motivated to appease ShengdaTech and Defendants because their remuneration was closely tied to the fees generated on the ShengdaTech engagements.

**ANSWER**: Paragraph 85 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits that it paid KPMG HK more than $1.2 million since ShengdaTech retained KPMG HK on or about November 11, 2008. ShengdaTech is without sufficient knowledge or information to admit or deny the allegations contained the second sentence of Paragraph 85 and therefore denies same. ShengdaTech denies any remaining allegations against it contained in Paragraph 85.

86. KPMG HK's website describes its audit process as being "globally consistent" and "designed to concentrate on the key areas of risk," stating, in pertinent part, as follows:

> Our audit process does more than assess financial information. It enables our professionals to consider the unique elements of the business - its culture, the industry in which it competes, competitive pressures, and the inherent risks. ***KPMG's member firms have developed a globally consistent audit process that is designed to concentrate on the key areas of risk***, based on a company's operational characteristics and performance profile. ***Our partners and professionals are trained to look closely at all aspects of financial reporting so they are better able to isolate risk***. (Emphasis added.)

**ANSWER**: The allegations of Paragraph 86 are not directed against ShengdaTech and therefore no answer is required.

87. Shengdatech's 2008 and 2009 Forms 10-K describe the Company's revenue recognition policy as "critical" in nature, thereby demanding a high level of concentration to isolate audit risk.

**ANSWER**: The allegations of Paragraph 87 are not directed against ShengdaTech and therefore no answer is required. ShengdaTech further states that the 2008 and 2009 Forms 10-K speak for themselves and denies any characterizations that are inconsistent therewith.

88. As alleged herein, KPMG HK turned a blind eye to the key audit risk areas in auditing the Financial Statements, and, indeed, factual audit evidence obtained later reveals that the Company's Financial Statements were materially misstated.

**ANSWER**: The allegations of Paragraph 88 are not directed against ShengdaTech and therefore no answer is required.

**KPMG HK's False and Misleading Audit Reports**

89. KPMG HK issued the following false and misleading audit report, dated March 31, 2009, on ShengdaTech's internal controls as of December 31, 2008 and the 2008 financial statements:

> The Board of Directors and Shareholders
>
> ShengdaTech, Inc.:
>
> We have audited ShengdaTech, Inc. and subsidiaries' internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). ShengdaTech, Inc. and subsidiaries' management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying *Management's Report On Internal Control Over Financial Reporting*. Our responsibility is to express an opinion on ShengdaTech, Inc. and subsidiaries' internal control over financial reporting based on our audit.
>
> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.
>
> A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable

assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. Material weaknesses have been identified and included in management's assessment related to the lack of adequate policies, procedures and personnel to address the accounting for and disclosures of non-routine transactions and the Company's internal control over the accounting for income taxes.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of ShengdaTech, Inc. and subsidiaries as of December 31, 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the year then ended. These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2008 consolidated financial statements, and this report does not affect our report dated March 31, 2009, which expressed an unqualified opinion on those consolidated financial statements.

***In our opinion, because of the effect of the aforementioned material weaknesses on the achievement of the objectives of the control criteria, ShengdaTech, Inc. and subsidiaries have not maintained effective internal control over financial reporting as of December 31, 2008***, based on criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

[Emphasis added and in original.]

**ANSWER**: The allegations of Paragraph 89 are not directed against ShengdaTech and therefore no answer is required.

90. KPMG HK also issued the following false and misleading unqualified audit report, dated March 15, 2010, on ShengdaTech's internal controls as of December 31, 2009 and the 2009 financial statements:

> The Board of Directors and Shareholders
>
> ShengdaTech, Inc.:
>
> We have audited ShengdaTech, Inc.'s internal control over financial reporting as of December 31, 2009, based on criteria established in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). ShengdaTech, Inc.'s management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management Report on Internal Control over Financial Reporting.
>
> Our responsibility is to express an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.
>
> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.
>
> A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

> Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.
>
> ***In our opinion, ShengdaTech, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009***, based on criteria established in *Internal Control-Integrated Framework* issued by COSO.
>
> The Company acquired Anhui Chaodong Nanomaterials Science and Technology Co., Ltd. (Chaodong) during 2009, and management excluded from its assessment of the effectiveness of ShengdaTech, Inc.'s internal control over financial reporting as of December 31, 2009, Chaodong's internal control over financial reporting associated with total assets of $4,593,970 and nil revenue, included in the consolidated financial statements of the ShengdaTech, Inc. and subsidiaries as of and for the year ended December 31, 2009. Our audit of internal control over financial reporting of ShengdaTech, Inc. also excluded an evaluation of the internal control over financial reporting of Chaodong.
>
> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of ShengdaTech, Inc. and subsidiaries of December 31, 2009 and 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended, and our report dated March 15, 2010 expressed an unqualified opinion on those consolidated financial statements.

[Emphasis added and in original.]

**ANSWER**: The allegations of Paragraph 90 are not directed against ShengdaTech and therefore no answer is required.

91. The statements referenced in ¶¶89-90 were materially false and misleading because when made because:

(a) as detailed above, the Financial Statements violated GAAP in numerous respects, and

(b) as detailed below, KPMG HK's audits of the Financial Statements were not conducted in accordance with Generally Accepted Auditing Standards ("GAAS").

**ANSWER**: The allegations of Paragraph 91 are not directed against ShengdaTech and therefore no answer is required.

92. GAAS has been established to ensure that external auditors fulfill their obligations when auditing and reviewing financial statements and other information contained in SEC filings. It consists of authoritative standards, originally established by the American Institute of Certified Public Accountants ("AICPA"), and now have been adopted, amended and expanded upon by the Public Company Accounting Oversight Board ("PCAOB").

**ANSWER**: The allegations of Paragraph 92 are not directed against ShengdaTech and therefore no answer is required.

93. GAAS, includes, *inter alia*, ten basic standards establishing the objectives of a financial statement audit and providing guidance for the quality of audit procedures to be performed, interpretations of these standards in Statements on Auditing Standards issued by the AICPA, (codified and referred to as "AU §__") and additional auditing standards (referred to herein as "AS__") promulgated by the PCAOB.

**ANSWER**: The allegations of Paragraph 93 are not directed against ShengdaTech and therefore no answer is required.

94. In certifying the Financial Statements, Defendant KPMG HK falsely represented that its audits were conducted in accordance with the standards of the PCAOB, which require that:

(a) the audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor;

(b) in all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors;

(c) due professional care is to be exercised in the performance of the audit and the preparation of the report;

(d) the work is to be adequately planned and assistants, if any, are to be properly supervised;

(e) a sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing and extent of the tests to be performed;

(f) sufficient competent evidential matter is to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit; and

(g) the report shall either contain an expression of an opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

**ANSWER**: The allegations of Paragraph 94, including subsections (a) through (g), are not directed against ShengdaTech and therefore no answer is required.

95. GAAS, in AU §326, required KPMG HK to:

- Obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit;
- Consider whether specific audit objectives have been achieved in evaluating evidential matter;
- Be thorough in the search for evidential matter and unbiased in its evaluation;
- Design audit procedures to obtain competent evidential matter; and
- Consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the client's financial statements.

**ANSWER**: The allegations of Paragraph 95, including its bullet points, are not directed against ShengdaTech and therefore no answer is required.

96. In addition, GAAS, in AU §330, provides that the auditor may need to "exercise a heighten degree of professional skepticism" when evaluating audit confirmation responses.

**ANSWER**: The allegations of Paragraph 96 are not directed against ShengdaTech and therefore no answer is required.

97. In violation of the above provisions of GAAS, KPMG HK did not obtain sufficient competent evidential matter in the performance of its audits. In fact, as noted below, KPMG HK received audit evidence, including abnormal audit confirmation responses, that called into question the very legitimacy of the ShendgaTech's financial reporting.

**ANSWER**: The allegations of Paragraph 97 are not directed against ShengdaTech and therefore no answer is required.

98. In addition, GAAS, AU §316 required KPMG HK to plan and perform its audits in a manner that provided reasonable assurance the Financial Statements were free from misstatements caused by error or fraud. This mandate included evaluating the business rationale for significant, unusual transactions and events. In fact, AU §316 required KPMG HK to "gain an understanding of the business rationale for such transactions and whether that rationale (or the lack thereof) suggest[ed] that the transactions may have been entered into to engage in fraudulent financial reporting or conceal misappropriation of assets."

**ANSWER**: The allegations of Paragraph 98 are not directed against ShengdaTech and therefore no answer is required.

99. The requirements of AU §316 were designed to put KPMG HK on notice of material financial misstatement risk factors arising from fraudulent financial reporting, which were present at ShengdaTech, including:

- A failure by management to display and communicate an appropriate attitude regarding internal control and the financial reporting process. Specific indicators might include:

  (i) inadequate monitoring of significant controls;

  (ii) management failing to correct known reportable conditions on a timely basis;

  (iii) management continuing to employ an ineffective accounting, information technology, or internal auditing staff; and

  (iv) management setting unduly aggressive financial targets and expectations for operating personnel;

- Strained relationship between management and the current or predecessor auditor. Specific indicators might include:

  (i) frequent disputes with the current or predecessor auditor on accounting, auditing, or reporting matters; and

  (ii) domineering management behavior in dealing with the auditor, especially involving attempts to influence the scope of the auditor's work;

- Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm;

- Significant, unusual, or highly complex transactions, especially those close to year end, that pose difficult "substance over form" questions; and

- Significant pressure to obtain additional capital necessary to stay competitive considering the financial position of the entity – including need for funds to finance major research and development or capital expenditures.

**ANSWER**: The allegations of Paragraph 99, including its bullet points, are not directed against ShengdaTech and therefore no answer is required.

100. In violation of GAAS, KPMG HK turned a blind eye towards each of the above risk factors, which were present at ShengdaTech during the Class Period. These risk factors

were red flags warning KPMG HK about the risk of material misstatement in the Company's financial statements. Nonetheless, KPMG HK ignored these red flags and failed to adequately plan and perform its audit procedures in a manner that was reasonably designed to identify the numerous financial improprieties alleged herein. Such failures permitted ShengdaTech to issue materially false and misleading Financial Statements over a multi-year period.

**ANSWER**: The allegations of Paragraph 100 are not directed against ShengdaTech and therefore no answer is required.

101. In addition, GAAS, in AS No. 5 required KPMG HK to plan and perform the audit to obtain evidence sufficient to reasonably determine the existence of material weaknesses in ShengdaTech's internal controls. The standard also provides that a direct relationship exists between the degree of risk associated with a particular area of a company's internal control over financial reporting and the amount of audit attention that should be devoted to that area. In addition, the standard provides that there is usually a higher risk that internal controls will fail to prevent or detect misstatements caused by fraud than the risk of a failure to prevent or detect an error and that auditors need to focus more attention on the areas of highest risk.

**ANSWER**: The allegations of Paragraph 101 are not directed against ShengdaTech and therefore no answer is required.

102. Nonetheless, KPMG HK ignored these standards during the course of its audits and issued unqualified opinions on the Financial Statements.

**ANSWER**: The allegations of Paragraph 102 are not directed against ShengdaTech and therefore no answer is required.

103. KPMG HK, as auditors, were obligated to assess ShengdaTech's internal financial and accounting controls and determine whether such controls were effective. KPMG HK was also required to evaluate whether ShengdaTech's deficient internal controls might lead to or contribute to the risk of fraud not being detected. Nonetheless, KPMG HK turned a blind-eye toward such deficiencies.

**ANSWER**: The allegations of Paragraph 103 are not directed against ShengdaTech and therefore no answer is required.

104. GAAS also required KPMG HK to examine related party transactions to ensure that these were properly accounted for so that the transactions reflected their economic substance rather than form. According to AU §334, KPMG HK was required to:

- Obtain an understanding of the business purpose of the related party transactions;

- Examine invoices, executed copies of agreements, contracts, and other pertinent documents;

- Determine whether the transaction has been approved by the board of directors or other appropriate officials;

- Test for reasonableness the compilation of amounts to be disclosed, or considered for disclosure, in the financial statements;

- Arrange for the audits of inter-company account balances to be performed as of concurrent dates, even if the fiscal years differ, and for the examination of specified, important, and representative related party transactions by the auditors for each of the parties, with appropriate exchange of relevant information; and

- Inspect or confirm and obtain satisfaction concerning the transferability and value of collateral.

**ANSWER**: The allegations of Paragraph 104, including its bullet points, are not directed against ShengdaTech and therefore no answer is required.

105. KPMG HK violated the requirements of GAAS and failed to determine that ShengdaTech transacted with related parties, including entities affiliated with Defendant X Chen.

**ANSWER**: The allegations of Paragraph 105 are not directed against ShengdaTech and therefore no answer is required.

106. In addition to the foregoing violations of GAAS, KPMG HK violated the following provisions of GAAS when auditing the financial statements:

(a) AU §380, which requires that auditors inform the audit committee of uncorrected misstatements;

(b) the first general standard, which requires that audits be performed by persons having adequate technical training and proficiency;

(c) the second general standard, which requires that the audit be performed by persons having adequate knowledge of the subject matter;

(d) the third general standard, which requires that the auditor perform the engagement only if he or she has reason to believe that the subject matter is capable of evaluation against criteria that are suitable and available to users;

(e) the fourth general standard, which requires that independence in mental attitude is to be maintained by the auditor in all matters related to the audit;

(f) the fifth general standard, which requires that due professional care is to be exercised in the planning and performance of the audit;

(g) the first standard of fieldwork, which requires that the audit be adequately planned and assistants, if any, shall be properly supervised;

(h) the second standard of fieldwork, which requires that sufficient evidence be obtained to provide a reasonable basis for the conclusion that is expressed in the report; and

(i) the first standard of reporting, which requires the auditor to issue a report on the subject matter or the assertion or withdraw from the attest engagement. KPMG HK was required to state that either no opinion could be issued by them on the Financial Statements or else issue an adverse opinion stating that such Financial Statements were not fairly presented in conformity with GAAP. KPMG HK's failure to make such a qualification, correction, modification and/or withdrawal of its audit opinions was a violation of GAAS, including the standards of reporting.

**ANSWER**: The allegations of Paragraph 106, including subsections (a) through (i), are not directed against ShengdaTech and therefore no answer is required.

107. KPMG HK's failure to perform its audits in accordance with GAAS, permitted ShengdaTech's accounting irregularities and improprieties to go unabated and allowed ShengdaTech to issue materially misstated financial statements over a multi-year period.

**ANSWER**: The allegations of Paragraph 107 are not directed against ShengdaTech and therefore no answer is required.

**KPMG HK's Reckless Conduct**

108. Collectively, the myriad of ways in which the Financial Statements violated GAAP and GAAS, coupled with the duration of such violations, and ShengdaTech's material internal control deficiencies, are, of themselves, indicative of KPMG HK's scienter in the "auditing" of the Financial Statements.

**ANSWER**: The allegations of Paragraph 108 are not directed against ShengdaTech and therefore no answer is required.

109. In addition to the foregoing, however, during the Class Period, KPMG HK accumulated audit evidence, including abnormal audit confirmation responses, that called into question the very legitimacy of the ShendgaTech's financial reporting.

**ANSWER**: The allegations of Paragraph 109 are not directed against ShengdaTech and therefore no answer is required.

110. For example, during the course of KPMG HK's audit of ShengdaTech's 2009 financial statements, KPMG HK received more audit confirmations from purported third parties than it had requested.

**ANSWER**: The allegations of Paragraph 110 are not directed against ShengdaTech and therefore no answer is required.

111. KPMG HK also became aware of several instances where customer names in the Company's accounting system did not match the names on invoices and/or related documents that purported to memorialize the Company's transactions.

**ANSWER**: The allegations of Paragraph 111 are not directed against ShengdaTech and therefore no answer is required.

112. In addition to these highly irregular occurrences, which should have put KPMG HK on notice that it needed to examine ShengdaTech's reported sales transactions more closely, KPMG HK was also told by a person familiar with the market for ShengdaTech's products that he/she believed that the "Company's reported sales figures exceeded the likely *global demand* for those products."

**ANSWER**: The allegations of Paragraph 112 are not directed against ShengdaTech and therefore no answer is required.

113. Nonetheless, KPMG HK acquiesced and issued a materially false and misleading audit report on the 2009 financial statements.

**ANSWER**: The allegations of Paragraph 113 are not directed against ShengdaTech and therefore no answer is required.

114. Thereafter, in or around May 2010, a member of ShengdaTech's Audit Committee met with KPMG HK's lead engagement audit partner to discuss a review KPMG HK was then conducting of the Company's 2010 first quarter financial statements. During this meeting, KPMG HK's audit partner informed the Audit Committee member that, during the course of KPMG HK's audit of ShengdaTech's 2009 financial statements, KPMG HK received more audit confirmations from purported third parties than it had requested.

**ANSWER**: Paragraph 114 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, admitted.

115. While the KPMG HK audit partner tried to assure the Audit Committee member that the foregoing was no cause for concern, the Audit Committee member requested that KPMG HK perform additional procedures to verify the accuracy of ShengdaTech's reported transactions during its audit of the Company's 2010 financial Statements.

**ANSWER**: Paragraph 115 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, admitted.

116. As a result, KPMG HK quickly learned of "potentially serious discrepancies and unexplained issues."

**ANSWER**: The allegations of Paragraph 116 are not directed against ShengdaTech and therefore no answer is required.

117. In a draft letter dated March 3, 2011, KPMG HK described some of the issues it had discovered: (i) that KPMG HK was unable to confirm sales amounts, sales terms, and outstanding balances; (ii) that "ShengdaTech management had misdirected, intercepted and/or otherwise interfered with [] confirmation requests and responses"; and (iii) that ShengdaTech's second largest customer had not been at that address for at least five to six years, among other things.

**ANSWER**: Paragraph 117 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech states that the March 3, 2011 draft letter speaks for itself and denies any characterizations inconsistent therewith. ShengdaTech denies any remaining allegations against it contained in Paragraph 117.

118. Later, KPMG HK informed the Audit Committee in writing that it had ''become aware of information indicating that an illegal act has or may have occurred" and that it had determined irregularities in customer confirmations and bank confirmations. *Liquidating Trust* Complaint at ¶45.

**ANSWER**: Paragraph 118 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, admitted. ShengdaTech further states that the Liquidating Trust Complaint speaks for itself and denies any characterizations inconsistent therewith.

119. In particular, KPMG HK had received a confirmation from Jiangsu Libao stating that it did not purchase anything from the Company in 2010, when ShengdaTech's books and records noted that during 2010 it had sales of RMB 7,850,769 to Jiangsu Libao. *Liquidating Trust* Complaint at ¶46(a).

**ANSWER**: Paragraph 119 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, admitted. ShengdaTech further states that the Liquidating Trust Complaint speaks for itself and denies any characterizations inconsistent therewith.

120. In addition, KPMG HK had received information from the Bank of China, Tai'an Branch, indicating that the Company's cash balances as of December 31, 2010 was RMB 89,949.48 and USD 67.61, only a small fraction of the RMB 13,282,581.99 and USD 50,054.18 balances shown on the Company's books as of December 31,2010. *Liquidating Trust* Complaint at ¶46(b).

**ANSWER**: Paragraph 120 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, admitted. ShengdaTech further states that the Liquidating Trust Complaint speaks for itself and denies any characterizations inconsistent therewith.

121. Defendant KPMG HK owed a duty to ShengdaTech to perform its auditing services with reasonable care and competence. As a member of a worldwide firm of Certified Public Accountants, auditors and business consultants, KPMG HK was well aware of its duties and obligations in serving as ShengdaTech's independent auditor.

**ANSWER**: The allegations of Paragraph 121 are not directed against ShengdaTech and therefore no answer is required.

122. During the Class Period, the personnel at KPMG HK abandoned their duties as independent auditors and turned a blind eye to the numerous red flags and violations of GAAP and GAAS as alleged herein.

**ANSWER**: The allegations of Paragraph 122 are not directed against ShengdaTech and therefore no answer is required.

123. KPMG HK knowingly or recklessly issued unqualified audit opinions on the Financial Statements to protect the lucrative business relationship it enjoyed with ShengdaTech and consented to the inclusion of its unqualified opinions on the Financial Statements in

ShengdaTech's Forms 10-K filed with the SEC during the Class Period, which it knew, or was reckless in not knowing, were materially false and misleading.

**ANSWER**: The allegations of Paragraph 123 are not directed against ShengdaTech and therefore no answer is required.

**KPMG HK Failed to Perform Proper Audits on ShengdaTech's 2008 and 2009 Financial Statements**

124. Had KPMG HK taken the follow-up action in its 2008 and 2009 audits as it belatedly did in its 2010 audit, the auditor would have discovered the widespread fraud that was then ongoing at the Company.

**ANSWER**: The allegations of Paragraph 124 are not directed against ShengdaTech and therefore no answer is required.

125. KPMG HK's first audit report for 2008 found material weaknesses in the Company's internal controls, but KPMG HK did not identify (as it should have) the widespread fraud that affected every aspect of the Company's financial reporting. KPMG HK's 2009 report, despite evidence to the contrary, did not contain any adverse opinion and did not call into question any of ShengdaTech's accounting or financial reporting practices.

**ANSWER**: The allegations of Paragraph 125 are not directed against ShengdaTech and therefore no answer is required.

126. In or about May 2010, during a meeting with a member of the Company's Audit Committee regarding KPMG HK's review of ShengdaTech's quarterly financial statements, KPMG HK's lead audit partner stated that, during its audit of the Company's 2009 financial statements, it received a higher than usual number of confirmation replies. In addition to the high number of confirmation replies, KPMG HK ignored other obvious red flags during its audit of the Company's 2009 financial statements. Specifically, KPMG HK was told by a person familiar with the market for ShengdaTech's products that he/she believed that the "Company's reported sales [] exceeded . . . the likely global market demand for those products." *Liquidating Trust* Complaint at ¶48(e). Moreover, during the 2009 audit, KPMG HK "noticed several instances where customer names in the Company's accounting system did not match the names on invoices and/or related documents that purported to memorialize the Company's transactions." *Oaktree* Complaint at ¶92. Unbeknownst to shareholders, the Audit Committee member requested that KPMG HK "look more closely at third party audit confirmations when auditing the 2010 Financial Statements." *Id*. at ¶77.

**ANSWER**: Paragraph 126 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the

allegations against ShengdaTech, ShengdaTech states that the Liquidating Trust Complaint and the Oaktree Complaint speak for themselves and denies any characterizations inconsistent therewith. ShengdaTech admits the first and last sentences of Paragraph 126. ShengdaTech denies any remaining allegations against it contained in Paragraph 126.

127. After KPMG HK began its investigation, it uncovered systemic and endemic problems with the Company's financial reports.

**ANSWER**: The allegations of Paragraph 127 are not directed against ShengdaTech and therefore no answer is required.

128. On March 3, 2011, KPMG HK provided a draft letter to the Audit Committee, which described some of the issues KPMG HK had discovered:

(a) when KPMG HK contacted ShengdaTech customers directly for confirmation of sales amounts, terms, and outstanding balances, rather than using the addresses provided by ShengdaTech management, it discovered huge discrepancies in sales and, in at least one case, no sales. These discrepancies are outlined below:

| Customer | 2010 Sales Recorded in ShengdaTech's Books (RMB) | 2010 Sales Confirmed by KPMG HK (RMB) |
|---|---|---|
| Xika (China) | 7,667,094 | 0 |
| Zhengzhou Minghua | 7,621,367 | 114,000 |
| Zhengzhou Zhongyuan | 9,525,897 | 662,000 |

See *Liquidating Trust* Complaint at ¶43(c);

(b) when KPMG HK mailed sales and accounts receivable confirmations to customers of ShengdaTech's Shaanxi Haize subsidiary and also to customers of ShengdaTech's subsidiaries in the Shangdong province, it concluded that "ShengdaTech management had misdirected, intercepted and/or otherwise interfered with these confirmation requests and responses" because false responses were returned to KPMG HK in the wrong envelopes despite the fact that these confirmations were mailed separately from Shangdong and Shaanxi by different audit teams, and the two sets of confirmations were accompanied by envelopes with different return addresses. *Oaktree* Complaint at ¶78;

(c) when KPMG HK performed background checks on certain of Shengdatech's purported customers, it determined that three of them had no offices at their registered business addresses. In fact, one of ShengdaTech's customers' business address was

actually the home address of an executive of one of Shengdatech's subsidiaries. This address was also the registered business address of another entity controlled by Defendant X Chen. The registered business address of a fourth purported customer was a room in a hotel that KPMG HK was unable to locate; and

(d) when KPMG HK traveled to the registered business address of ShengdaTech's second largest customer, Beijing Xiling, Beijing Xiling was not at that address and the gatekeeper at the building told KPMG HK that Beijing Xiling had not been at that address for at least five to six years. ShengdaTech then provided KPMG HK with an alternate address, but the address was registered to another company, not Beijing Xiling.

**ANSWER**: Paragraph 128, including subsections (a) through (d), contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits that the KPMG HK provided a draft letter to the Audit Committee, states that the draft letter dated March 3, 2011 speaks for itself and denies any characterizations inconsistent therewith. Further answering, ShengdaTech states that the Liquidating Trust Complaint and the Oaktree Complaint speak for themselves and denies any characterizations inconsistent therewith. ShengdaTech denies any remaining allegations against it contained in Paragraph 128, including subsections (a) through (d).

129. On March 14, 2011, KPMG HK participated in a telephone conference with the Audit Committee and informed them of additional issues that they discovered. According to a written report that followed the conversation, KPMG HK disclosed the following problems:

(a) KPMG HK confirmed that one of the Company's purported customers, Jiangsu Libao, had purchased nothing from the Company in 2010, but the Company's records indicated that the Company sold RMB 7,850,769 in goods to this customer during 2010; and

(b) KPMG HK confirmed that ShengdaTech's account balances as of December 31, 2010 at the Bank of China, Tai'an Branch, were RMB 89,949.48 and USD $67.61 as opposed to the Company's records, which indicated a balance of RMB 13,282,581.99 and USD $50,054.18.

**ANSWER**: Paragraph 129, including subsections (a) through (b), contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits the first

sentence of Paragraph 129, states that the written report regarding the March 14, 2011 telephone conference speaks for itself and denies any characterizations inconsistent therewith. ShengdaTech denies any remaining allegations against it contained in Paragraph 129, including subsections (a) through (b).

130. In a document dated March 17, 2011, and entitled "Additional Matters Communicated to the Audit Committee," KPMG HK informed the Audit Committee of other improprieties, including:

(a) when KPMG HK attempted to confirm accounts payable balances with Xianyang Chuangfa ("XC") and Xingtai Guangfa ("XG"), two of the Company's purported top ten coal suppliers in 2010, KPMG HK was told that XC had "no balances with the Company and had not done any business with the Company for a long time, other than sending some samples to Shaanxi Haize in 2006 or 2007." *Liquidating Trust* Complaint at ¶48(a). Further, KPMG HK could not find a working number for XG. ShengdaTech's 2008 financial results reported RMB 65.9 million in coal purchases from XC and ShengdaTech's 2009 financial results reported RMB 59 million in coal purchases from XC and RMB 9.8 million in coal purchases from XG;

(b) when KPMG HK attempted to confirm the Company's account balance at the Agricultural Bank of China, Qianxian Branch, the bank stated that the total of all business accounts maintained at the branch were only about RMB 200 million, far less than the RMB 553 million reported by the Company. Moreover, KPMG HK noticed that the 2008 "chop" differed from the "chop" on the 2009 and 2010 confirmations, "suggesting that the 2009 and 2010 confirmations and chops had been falsified." *Id*. at ¶48(b);

(c) when KPMG HK attempted to confirm the Company's account balance at CMB – Jinan Branch, KPMG HK was told that this was an offshore account, and thus, any chop or confirmation had to come from the Shenzhen Head Office – Offshore Department. *See id*. at ¶48(c). However, in 2008 and 2009, KPMG HK was provided chops instead from the Jinan Branch –suggesting that the Company's balance of USD $73.1 million was fictitious; and

(d) when KPMG HK compared six VAT invoices to the information posted by the NTBS, the names on two sales invoices and four purchase invoices did not match the name on the NTBS system. *See id*. at ¶48(d).

**ANSWER**: Paragraph 130, including subsections (a) through (d), contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits that the Audit Committee received a draft letter dated March 3, 2011, states that the draft letter dated March 3, 2011 speaks for itself and denies any characterizations inconsistent therewith.

131. Thus, as alleged herein, the fraud that Defendants perpetrated was alarmingly far-reaching. Any earlier investigation of ShengdaTech's operations, reported sales or customer base would have revealed that the Company's entire operation was a fraud.

**ANSWER**: Paragraph 131 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. ShengdaTech denies the allegations of Paragraph 131 against it.

**ShengdaTech's SEC Filings During the Class Period Are Inconsistent with the Combined Results of ShengdaTech's Indirect Subsidiaries as Reported to the Chinese AIC**

132. A comparison of ShengdaTech's SEC filings with the combined results of ShengdaTech's indirect subsidiaries as reported to the Chinese AIC illustrates that the Company was materially overstating its financial results during the Class Period.

**ANSWER**: ShengdaTech admits that it made SEC filings that contained combined results of its indirect subsidiaries and that its indirect subsidiaries made filings with the AIC. ShengdaTech states that the SEC and AIC filings speak for themselves and denies any characterizations inconsistent therewith.

133. Similar to a company's SEC filings, a company's AIC filings include balance sheets, income statements, and cash flow statements. Both SEC filings and AIC filings need to be audited. Moreover, in terms of revenue recognition, there are no differences between U.S. GAAP and Chinese GAAP. For example, for revenue recognition, Chinese GAAP provides that "[n]o revenue from selling goods may be recognized unless":

> (1) The significant risks and rewards of ownership of the goods have been transferred to the buyer by the enterprise; (2) The enterprise retains neither continuous management right that usually keeps relation with the ownership nor effective control over the sold goods; (3) The relevant amount of revenue can be measured in a reliable way; (4) The relevant economic benefits may flow into the enterprise; and (5) The relevant costs incurred or to be incurred can be measured in a reliable way.

**ANSWER**: ShengdaTech admits that it made SEC filings that contained combined results of its indirect subsidiaries and that its indirect subsidiaries made filings with the AIC. ShengdaTech states that the SEC and AIC filings speak for themselves and denies any characterizations inconsistent therewith. ShengdaTech further states that U.S. GAAP and

Chinese GAAP speak for themselves and denies any characterizations that are inconsistent therewith.

134. Thus, there is no reason why the Company's consolidated financial statements to the SEC should differ from the combined financial statements of ShengdaTech's subsidiaries to the AIC since all of the Company's revenues came from those subsidiaries.

**ANSWER**: ShengdaTech is without sufficient knowledge or information to admit or deny the allegations contained in Paragraph 134 and therefore denies same.

135. However, in fact, the financial statements of ShengdaTech's subsidiaries filed with the AIC showed much less revenue and net income than the financial statements filed by ShengdaTech with the SEC. For example, for the period ending December 31, 2008, ShengdaTech reported $82.4 million in NPCC net sales and $36.03 million in net income to the SEC in its 10-K, but reported only $9.5 million in net sales and an approximately $2 million net loss to the AIC. For the period ending December 31, 2009, the Company reported net sales of $102.1 million and net income of $23.1 million to the SEC as compared to net income of $6.07 million and a net loss of $6.2 million with the AIC.

**ANSWER**: ShengdaTech states that the SEC and AIC filings referred to in Paragraph 135 speak for themselves and denies any characterizations inconsistent therewith.

136. Moreover, the investing public could not have become aware of ShengdaTech's contradictory filings. In order to request ShengdaTech's AIC filings, the third party must be a China-licensed lawyer, and must pay a fee.

**ANSWER**: ShengdaTech is without sufficient knowledge or information to admit or deny the allegations contained in Paragraph 136 and therefore denies same.

**Materially False and Misleading Statements**
**Issued During the Class Period**

137. The Class Period begins on May 6, 2008. On that date, ShengdaTech filed with the SEC its Form 10-Q for the first quarter of 2008, the period ended March 31, 2008 (the "March 2008 Form 10-Q"), which was signed by Defendants X Chen and Guo. The March 2008 Form 10-Q disclosed a restatement of financial statements by the Company to correct an overstatement of advances paid to suppliers and an understatement of property and equipment in the amount of $17,186,677.

**ANSWER**: ShengdaTech admits the first sentence of Paragraph 137. ShengdaTech admits that on or around May 7, 2008 ShengdaTech filed with the SEC its March 2008 Form 10-

Q, states that the March 2008 Form 10-Q speaks for itself and denies any characterizations inconsistent therewith.

138. In the March 2008 Form 10-Q, Defendants stated as follows with respect to the Company's financial controls and procedures:

> Evaluation of disclosure controls and procedures.
>
> Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures as required by Exchange Act Rule 13a-15(b) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective.

**ANSWER**: ShengdaTech admits that it filed the March 2008 Form 10Q, states that the March 2008 Form 10-Q speaks for itself and denies any characterizations inconsistent therewith.

139. Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Guo submitted the following false and misleading certifications:

> I, [Defendants X Chen and Guo], certify that:
>
> 1. I have reviewed this quarterly report on Form 10-Q of ShengdaTech, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:
>
> > (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

**ANSWER**: The allegations of Paragraph 139 are not directed against ShengdaTech and therefore no answer is required.

140. On May 14, 2008, the Company filed an Amended Form 10-K for the year ended December 31, 2007 and an Amended Form 10-Q for the quarter ended March 31, 2008. The March 2008 Form 10-Q discussed the restatement and stated, in pertinent part, as follows:

*Restatement of Financial Statements* – Subsequent to March 2008, the Company realized that the December 31, 2007 consolidated financial statements needed to be revised to correct an overstatement of advances paid to suppliers and an understatement of property and equipment in the amount of $17,186,677. The Company concluded that advances made for production equipment should be treated as construction in progress within property and equipment. This correction was not considered material in accordance with SAB 108 for the year ended December 31, 2007 but is considered significant. As a result, the Company corrected the financial statements for December 31, 2007. The corrected consolidated balance sheet is included in these financial statements. The correction of the December 31, 2007 financial statements had no effect on the previously reported net income.

* * *

> ***Our independent auditor has advised our management and Board of Directors that there were significant deficiencies in our internal control over financial reporting as of December 31, 2007***. The identified significant deficiencies relate to lack of disclosure regarding changes in equity, specifically relating to the issuance of shares from the exercise of a stock warrant, for which we have adopted policies and procedures that have remedied this deficiency, and misclassification in the balance sheet of advances to suppliers relating to construction in progress. Our auditor does not consider either significant deficiency, either alone or in the aggregate, to constitute a material weakness. Management believes that should additional deficiencies occur, a potential misapplication of generally accepted accounting principles or potential misstatement in our financial statements could occur. Enhancing our internal controls will continue as we grow and development of systems of internal control that might be deemed necessary can and will result in increased costs to us.

[Emphasis added and in original.]

**ANSWER**: ShengdaTech admits that it filed the documents referred to in Paragraph 140, states that the documents referred to in Paragraph 140 speak for themselves and denies any characterizations inconsistent therewith.

141. On May 7, 2008, ShengdaTech issued a press release announcing its financial results for the first quarter of 2008, the period ended March 31, 2008. For the quarter, the Company reported revenues of $28.6 million, and net income from continuing operations of $7.4 million, or $0.14 per diluted share. Defendant X Chen, commenting on the results, stated, in pertinent part, as follows:

> We are pleased to report year-over-year growth in revenue and net income due to continued strong market demand for our NPCC products and chemical products. In the first quarter of 2008, we added eleven new domestic customers including three tire manufacturers, two PVC producers, two latex producers and four adhesive manufacturers. We also successfully added three new international customers in Vietnam, Malaysia and Thailand, for NPCC used in PVC, polyethylene and paper. In addition, our existing NPCC lines all reached full operating capacity this quarter, plus, we completed construction of three new stainless steel NPCC production lines at the end of the quarter, increasing annual capacity by 60,000 metric tons.

With regard to the Company's financial condition, Defendants stated, in pertinent part, as follows:

> As of March 31, 2008, ShengdaTech had $18.4 million in cash and cash equivalents, $13.0 million in working capital and $0.8 million in long-term payables. Net cash provided by operating activities for the period was

> $15.3 million. Shareholders' equity stood at $100.3 million, up from $89.0 million at year end 2007.

**ANSWER**: ShengdaTech admits that it issued a press release on May 7, 2008, states that the May 7, 2008 press release speaks for itself and denies any characterizations inconsistent therewith.

142. On May 14, 2008, the same day that it announced its restatements, the Company issued a press release announcing its intentions to offer an aggregate of $100 million of senior convertible notes due 2018 in an offering to qualified institutional buyers ("2008 Note Offering"). The Company stated that it would use approximately $56 million of the net proceeds to expand its NPCC production capacity and use the remaining proceeds for potential coal-based chemical acquisitions, strategic investments and to fund working capital requirements.

**ANSWER**: ShengdaTech admits that it issued a press release on or about May 14, 2008, states that the May 14, 2008 press release speaks for itself and denies any characterizations inconsistent therewith.

143. On August 15, 2008, ShengdaTech issued a press release announcing its financial results for the second quarter of 2008, the period ended June 30, 2008. For the quarter, the Company reported revenues of $39.8 million, and net income from continuing operations of $10.0 million, or $0.18 per diluted share. Defendant X Chen, commenting on the second quarter results, stated, in pertinent part, as follows:

> We are pleased to report growth of 75% in revenue and 66% in net income due to continued strong market demand for our NPCC and chemical products. During the second quarter of 2008, we made a significant breakthrough in the development of our new NPCC product, 'NPCCA301,' for use in automobile undercoating paints. We added six new domestic customers including one new tire manufacturer, three adhesive producers, and a paper manufacturer. We successfully expanded our international customers by adding four new clients, a Korean tire manufacturer, Vietnamese and Israeli polyethylene manufacturers, and an automobile undercoating company in Singapore. In addition, our new NPCC lines, with a total capacity of 60,000 metric tons, reached 70% operating capacity this quarter. The planned acquisition of Jinan Fertilizer will strengthen our position in the coal-based chemical sector, and once due diligence now underway is completed, we anticipate a relatively seamless transition of our existing chemical facility to the new location.

With regard to the Company's financial condition, Defendants stated, in pertinent part, as follows:

> As of June 30, 2008, ShengdaTech had $138.2 million in cash and cash equivalents, $133.8 million in working capital and $115.0 million in long-term convertible senior notes. Net cash provided by operating activities was $25.2 million. Shareholders' equity stood at $113.0 million, up from $89.0 million at year end 2007.
>
> In the second quarter of 2008, ShengdaTech generated $115.0 million in gross proceeds from the sale of 6.00% senior convertible notes due 2018, including full exercise of the over-allotment option. The Company plans to use the net proceeds from the offering to fund the announced NPCC expansion in Zibo, Shandong Province, which will add to the current NPCC production capacity, to finance the planned acquisition of Jinan Fertilizer, and to provide cash for working capital requirements.

**ANSWER**: ShengdaTech admits that it issued a press release on August 15, 2008, states that the August 15, 2008 press release speaks for itself and denies any characterizations inconsistent therewith.

144. On November 10, 2008, ShengdaTech filed with the SEC its Form 10-Q for the third quarter of 2008, the period ended September 30, 2008 (the "September 2008 Form 10-Q"), which was signed by Defendants X Chen and Guo and disclosed:

> a) Evaluation of disclosure controls and procedures.
>
> Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e) or 15d-15(e)) as required by Exchange Act Rule 13a-15(b) or 15d - 15(b) as of the end of the third quarter of 2008. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective***.

[Emphasis added.]

**ANSWER**: ShengdaTech admits that it filed the September 2008 Form 10-Q on November 10, 2008, states that the September 2008 Form 10-Q speaks for itself and denies any characterizations inconsistent therewith.

145. In addition, the September 2008 Form 10-Q included representations about the Company's disclosure and internal controls and Defendants X Chen's and Guo's false and misleading certifications thereon.

**ANSWER**: The allegations of Paragraph 145 regarding X Chen and Guo's certifications are not directed against ShengdaTech and therefore no answer is required by ShengdaTech. With respect to any allegations of Paragraph 145 against ShengdaTech, ShengdaTech states that the September 2008 Form 10-Q speaks for itself and denies any characterizations inconsistent therewith.

146. On November 10, 2008, the Company issued a press release announcing its financial results for the third quarter of 2008, the period ended September 30, 2008. For the quarter, the Company reported revenues of $49.3 million, and net income from continuing operations of $9.9 million, or $0.17 per diluted share. Defendant X Chen, commenting on the third quarter results, stated, in pertinent part, as follows:

> We are pleased to report another quarter of year-over-year growth in revenue and net income driven by growing demand for our NPCC and chemical products. During the quarter, we expanded our domestic NPCC customer base with 22 new customers, including two new tire manufacturers, two adhesive producers, twelve PE manufacturers, three PVC producers, and three paint manufacturers. We also added nine new international NPCC customers, including an adhesive producer in India, a PE manufacturer in Israel, a paint manufacturer and two PVC producers in Thailand, and four new tire manufacturers in Philippines, Iran, South Korea and Malaysia. Our new NPCC lines in Shaanxi Province are now running at full utilization and provide us with the capacity we need to fill the growing worldwide demand for NPCC.

With regard to the Company's financial condition, the press release stated, in pertinent part, as follows:

> As of September 30, 2008, ShengdaTech had $132.4 million in cash and cash equivalents, $131.7 million in working capital and $115.0 million in long-term convertible senior notes. Shareholders' equity stood at $123.3 million, up from $89.0 million at year-end 2007. For the first nine months of 2008, the Company generated net cash flow from operating activities of $34.5 million.
>
> During the quarter, the Company invested approximately $30 million, to purchase land use rights and workshops for its new NPCC facility in Zibo, Shandong Province. The Company expects capital expenditures of approximately $26 million over the next 12 months to expand capacity and improve margin, which will be funded from cash on hand and cash flow from operations.

**ANSWER**: ShengdaTech admits that it issued a press release on November 10, 2008, states that the November 10, 2008 press release speaks for itself and denies any characterizations inconsistent therewith.

147. On November 13, 2008, ShengdaTech issued a press release announcing that, on November 11, 2008, the Company dismissed Hansen Barnett Maxwell, P.C. as its independent registered public accounting firm and retained KPMG HK to serve as its independent registered public accounting firm.

**ANSWER**: ShengdaTech admits that it issued a press release on or around November 13, 2008, states that the November 13, 2008 press release speaks for itself and denies any characterizations inconsistent therewith.

148. On April 1, 2009, ShengdaTech filed with the SEC its Form 10-K for 2008, the year ended December 31, 2008 (the "2008 Form 10-K"), which was signed by Defendants X Chen, Guo, Mudd, Saidman and Zhang. With regard to the Company's financial results, for the year, ShengdaTech reported net sales of $149.4 million, including $82.4 million in sales of NPCC products, and net income of $40.0 million. In connection with the 2008 Form 10-K, Defendant KPMG HK issued its audit report for the year ended December 31, 2008. In its report, Defendant KPMG HK stated, in pertinent part, as follows:

> In our opinion, because of the effect of the aforementioned material weaknesses on the achievement of the objectives of the control criteria, ShengdaTech, Inc. and subsidiaries ***have not maintained effective internal control over financial reporting as of December 31, 2008***, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

[Emphasis added and in original.]

**ANSWER**: Paragraph 148 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits that on April 1, 2009 it filed with the SEC its Form 10-K for 2008, states that the 2008 Form 10-K speaks for itself and denies any characterizations inconsistent therewith.

149. Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Guo submitted false and misleading certifications, which were virtually identical to the certifications referenced above at ¶139.

**ANSWER**: The allegations of Paragraph 149 are not directed against ShengdaTech and therefore no answer is required.

150. On April 2, 2009, ShengdaTech issued a press release announcing its financial results for the fourth quarter and year end of 2008, the period ended December 31, 2008. For the quarter, the Company reported revenues of $31.8 million, and net income from continuing operations of $12.7 million, or $0.11 per diluted share. For the year, ShengdaTech reported revenue of $149.4 million, NPCC revenue of $82.4 million, and net income of $40.0 million, or $0.60 per diluted share. Defendant X Chen, commenting on the Company's fourth quarter results, stated, in pertinent part, as follows:

> We are excited to report another year of strong financial performance despite the fact that we ceased production at our Bangsheng Chemical facility mid way through the quarter. We continue to generate ever-increasing interest in NPCC from domestic and international companies. We are working closely with our potential customers to develop and test a wide range of applications using NPCC that will improve their products and reduce their production costs.
>
> In 2008, we successfully met our capacity expansion plan to reach 190,000 metric tons of annual NPCC production. All NPCC facilities are currently operating at full capacity as we expand and increase our market penetration. During 2008, we added 47 domestic and international customers, including 12 tire manufacturers, 4 PVC producers, 14 PE producers, 4 in latex and adhesives, 1 ink manufacturer, 9 coating manufacturers, 1 in automobile undercoating paint, and 2 paper manufacturers.

With regard to the Company's financial condition, Defendants stated, in pertinent part, as follows:

> As of December 31, 2008, ShengdaTech had $114.3 million in cash, $112.7 million in working capital and $95.3 million in long-term convertible senior notes. Shareholders' equity stood at $135.8 million, up from $89.0 million at year-end 2007. In 2008, the Company generated net cash flow from operating activities of $38.9 million.
>
> In November 2008, the Company repurchased an aggregate of $19.8 million face value of its 6.0% Convertible Senior Notes due 2018, for consideration of approximately $9.9 million, plus accrued interest in cash. These repurchases reduced the dilution of ShengdaTech's common stock outstanding by nearly 2.0 million shares.

**ANSWER**: ShengdaTech admits that it issued a press release on April 2, 2009, states that the April 2, 2009 press release speaks for itself and denies any characterizations inconsistent therewith.

151. The statements referenced above in ¶¶140 and 148 that "there were significant deficiencies in our internal control over financial reporting as of December 31, 2007" related to "changes in equity" and that the Company had "not maintained effective internal control over financial reporting as of December 31, 2008" were each materially false and misleading when made because it omitted facts that were known to or recklessly disregarded by Defendants as detailed in ¶152.

**<u>ANSWER</u>**: Paragraph 151 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. ShengdaTech denies the allegations against it contained in Paragraph 151.

152. The statements referenced above in ¶¶137-141, 143-146 and 148-150 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a) that the Company's 2008 SEC filings were inconsistent with the combined AIC filings of ShengdaTech's indirect subsidiaries; specifically, for the period ending December 31, 2008, ShengdaTech reported \$82.4 million in net sales and \$36.03 million in net income to the SEC in its Form 10-K, but reported only \$9.5 million in net sales and an approximately \$2 million net loss to the AIC;

(b) that the Company was falsifying its reported sales;

(c) that the Company manipulated the amounts of goods it purchased from the Company's major suppliers;

(d) that the Company was improperly inflating its gross revenues;

(e) that ShengdaTech's financial statements were not fairly presented in conformity with U.S. GAAP and were materially false and misleading;

(f) that ShengdaTech was drastically overstating the size of the Company's customer base;

(g) that Defendants falsified information on VAT invoices;

(h) that Defendants misstated cash accounts held in Chinese banks;

(i) that the Company's cash accounts were materially overstated because they included CDs, which did not exist;

(j) that ShengdaTech was participating in undisclosed related party transactions;

(k) that ShengdaTech was operating with material deficiencies in the system of internal control over its financial reporting; and

(l) that based on the foregoing, investors were unable to ascertain the true financial condition of the Company.

**ANSWER**: Paragraph 152, including subsections (a) through (l), contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. ShengdaTech denies the allegations against it contained in Paragraph 152, including subsections (a) through (l).

153. On April 15, 2009, the Company announced that Defendant Guo had resigned from her position as CFO and that the Company's Board of Directors appointed her as COO. Defendant Andrew Chen replaced Defendant Guo as CFO.

**ANSWER**: Admitted.

154. On May 11, 2009, ShengdaTech filed with the SEC its Form 10-Q for the first quarter of 2009, the period ended March 31, 2009 (the "March 2009 Form 10-Q"), which was signed by Defendants X Chen and Andrew Chen. With regard to the Company's financial controls and procedures, Defendants stated, in pertinent part, as follows:

(a) Disclosure Controls and Procedures.

> The Company carried out an evaluation, under the supervision and with the participation of management, including the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures as of March 31, 2009 pursuant to Exchange Act Rule 13a-15b. ***Based on our evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective at March 31, 2009 due to the fact that the material weaknesses in the Company's internal control over financial reporting described in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 have not been remediated as of March 31, 2009, although steps have been taken toward remediation during the first quarter of 2009***.

[Emphasis added.]

Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Andrew Chen submitted false and misleading certifications, which were virtually identical to the certifications referenced above at ¶139.

**ANSWER**: Paragraph 154 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the

allegations against ShengdaTech, ShengdaTech admits the first sentence of Paragraph 154 and states that the March 2009 Form 10-Q speaks for itself and denies any characterizations inconsistent therewith. ShengdaTech denies any remaining allegations against it contained in Paragraph 154.

155. On May 11, 2009, ShengdaTech issued a press release announcing its financial results for the first quarter of 2009, the period ended March 31, 2009. For the quarter, the Company reported revenues of $20.7 million, and net income from continuing operations of $5 million, or $0.08 per diluted share. Defendant X Chen, commenting on the Company's first quarter results, stated, in pertinent part, as follows:

> ***We are pleased to report strong financial performance from our NPCC business during the first quarter of 2009***. Despite the challenging economic environment in 2008 and early 2009, we continued to experience a high level of demand for our products. Our NPCC products' superior quality, increased purity, and improved functionality have resulted in growing interest from a wide range of industrial companies, particularly for our PE (polyethylene), adhesive and latex applications. While demand for NPCC products used in tires and PVC was affected by the economic slowdown, we have recently seen signs of improvement in those markets as the Chinese economy begins to recover. [Emphasis added.]

With regard to the Company's financial condition, the press release stated, in pertinent part, as follows:

> As of March 31, 2009, ShengdaTech had $114.2 million in cash and $115.1 million in working capital. As of March 31, 2009, shareholders' equity reached $152.5 million, up 3.7% from shareholder's equity of $147.0 million as of December 31, 2008. Please refer to Table 6 for the impact on shareholder's equity as of December 31, 2008 due to the adoption of FSP APB 14-1. In the first quarter of 2009, the Company generated net cash flow from operating activities of $6.9 million.
>
> In February 2009, the Company repurchased an aggregate of $5.2 million face value of its 6.0% Convertible Senior Notes due 2018, for consideration of approximately $2.5 million, plus accrued interest of $72,144 in cash. The Company is not actively seeking to repurchase additional notes and has no plan for early extinguishment of the notes.

**ANSWER**: ShengdaTech admits that it issued a press release on May 11, 2009, states that the May 11, 2009 press release speaks for itself and denies any characterizations inconsistent therewith.

156. On August 10, 2009, ShengdaTech filed a Form 8-K with the SEC and disclosed the following restatements with respect to the Company's statements of cash flows for the six-month and nine-month periods ended June 30, 2008 and September 30, 2008, in pertinent part, as follows:

> In connection with the preparation of the Quarterly Report on Form 10-Q for the six months ended June 30, 2009 of ShengdaTech, Inc. and its subsidiaries (collectively, the "Company"), the Company determined its previously issued unaudited condensed consolidated statements of cash flows for six-month and nine-month periods ended June 30, 2008 and September 30, 2008, respectively, should be restated to correct errors in the classification of cash flows. As a result, we restated the unaudited condensed consolidated statements of cash flows for six months ended June 30, 2008 and reflected such classification errors in the Company's Quarterly Reporting on Form 10-Q for the six months ended June 30, 2009, which is expected to be filed on or about August 10, 2009.
>
> The correction for the six months ended June 30, 2008 includes the following items:
>
> - to decrease cash flows provided by operating activities by $4,457,872,
> - to decrease cash flows used in investing activities by $3,701,519, and
> - to increase cash flows provided by financing activities by $756,353.
>
> The correction for the nine months ended September 30, 2008 includes the following items:
>
> - to decrease cash flows provided by operating activities by $4,287,695,
> - to decrease cash flows used in investing activities by $3,704,417, and
> - to increase cash flows provided by financing activities by $583,278.

**ANSWER**: ShengdaTech admits that it filed a Form 8-K on August 10, 2009, states that the August 10, 2009 Form 8-K speaks for itself and denies any characterizations inconsistent therewith.

157. On August 10, 2009, ShengdaTech filed with the SEC its Form 10-Q for the second quarter of 2009, the period ended June 30, 2009 (the "June 2009 Form 10-Q"), which was signed by Defendants X Chen and Andrew Chen. With regard to the Company's financial controls and procedures, Defendants stated, in pertinent part, as follows:

> (a) Disclosure Controls and Procedures.

> The Company carried out an evaluation, under the supervision and with the participation of management, including the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of June 30, 2009. ***Based on our evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective at June 30, 2009 due to the fact that the material weaknesses in the Company's internal control over financial reporting described in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 have not been remediated as of June 30, 2009, although steps have been taken toward remediation during the second quarter of 2009***.

[Emphasis added.]

Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Andrew Chen submitted false and misleading certifications, which were virtually identical to the certifications referenced above at ¶139.

**ANSWER**: Paragraph 157 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits the first sentence of Paragraph 157 and states that the June 2009 Form 10-Q speaks for itself and denies any characterizations inconsistent therewith. ShengdaTech denies any remaining allegations against it contained in Paragraph 157.

158. On August 10, 2009, ShengdaTech issued a press release announcing its financial results for the second quarter of 2009, the period ended June 30, 2009. For the quarter, the Company reported revenues of $26 million, and net income from continuing operations of $6.5 million, or $0.12 per diluted share. Defendant X Chen, commenting on the Company's second quarter results, stated, in pertinent part, as follows:

> ***We are pleased to report strong revenue growth and high profitability from our NPCC business in the second quarter of 2009***. During the quarter, the Chinese economy showed signs of recovery with positive growth recorded by both the automobile and construction industries, which have begun responding to the Chinese government's RMB 4 trillion ($586 billion) stimulus policy. ***We experienced strong demand for our NPCC products, especially from our tire and PVC customers***, who combined accounted for 65.6% of NPCC revenue during the quarter . . . [i]n addition, we are pleased to announce that our Zibo

> NPCC production facility is on schedule to commence production at the end of the month and will begin to ship products to the customers in early September.

[Emphasis added.]

With regard to the Company's financial condition, the press release stated, in pertinent part, as follows:

> As of June 30, 2009, ShengdaTech had $111.0 million in cash and $112.2 million in working capital. As of June 30, 2009, shareholders' equity was $159.1 million, up 8.2% from shareholder's equity of $147.0 million as of December 31, 2008. For the first six months of 2009, the Company generated net cash flow from operating activities of $14.9 million.

**ANSWER**: ShengdaTech admits that it issued a press release on August 10, 2009, states that the August 10, 2009 press release speaks for itself and denies any characterizations inconsistent therewith.

159. On November 9, 2009, ShengdaTech filed with the SEC its Form 10-Q for the quarter ended September 30, 2009 (the "September 2009 Form 10-Q"), which was signed by Defendants X Chen and Andrew Chen. With regard to the Company's financial controls and procedures, Defendants stated, in pertinent part, as follows:

> (a) Disclosure Controls and Procedures.
>
> The Company carried out an evaluation, under the supervision and with the participation of management, including the Chief Executive Officer and the Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of September 30, 2009. ***Based on our evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective at September 30, 2009 due to the fact that the material weaknesses in the Company's internal control over financial reporting described in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2008 have not been remediated as of September 30, 2009, although steps have been taken toward remediation during the third quarter of 2009***.
>
> (b) Changes in internal control over financial reporting.
>
> There was no change in our internal control over financial reporting that occurred in the third quarter of 2009 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added.]

Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Andrew Chen submitted false and misleading certifications, which were virtually identical to the certifications referenced above at ¶139.

**ANSWER**: Paragraph 159 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits the first sentence of Paragraph 159 and states that the September 2009 Form 10-Q speaks for itself and denies any characterizations inconsistent therewith. ShengdaTech denies any remaining allegations against it contained in Paragraph 159.

160. On November 9, 2009, ShengdaTech issued a press release announcing its financial results for the third quarter of 2009, the period ended September 30, 2009. For the quarter, the Company reported revenues of $25.4 million, and net income from continuing operations of $4.6 million, or $0.09 per diluted share. Defendant X Chen, commenting on the Company's third quarter results, stated, in pertinent part, as follows:

> The third quarter of 2009 marked an important period for ShengdaTech, as we successfully implemented our NPCC expansion strategy with the acquisition of Chaodong in Anhui Province. We also began shipping first production products to customers from our newly built NPCC facility in Zibo. ***During the quarter, we expanded our domestic NPCC customer base with 19 new customers, including seven new polyethylene (PE) manufacturers, six adhesive manufacturers, five tire manufacturers, and one PVC manufacturer***. Our new NPCC lines in Zibo have ramped up quickly to meet the growing market demand for our products and are on track to reach 80% capacity utilization by year end, and 100% of the plant's 60,000-metric-ton capacity early next year.

[Emphasis added.]

With regard to the Company's financial condition, the press release stated, in pertinent part, as follows:

> As of September 30, 2009, ShengdaTech had $105.5 million in cash and $109.3 million in working capital. As of September 30, 2009, shareholders' equity was $163.9 million, up 11.5% from shareholder's equity of $147.0 million as of December 31, 2008. For the first nine months of 2009, the Company generated net cash flow from operating activities of $17.6 million.

**ANSWER**: ShengdaTech admits that it issued a press release on November 9, 2009, states that the November 9, 2009 press release speaks for itself and denies any characterizations inconsistent therewith.

161. On March 15, 2010, ShengdaTech filed with the SEC its Form 10-K for 2009, the year ended December 31, 2009 (the "2009 Form 10-K"), which was signed by Defendants X Chen, Guo, Mudd, Saidman and Zhang. For the year, ShengdaTech reported net sales of $102.1 million and net income of $23.1 million. With regard to the Company's financial controls and procedures, Defendants stated, in pertinent part, as follows:

> (a) Disclosure Controls and Procedures.
>
> Disclosure controls and procedures (as defined in Rules 13a – 15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) are designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. This information is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. Our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. Based on the evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 31, 2009.
>
> (b) Management's report on internal control over financial reporting.
>
> Internal control over financial reporting (as defined in Rules 13a - 15(f) and 15d-15(f) under the Exchange Act) is a process that is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles, and includes those policies and procedures that:
>
> • Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the Company,
>
> • Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures are being made only in accordance with authorizations of management and the board of directors of the Company, and

- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

Based on our evaluation of internal control over financial reporting as of December 31, 2009, management has determined that our internal control over financial reporting was effective. We acquired Chaodong in December 2009, and management excluded from its assessment of the effectiveness of our internal control over financial reporting as of December 31, 2009. Chaodong's internal control over financial reporting associated with total assets of $4,593,970 and nil revenue, which was included in the consolidated financial statements of the Company. We also did not assess the effectiveness of the internal control over financial reporting of Chaodong. The Company's evaluation of the effectiveness of our internal control over financial reporting is based on the criteria established in COSO's Internal Control – Integrated Framework.

Our independent registered public accounting firm, KPMG has audited the effectiveness of the Company's internal control over financial reporting as of December 31, 2009, as stated in their report, which appears below.

(c) Changes in internal control over financial reporting.

As previously reported under "Item 4 – Controls and Procedures" in our quarterly report on Form 10-Q for the quarter ended September 30, 2009, management concluded that our internal control over financial reporting was not effective based on the material weaknesses identified in the Company's internal control over financial reporting described in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2008. Management has continued to work on remediation efforts since the filing of that report.

During the quarter ended December 31, 2009, changes in our internal control over financial reporting occurred related to the two previously reported material weaknesses as follows:

- Management had concluded that for non-routine transactions and related disclosures, we did not maintain adequate policies and procedures and lacked personnel possessing adequate technical accounting expertise to ensure that those transactions are properly accounted for and disclosed in our consolidated financial statements. As of December 31, 2009, management has concluded that the severity of this previously reported material weakness has been sufficiently reduced and remediated such that the previously reported material weakness is no

> longer a material weakness. We have designed adequate policies and procedures and hired and trained enough technically-qualified personnel to properly account for and disclose non-routine transactions. In addition, as part of the 2009 period-end financial closing procedures, management utilized a monthly monitoring process. Based on these reviews, which are part of the control process, non-routine transactions and related disclosure controls are deemed to be operating effectively.
>
> - Management had concluded that we did not design and maintain effective policies and procedures to ensure adequate maintenance of tax records, timely reconciliation of income tax accounts and adequate analysis and review of deferred tax calculations. As a result, we did not maintain effective internal control over the accounting for income taxes and related financial statement disclosures. As of December 31, 2009, management has concluded that the severity of this previously reported material weakness has been sufficiently reduced and remediated such that the previously reported material weakness is no longer a material weakness. We have designed policies and procedures to ensure the maintenance of tax records, timely reconciliation of income tax accounts and adequate analysis and review of deferred tax calculations and hired qualified third party specialists to perform these procedures. In addition, as part of the 2009 period-end financial closing procedures, management utilized a monthly monitoring process. Based on these reviews, which are part of the control process, tax records, timely reconciliation of income tax accounts and adequate analysis and review of deferred tax calculations and related disclosure controls are deemed to be operating effectively.

Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Andrew Chen submitted false and misleading certifications, which were virtually identical to the certifications referenced above at ¶139.

**ANSWER**: Paragraph 161 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits the first sentence of Paragraph 161 and states that the 2009 Form 10-K speaks for itself and denies any characterizations inconsistent therewith. ShengdaTech denies any remaining allegations against it contained in Paragraph 161.

162. In connection with the 2009 Form 10-K, Defendant KPMG HK issued its audit report for the year ended December 31, 2009. Unlike its report for 2008, KPMG HK found no material weaknesses in ShengdaTech's internal controls. In its report, Defendant KPMG HK stated, in pertinent part, as follows:

> In our opinion, ShengdaTech, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on criteria established in Internal Control—Integrated Framework issued by COSO.

**ANSWER**: The allegations of Paragraph 162 are not directed against ShengdaTech and therefore no answer is required.

163. On March 16, 2010, ShengdaTech issued a press release announcing its financial results for the fourth quarter and year end of 2009, the period ended December 31, 2009. For the quarter, the Company reported revenues of $30.1 million and net income from continuing operations of $6.7 million, or $0.12 per diluted share. For the year, the Company reported revenues of $102.1 million and net income of $23.1 million. Defendant X Chen, commenting on the Company's year end results, stated, in pertinent part, as follows:

> Our NPCC products are rapidly penetrating deeper into our existing end-market industries and expanding into new markets resulting in strong demand and increasing sales volumes. To meet this growing demand, phase I of our new Zibo NPCC Facility quickly ramped up to 100% utilization rate in January 2010. Currently, our NPCC operations are producing at full capacity of 250,000 MT per annum. During 2009, we added 57 new domestic customers, including 21 PE producers, 13 tire manufacturers, 12 PVC producers, and 11 adhesive manufacturers. Unfortunately, we also lost a number of customers who fell victim to prevailing world-wide economic conditions and simply were unable to continue their operations. However, our net gain of 17 customers easily offset the lost tonnage from our troubled former customers. We believe that our net gains will accelerate as global economic conditions improve. Just as we have done in previous years, we plan to sell out our total production capacity in 2010.

With regard to the Company's financial condition, the press release stated, in pertinent part, as follows:

> As of December 31, 2009, ShengdaTech had $116.0 million in cash, $116.3 million in working capital and $79.3 million in long-term convertible notes. Shareholders equity was $170.6 million, up from $147.0 million at year end 2008. In 2009, the Company generated net cash flow from continuing operations of $28.0 million.

**ANSWER**: ShengdaTech admits that it issued a press release on March 16, 2010, states that the March 16, 2010 press release speaks for itself and denies any characterizations inconsistent therewith.

164. Following the Company's 2009 fourth quarter and year end earnings announcement, Defendants held a conference call with analysts and investors wherein Defendants made positive statements about the Company and its prospects, including, but not limited to, its revenues, income, growth drivers and operations. In that regard, Defendants X Chen and Andrew Chen stated, in pertinent part, as follows:

> Defendant X Chen: I am very pleased to announce that ShengdaTech exceeded our planned financial growth in 2009, reflecting strong demand for our products, successful execution of our aggressive capacity expansion strategy and our progress in achieving greater penetration in our end-user markets. We are proud of the recognition we have received during the year, including the 2008 China Frost & Sullivan Award for Growth Excellence and being named on the Forbes Magazine's fifth annual list of Asia's "200 Best under a Billion" for the year 2009. Both [these] awards acknowledge our commitment to excellence, and recognize our continued revenue and profit growth, as well as ShengdaTech's ability to manage a progressive and highly successful enterprise. Now Mr. Crocker Coulson will discuss some additional remarks on our operations on my behalf.
>
> * * *
>
> [Crocker Coulson on behalf of Defendant X Chen]: Revenue for the full-year 2009 increased 23.9% to $102 million compared to $82.4 million in 2008. Net income from continuing operations in 2009 was $23.6 million with diluted earnings per share of $0.43. I'm very pleased to announce that even through the global downturn, thanks to faster than anticipated improvement in market conditions for NPCC products with high margin, combined with our ability to maintain our selling prices, we exceeded our revenue and EPS guidance for the full year of 2009.
>
> Now I'd like to move on to discussing our fourth-quarter results. We closed the year with strong revenue growth generating $30.1 million in revenue, up 23.3% year-over-year, and with gross profit of $11.9 million, up 19.4% year-over-year, with a gross margin of 39.8%. Our double-digit top-line growth was the result of continued market demand for our NPCC products in our existing end markets which contributed to a higher sales volume.
>
> * * *
>
> During the quarter we were very excited to announce that we've added 25 new domestic customers, including seven PVC producers, seven adhesive and latex

manufacturers, six tire manufacturers and five polyethylene producers. In comparison to the third quarter of 2009, revenue increased 18.4% as a result of higher sales volume, while selling prices remained relatively unchanged. This was mainly due to the positive impact from a strengthening economic environment in

China, and the additional capacity at Zibo, which allowed us to meet the incremental needs of both new and existing customers.

* * *

Our NPCC application for polyethylene, or PE, was our largest end market during the quarter, accounting for 32.4% of the quarter's revenue; a significant increase from only 7.8% in the same period last year.

* * *

Our NPCC tire application has a very compelling value proposition, as its use in tire manufacturing is capable of delivering 10% to 20% overall improvement in performance, as measured by increased traction, wave resistance, tear resistance, tensile strength and aging resistance. And reduces tire manufacturing costs by about $20 to $30 per metric ton. We remain very positive about our presence in the vertical market and are the largest NPCC supplier in China's tire industry, with current penetration of approximately 26% of market demand. We now supply NPCC to three of China's top tire manufacturers. Based on industry research, the market for NPCC for use in tire manufacturing in China is expected to grow from 557 million tires in 2007 to 1 billion tires by 2012. As anticipated, due to the global downturn, sales to the PVC industry declined 16.5% on a year-over-year basis. Our target prospects for this application have narrowed.

* * *

We have a very strong pipeline of new customers. We're currently working with 76 prospective customers, including 59 domestic customers, of which 42 are in the testing phase, and 17 international customers, all of whom are in the testing phase.

* * *

Defendant Andrew Chen: First, let's go to our quarterly results. Revenue increased to $30.1 million; up 23.3% from $24.4 million in the fourth quarter of 2008. Total volume of NPCC sold during fourth quarter of 2009 was up 26.5%, to 62,146 metric tons, from 49,143 metric tons in the fourth quarter of 2008. The average selling price of NPCC products declined 2.6% to $484 per metric ton from $497 per metric ton in the fourth quarter of 2008, caused primarily by changes in product mix. NPCC for use in PE, tires and PVC represented the majority of NPCC sales, at 32.4%, 26.7% and 20.6% of total NPCC revenue respectively. NPCC use in adhesives and latex increased to 14.4% of total NPCC

> revenue, compared to 9.4% of total revenue in the fourth quarter of 2008. NPCC use in paper, oil, ink, paint and automobile undercoating paint combined to generate 5.9% of NPCC revenue. Our gross profit for fourth quarter of 2009 was $11.9 million, up 19.4%, from $10 million in the fourth-quarter 2008. Total gross margin was 39.8%, compared with 41.1% during the fourth quarter of 2008.
>
> * * *
>
> Operating income for the fourth quarter of 2009 was $9.6 million, up 17.8%, from $8.1 million in the same period a year ago.
>
> * * *
>
> Net income from continuing operations in the fourth quarter of 2009 was $6.7 million, down 31.8% from $9.9 million in the same period last year. Which included $5.5 million in gain, as a result of repurchasing of senior notes during the quarter.
>
> * * *
>
> As of December 31, 2009, ShengdaTech had $116 million in cash, and $116.3 million in working capital, and $79.3 million in long term convertible senior notes. Shareholders' equity was $170.6 million, up from $147 million at year-end 2008. In 2009, we generated net cash flow from operating activities of $28 million. We're confident in our ability to generate positive cash flows from our business operations. Such ability, when combined with our strong cash position, will sufficiently support our planned business expansion in 2010.
>
> * * *
>
> Our positive outlook is based on our proprietary production technology, strong capability in new applications development, the well-established value proposition for NPCC, positive growth outlook of NPCC business sector, and most importantly, our highly experienced management team. We have a strong pipeline of new applications for NPCC products, and a well-qualified research team to ensure successful execution, accelerating our growth in the coming years.

**ANSWER**: Paragraph 164 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits that it held a conference call with analysts and investors on March 16, 2010 and that language substantially similar to the quoted language in Paragraph 164 is contained in the transcript of that conference call. ShengdaTech further states that the transcript of the March 16, 2010 conference call speaks for itself and

denies any characterizations inconsistent therewith. ShengdaTech denies any remaining allegations against it contained in Paragraph 164.

165. The statements referenced above in ¶162 regarding KPMG HK's audit and its statement that ShengdaTech had "maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009" were each materially false and misleading when made because they misrepresented and failed to disclose that, during its audit of the Company's 2009 financial statements, KPMG HK received an unusual number of confirmation replies. *Liquidating Trust* Complaint at ¶88. In addition to the high number of confirmation replies, KPMG HK ignored other obvious red flags during its audit of the Company's 2009 financial statements. For example, KPMG HK was told by a person familiar with the market for ShengdaTech's products that he/she believed that the "Company's reported sales [] exceeded . . . the likely global market demand for those products." *Id*. at ¶48(e). Moreover, during the 2009 audit, KPMG HK "noticed several instances where customer names in the Company's accounting system did not match the names on invoices and/or related documents that purported to memorialize the Company's transactions." *Oaktree* Complaint at ¶91.

**<u>ANSWER</u>**: Paragraph 165 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. ShengdaTech further states that the Liquidating Trust Complaint and the Oaktree Complaint speak for themselves and denies any characterizations inconsistent therewith. ShengdaTech denies any remaining allegations against it contained in Paragraph 165.

166. The statements referenced above in ¶¶154-164 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a) that the Company's 2009 SEC filings were inconsistent with the combined AIC filings of ShengdaTech's indirect subsidiaries; specifically, for the period ending December 31, 2009, the Company reported net sales of $102.1 million and net income of $23.1 million to the SEC as compared to net income of $6.07 million and a net loss of $6.2 million with the AIC;

(b) that the Company was falsifying its reported sales;

(c) that the Company manipulated the amounts of goods it purchased from the Company's major suppliers;

(d) that the Company was improperly inflating its gross revenues;

(e) that ShengdaTech's financial statements were not fairly presented in conformity with U.S. GAAP and were materially false and misleading;

(f) that ShengdaTech was drastically overstating the size of the Company's customer base;

(g) that Defendants falsified information on VAT invoices;

(h) that Defendants misstated cash accounts held in Chinese banks;

(i) that the Company's cash accounts were materially overstated because they included CDs, which did not exist;

(j) that ShengdaTech was participating in undisclosed related party transactions;

(k) that ShengdaTech was operating with material deficiencies in the system of internal control over its financial reporting; and

(l) that based on the foregoing, investors were unable to ascertain the true financial condition of the Company.

**ANSWER**: Paragraph 166, including subsections (a) through (l), contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits that it made SEC filings that contained combined results of its indirect subsidiaries and that its indirect subsidiaries made filings with the AIC, states that the SEC and AIC filings speak for themselves and denies the allegations contained in Paragraph 166, including subsections (a) through (l), to the extent they are inconsistent therewith. ShengdaTech denies any remaining allegations against it contained in Paragraph 166, including subsections (a) through (l).

167. On May 10, 2010, ShengdaTech filed with the SEC its Form 10-Q for the first quarter of 2010, the period ended March 31, 2010 (the "March 2010 Form 10-Q"), which was signed by Defendants X Chen and Andrew Chen. With regard to the Company's financial controls and procedures, Defendants stated, in pertinent part, as follows:

(a) Disclosure Controls and Procedures.

> Disclosure controls and procedures (as defined in Rules 13a – 15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act")) are designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. This information is accumulated and communicated to management,

> including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. ***Our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. Based on the evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of March 31, 2010.***
>
> (b) Changes in internal control over financial reporting.
>
> There was no change in our internal control over financial reporting that occurred in the first quarter of 2010 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added.]

**ANSWER**: ShengdaTech admits that it filed its March 2010 Form 10-K on May 10, 2010, states that the March 2010 Form 10-Q speaks for itself and denies any characterizations inconsistent therewith.

168. Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Andrew Chen submitted false and misleading certifications, which were virtually identical to the certifications referenced above at ¶139.

**ANSWER**: The allegations of Paragraph 168 are not directed against ShengdaTech and therefore no answer is required. ShengdaTech further states that the March 2010 Form 10-Q speaks for itself and denies any characterizations inconsistent therewith.

169. On May 11, 2010, ShengdaTech issued a press release announcing its financial results for the first quarter of 2010, the period ended March 31, 2010. For the quarter, the Company reported revenue from continuing operations of $30.2 million and net income from continuing operations of $6.7 million, or $0.12 per diluted share. Defendant X Chen, commenting on the Company's first quarter results, stated, in pertinent part, as follows:

> We are delighted to report another strong record-breaking quarter for our NPCC business evidenced by robust top-line growth coupled with improved margins. Our investments in R&D and end-market development continue to bear fruit, as we shift our product mix to more value-added NPCC applications to meet the rising demand from high-end-product markets, where we can justify greater pricing flexibility and realize sustainable growth potential.
>
> As a nano-technology leader in the specialty chemical sector in China, we remain proactive in new-product development and in expanding our application base. Our engineers work closely with our customers to design solutions for them to

> enhance their product functionalities and reliabilities and to lower their costs as well. This is the value proposition that has successfully set us apart from other product offerings in this space. By extending our record of complete customer satisfaction into many more manufacturing sectors, we expect rapidly growing opportunities in our addressable markets for NPCC.

With regard to the Company's financial condition, the press release stated, in pertinent part, as follows:

> As of March 31, 2010, the Company had cash of $117.3 million, compared with $116.0 million as of December 31, 2009. Days Sales Outstanding (DSO), a measure of receivables collection, for the first quarter was 61 days as compared to 60 days in the fourth quarter of 2009. We exclude cash sales in our calculation of accounts receivable turnover days. As of the end March 2010, there were no overdue accounts receivables. Total shareholders' equity rose to $177.3 million at March 31, 2010, from $170.6 million at December 31, 2009.

**ANSWER**: ShengdaTech admits that it issued a press release on May 11, 2010, states that the May 11, 2010 press release speaks for itself and denies any characterizations inconsistent therewith.

170. Following the 2010 first quarter announcement, Defendants held a conference call with analysts and investors wherein Defendants made positive statements about the Company and its prospects, including, but not limited to, its revenues, expenses, income, margins, markets, growth, orders, average selling prices, and customers. In that regard, Defendants X Chen and Andrew Chen stated, in pertinent part, as follows:

> Defendant X Chen: We are very pleased to report to our shareholders that with the recovery of the global economy, our Company's sales grew strongly, coupled with significant profits. Under the joint efforts of management and employees, the increase of our NPCC segment has reached a new record high.
>
> * * *
>
> As a nanotechnology leader, we will continue to focus on new product development and on meeting the demands of our customers. Our advantages in raw material resources, low labor cost, the world leading technology of membrane dispersion and strong R&D team are all our natural resources and advantages in China, which are incomparable by other competitors in the world.
>
> Currently, we are receiving returns on our investment in the development of new products. In 2010, on the base of existing overseas returnees and other domestic excellent researchers, we will continue to strengthen the R&D force to make the number of the R&D team reach hundreds of professionals. We will continuously focus on developing new value add products, not only in applications of

adhesives, rubber, plastic, paint, oil paint, paper, road way, etc., but also in the exploratory applications of food, cosmetics, electronics, electricity and others.

Meanwhile, we will expand our production capacity, explore and occupy new markets, and make customer made solutions to meet there [sic] specific requirements so as to attract new customers, gain more market share by technology, and generate rich rewards by product quality. Time has shown that we are confident in continuously renewing our records and increasing our shareholder value.

* * *

Defendant Andrew Chen: Revenues from continuing operations in the 2010 first quarter increased 46.2% to $30.2m from $20.7m in the first quarter of 2009. The revenue increase was due primarily to the Company's expanded production capacity to meet the growing market demand, as well as an increase in the average selling price. During our first quarter of 2010, sales volume was 62,313 metric tons, an increase of 19,344 metric tons from the first quarter of 2009, resulting from the production capacity added to the Zibo Facility. In addition, the average selling price for our products was $485 per metric ton, an increase of $4 per metric ton from the average selling price of $481 per metric ton in the first quarter last year. The increase in average selling price was mainly due to changes in our pricing strategy, in our product mix, based on market demands.

For the first quarter of 2010, sales for PE and latex applications increased by 18,365 and 5,296 metric tons respectively, compared to the same quarter of 2009 due to increased sales in these applications to existing customers, as well as new customers' orders. Sales for tires, PVC, paper, and ink applications decreased by 820 metric tons, 2,014 metric tons, 338 metric tons, and 1,389 metric tons respectively, due primarily to specific customers' needs and demand and timing of their purchases. Gross profit increased 49.6% to $12.7m from $8.5m in the same period of 2009. Gross margin for the quarter was 42% as compared with 41.1% in the same quarter of 2009. The improved gross margin was mainly attributable to a greater number of tons sold and a higher average selling price as more value added products, commanding justifiable higher prices, were shipped during this quarter. Selling, general and administrative expenses amounted to $2m, an increase of $0.4m from $1.6m in the first quarter of 2009. As a percentage of total revenues, SG&A expenses decreased to 6.6% for the first quarter of 2010, from 7.6% in the first quarter of 2009.

* * *

Operating income for the first quarter of 2010 was $10.7m, up 55% from $6.9m in the first quarter a year ago. Operating margin rose to 35.4%, compared with 33.4% in the first quarter of 2009. The increase in operating income and operating margin in the first quarter of 2010 was mainly due to higher sales, gross profit, and gross margin compared to the first quarter of 2009.

*     *     *

> Net income from continuing operations in the first quarter of 2010 was $6.7m, reflecting a 25.2% year over year increase from $5.4m in the same period last year. Fully diluted earnings per share from continuing operations for the first quarter of 2010 were $0.12, compared with fully diluted earnings from continuing operations per share of $0.09 in the same quarter of 2009. Fully diluted weighted average share outstanding were 54,207,633 in the first quarter of 2010, down from 67,432,169 in the same quarter last year, primarily due to the fact that a number of potential common shares related to the Company's convertible debt were anti-dilutive during the first quarter of 2010 and therefore were excluded from the diluted earnings per share calculation.
>
> As of March 31, 2010, the Company had cash balance of $117.3m compared with $116m at the end of March 2009. Days sales outstanding, DSO, a measure of receivable collection activity, for the first quarter was 61 days, as compared to 60 days in the fourth quarter of 2009. We exclude cash sales in our calculation of accounts receivable turnover in days. As of the end of March 2010, there was no overdue accounts receivable.
>
> Total shareholders' equity rose to $177.3m at March 31, 2010 from $170.6m at December 31, 2009. Net cash flow provided by operating activities for the first quarter of 2010 increased to $12m from $7.3m for the same quarter of 2009, mainly due to the increased sales revenue, as well as improved cash management.

**ANSWER**: Paragraph 170 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits that it held a conference call with analysts and investors on May 11, 2010 and that language substantially similar to the quoted language in Paragraph 170 is contained in the transcript of that conference call. ShengdaTech further states that the transcript of the May 11, 2010 conference call speaks for itself and denies any characterizations inconsistent therewith. ShengdaTech denies any remaining allegations against it contained in Paragraph 170.

171. On June 15, 2010, ShengdaTech filed with the SEC a Form S-3 registration statement (the "Registration Statement") to register $150,000,000 of ShengdaTech common stock, debt securities, warrants and units.

**ANSWER**: ShengdaTech admits that on June 14, 2010 it filed with the SEC the Registration Statement, states that the Registration Statement speaks for itself and denies any characterizations inconsistent therewith.

172. On August 9, 2010, ShengdaTech filed with the SEC its Form 10-Q for the second quarter of 2010, the period ended June 30, 2010 (the "June 2010 Form 10-Q"), which was signed by Defendants X Chen and Andrew Chen. With regard to the Company's financial controls and procedures, Defendants stated, in pertinent part, as follows:

> (a) Disclosure Controls and Procedures.
>
> Disclosure controls and procedures (as defined in Rules 13a – 15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act")) are designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. This information is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. Our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. ***Based on the evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of June 30, 2010.***
>
> (b) Changes in internal control over financial reporting.
>
> There was no change in our internal control over financial reporting that occurred in the second quarter of 2010 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added.]

**ANSWER**: ShengdaTech admits that it filed the June 2010 Form 10-Q on August 9, 2010, states that the June 2010 Form 10-Q speaks for itself and denies any characterizations inconsistent therewith.

173. Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Andrew Chen submitted false and misleading certifications, which were virtually identical to the certifications referenced above at ¶139.

**ANSWER**: The allegations of Paragraph 173 are not directed against ShengdaTech and therefore no answer is required.

174. On August 10, 2010, ShengdaTech issued a press release announcing its financial results for the second quarter of 2010, the period ended June 30, 2010. For the quarter, the Company reported revenue from continuing operations of $33.2 million, a 28% increase over the prior year period, and net income from continuing operations of $7.1 million, or $0.13 per diluted share. Defendant X Chen, commenting on the Company's second quarter results, stated, in pertinent part, as follows:

> Our growth continued in the second quarter of 2010 as our enhanced R&D efforts have created much higher value-added products, which are generating robust sales. Our solid financial performance also comes from the economies-of-scale contributed by our increases in production capacity. We will continue to target the high-end markets and industries ideal for our nano-technology applications.
>
> We believe that with our increased production capacity and on-going acquisition of limestone mining rights, along with our strong R&D support, we are well-positioned to achieve high gross margins. We remain confident in the industry's growth prospects and we are well positioned to sustain our demonstrated leadership and record of success in this sector.

With regard to the Company's financial condition, the press release stated, in pertinent part, as follows:

> As of June 30, 2010, the Company had cash of $110.6 million, compared with $116.0 million at the end of December 2009. The Company's cash position at June 30, 2010 exceeds total liabilities. Days Sales Outstanding (DSO), a measure of receivables collection activity, were 60 days in the six months ended June 30, 2010 and 53 days in six months ended December 31, 2009. As of the end of June 2010, there was no overdue accounts receivable. Total shareholders' equity rose to $185.3 million at June 30, 2010, from $170.6 million at December 31, 2009.
>
> Net cash flow provided by operating activities increased to $20.4 million during the six months ended June 30, 2010, from $15.1 million for the same period of 2009, primarily due to the increased sales. The Company continued to invest in expanding its capacity in the second quarter of 2010. It spent a total of almost $26.0 million, of which $3.8 million was the payment for the Company's December 2009 acquisition of Anhui facility, $16.2 million was for additional land use rights for the Anhui Facility, and the remainder was for the purchase of plant and equipment and mining rights.
>
> Mr. Andrew Chen, the Company's Chief Financial Officer, commented, "As our superior product line, with our patent-protected membrane-dispersion technology, enables us to gain market penetration and strengthen pricing power, we continue

> to exercise prudent cash management and focus on cash-flow generation. With our leading position in the industry, notable financial accomplishments, outstanding business growth, and a track record of effective execution of our comprehensive strategic plan, we believe we will continue to deliver increasing value to our shareholders and the investment community."

**ANSWER**: ShengdaTech admits that it issued a press release on August 10, 2010, states that the August 10, 2010 press release speaks for itself and denies any characterizations inconsistent therewith.

175. Following the 2010 second quarter announcement, Defendants held a conference call with analysts and investors wherein Defendants made positive statements about the Company and its prospects, including, but not limited to, its revenues, expenses, income, margins, markets, growth, average selling prices, and customers. In that regard, Defendants X Chen and Andrew Chen, stated, in pertinent part, as follows:

> Defendant X Chen: Good morning, everyone. Welcome to our second-quarter conference call. We are very pleased to report to our shareholders that our Company sales continued to grow strongly, with significant profits for the period ended June 30, 2010. The market demand for our NCC -- I'm sorry, NPCC products is much higher since, not only can we reduce the production costs and improve the quality of the end products for customers, but also, as functional materials, we can provide better advantages for the products of customers to help gain more market share with higher profits. Therefore, the overall market demand continues to grow fast for NPCC in China.
>
> * * *
>
> In 2009 we were ranked number one in NPCC sales in China, with a gross margin that is nearly double the industry standard, due to our higher-valued products justifying higher prices. ShengdaTech expects to continue to be the largest manufacturer of NPCC in China for 2010 and beyond. Currently we already have products in a number of different industries, such as Tire and Rubber, Paint, Paper, Latex, Polypropylene, Polyethylene, PVC, Ink, Plastics, Automobile Undercoating, Adhesives and Sealants, where our products are currently proving their value. In order to achieve these savings and performance goals, and to attract more customers, we will continue to design and tailor each NPCC product for each specific application.
>
> * * *
>
> Simply put, our unwavering goal is to make ShengdaTech's R&D the best NPCC research center in the world, allowing us to produce the best products. We have continued to move forward with our capacity expansion program to meet the market demand for 2010 and beyond.

*    *    *

We will also continue to build our R&D capabilities to develop more value-added products. And we will further strengthen our international marketing and sales team for the future. By the end of June 2010 our international sales and marketing force had increased to 20, from four at the end of 2009. Besides the focus on domestic markets, we shall also continue to invest in international marketing and operations. It is estimated by Frost & Sullivan, a global research firm, that of the 1,875,000 metric tons of NPCC demand, 1,143,000 metric tons are beyond China, which indicates that ShengdaTech has great opportunities. We expect to see better performance by the end of 2010 or the first quarter of 2011, and will establish ourselves in the large, global international market.

*    *    *

Defendant Andrew Chen: As key highlights in our filing, we are reporting that in the second quarter of 2010 we continued our sales growth in both volume and average selling price compared with a year ago in the same quarter. This increase reflects both continuing strong demand for our NPCC products, and that customers are willing to pay higher prices for products that lower their cost and provide greater end-user product performance.

*    *    *

Net revenues from continuing operations in the second quarter of 2010 increased by 27.7%, to $33.2m, from $26m in the second quarter of 2009. The net revenue increase is a result of expanded production capacity to meet the growing market demand, as well as an increase in average selling price. For the three months ended June 30, 2010, sales increased by $7.2m compared to the same period last year. The increase was mainly due to a rise in sales volumes of 14,067 metric tons, resulting in a $6.8m sales gain from the increased production of the Zibo, Shandong facility and the modest production from the mid-quarter startup of the Anhui facility.

*    *    *

For the three months ended June 30, 2010 sales of polyethylene, or PE, and Latex applications increased by 15,810 and 5,234 metric tons respectively, compared to the three months ended June 30, 2009. Sales of Paint and Automobile Undercoating applications remained stable compared to the three months ended June 30, 2009. Sales for Tires, PVC, Paper and Ink applications for the three months ended June 30, 2010 decreased by 3,881, 1,280, 268, and 1,852 metric tons respectively, primarily due to specific customers' needs and demands, and timing of their purchases. In addition, our sales process has adopted a strict customer screening program that evaluates customer credit and payment capacity as qualification criteria. As a result, certain customers were filtered out, particularly in these application areas. We believe that this process will be an

effective means to qualify current and future customers, and will help in identifying credit-worthy customers with higher-end applications. Gross profit increased 19.7%, to $13.6m, from $11.4m in the same period of 2009.

* * *

Turning into our six months' result from continuing operations, total revenue for the first six months of 2010 increased by 35.9% year over year, to $63.5m, from $46.7m in the first six months last year. Gross profit for the first six months of 2010 was $26.3m, up 32.5% from the gross profit of $19.9m in the same period last year. Gross margin was 41.5% for the first six months of 2010. Income from operations was $22.2m, up 35.4%, from $16.4m in the first six months of 2009. And the operating margin for the first six months of 2010 was 34.9%, in line with the same period of 2009. Net income from continuing operations for the first nine (sic -- see press release) months of 2010 was $13.8m, with diluted earnings per share of $0.25. Turning into our financial section, as of June 30, 2010 the Company had cash of $110.6m, compared with $116m at the end of December 2009. The Company's cash position at June 30, 2010 exceeds total liabilities.

* * *

Total shareholders' equity rose to $185.3m at June 30, 2010, from $170.6m at December 31, 2009. Net cash flow provided by operating activities increased to $20.4m during the first -- the six months ended June 30, 2010, from $15.1m for the same period of 2009, primarily due to the increased sales.

* * *

Our superior product line, with our patent-protected membrane dispersion technology, enables us to gain market penetration and strengthen our pricing power. We continue to exercise prudent cash management and focus on cash flow generation. With our leading position in the industry, notable financial accomplishments and record of outstanding business growth, we believe that our stock is undervalued. Nonetheless, we will continue to produce superior financial performance while growing our business with the effective execution of our comprehensive strategic plan. By doing so, we hope to demonstrate our true value to our shareholders and the investment community. We remain confident that we will stay on track and produce financial results consistent with our guidance expectations. The Company therefore maintains its 2010 guidance on revenue and net income from continuing operations, to be in the range of $123m to $126m, and $25m to $27m, respectively.

Your support is appreciated. And we believe ShengdaTech has never been better positioned to build on its already successful operations, while increasing our value to our shareholders.

**ANSWER**: Paragraph 175 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits that it held a conference call with analysts and investors on August 10, 2010 and that language substantially similar to the quoted language in Paragraph 175 is contained in the transcript of that conference call. ShengdaTech further states that the transcript of the August 10, 2010 conference call speaks for itself and denies any characterizations inconsistent therewith. ShengdaTech denies any remaining allegations against it contained in Paragraph 175.

176. On October 1, 2010, ShengdaTech filed a Form 8-K with the SEC disclosing that on September 30, 2010, Defendant Andrew Chen resigned as the Company's CFO "for personal reasons" and that the Company's Board of Directors appointed Defendant Guo, COO, to serve as acting CFO until such time that ShengdaTech hired a new CFO.

**ANSWER**: ShengdaTech admits that on October 1, 2010 ShengdaTech filed a Form 8-K with the SEC, states that the October 1, 2010 Form 8-K speaks for itself and denies any characterizations inconsistent therewith.

177. On November 8, 2010, ShengdaTech filed with the SEC its Form 10-Q for the third quarter of 2010, the period ended September 30, 2010 (the "September 2010 Form 10-Q"), which was signed by Defendants X Chen and Guo. With regard to the Company's financial controls and procedures, Defendants stated, in pertinent part, as follows:

(a) Disclosure Controls and Procedures.

> Disclosure controls and procedures (as defined in Rules 13a – 15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) are designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. This information is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. Our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. ***Based on the evaluation, our Chief Executive***

> ***Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of September 30.***
>
> (b) Changes in internal control over financial reporting.
>
> There was no change in our internal control over financial reporting that occurred in the third quarter of 2010 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added.]

Moreover, with regard to the Company's system of financial reporting, Defendants X Chen and Guo submitted false and misleading certifications, which were virtually identical to the certifications referenced above at ¶139.

**ANSWER**: Paragraph 177 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits that it filed the September 2010 Form 10-Q on November 8, 2010, states that the September 2010 Form 10-Q speaks for itself and denies any characterizations inconsistent therewith. ShengdaTech denies any remaining allegations against it contained in Paragraph 177.

178. On November 8, 2010, ShengdaTech issued a press release announcing its financial results for the third quarter of 2010, the period ended September 30, 2010. For the quarter, the Company reported revenue from continuing operations of $34.4 million, a 36% increase over the prior year period, and net income from continuing operations of $7.0 million, or $0.13 per diluted share. Defendant X Chen, commenting on the Company's first quarter results, stated, in pertinent part, as follows:

> Our strong revenue and net income growth in the third quarter of 2010 was led by continued capacity expansion fueled by growth in customer demand. Demand for our NPCC products continues to rise as we further penetrate our existing end-markets and expand into new markets. We are aggressively ramping up capacity utilization at our new NPCC facility in Anhui Province and are in advanced negotiations with prospective customers in this high-potential, prospect-rich economic region.
>
> One of our leading competitive advantages in the NPCC market is our ability to introduce new, value-added product applications for NPCC. For example, in the third quarter of 2010, we recognized our first sales of our new NPCC application for asphalt and expect orders to accelerate in the coming months. We plan to patent protect this application to capitalize on this market opportunity and reap maximum benefits from our intensive and extensive research efforts.

With regard to the Company's financial condition, the press release stated, in pertinent part, as follows:

> As of September 30, 2010, the Company had cash of $120.6 million, compared with $116.0 million at the end of December 2009. The Company's cash position at September 30, 2010 exceeds total liabilities. The Company has a credit policy extending 30 to 90 day credit terms to customers who meet its credit evaluation criteria. It reported accounts receivables of $6.1 million as of September 30, 2010, as compared to $4.6 million as of December 31, 2009. Days Sales Outstanding ("DSO"), a measure of receivables collection effectiveness were 60 days in the nine months ended September 30, 2010. As of September 30, 2010, there was no overdue accounts receivable. Total shareholders' equity rose to $196.4 million at September 30, 2010, from $170.6 million at December 31, 2009.
>
> Net cash flow provided by operating activities increased to $31.4 million during the nine months ended September 30, 2010, up from $17.7 million for the same period of 2009, primarily due to the effective collection of accounts receivable and less income tax payments made because of a difference in the timing of payments during the nine months period ended September 30, 2010 as compared to the same period last year. The Company continued to invest in expanding capacity in the third quarter of 2010. For the nine months ended September 30, 2010, it spent approximately $28.4 million, of which $3.8 million was for the payment for the Company's December 2009 acquisition of the Anhui facility, $14.7 million for additional land use rights for the Anhui facility, $9.4 million for the purchase of equipment and the construction for Phase II production lines of the Zibo facility, and the remainder $0.5 million for the purchase of equipment and plant reconstruction for the Anhui facility.
>
> Mr. Chen concluded, "We believe we can continue to run our operations efficiently and reinvest our operating cash flow in our business. We are confident that our products, customer relationships, expanded international sales force, innovative new applications and aggressive capacity expansion plans will allow us to continue our penetration into new markets and capture greater market share of the rapidly growing NPCC market. When combining our notable achievements to date with the progressive strategic plans in place, we believe that the management team is well positioned to continue our record of highly favorable financial performance for years to come."

**ANSWER**: ShengdaTech admits that it issued a press release on November 8, 2010, states that the November 8, 2010 press release speaks for itself and denies any characterizations inconsistent therewith.

179. Following the 2010 third quarter announcement, Defendants held a conference call with analysts and investors wherein Defendants made positive statements about the

Company and its prospects, including, but not limited to, its revenues, expenses, income, margins, markets, growth, average selling prices, and customers. In that regard, Defendant X Chen stated, in pertinent part, as follows:

> Defendant X Chen: I'm pleased again to report that in the third quarter our revenue and net income continued to activate strong growth as we made significant progress to advance our NPCC business, while building momentum by increasing capacity utilization at our new Anhui facility, reaching success in delivering initial sales of our new NPCC applications for asphalt, and in strengthening our international sales and marketing department. I'm proud to report that ShengdaTech achieved robust results in the quarter, highlighted by net sales from continuing operations growing 35.6% to $34.4m, and the net income from continuing operations increasing 45.3% to $7m.
>
> * * *
>
> [Crocker Coulson on behalf of Defendant X Chen]: To begin with, I'd like to highlight that we continued to achieve record NPCC revenues with each progressing quarter, reflecting the robust market demand for our products. ShengdaTech continues to make measurable progress in successfully executing our plans to aggressively expand our capacity, accelerate research and development efforts, and provide world-class sales and technical service. During the third quarter net sales increased by $9m compared to the same period last year, primarily due to a rise in sales volume of 17,675 metric tons to reach 70,164 metric tons, up from 52,489 metric tons in the prior year period. Our strong sales volume growth resulted mainly from the increased production capacity at our Zibo facility and to a smaller extent the start-up tonnage in the new Anhui facility. Sales of plastics, adhesive and rubber applications increased by $6.9m, $2.4m and $0.6m respectively, as compared to the year ago period. Sales of our paint, ink and paper applications declined by $0.8m due to specific customer needs and the timing of their purchases. Sales of automobile undercoating applications remain stable from the prior year period.
>
> * * *
>
> During the third quarter we added 12 new domestic customers, of which two new customers were asphalt manufacturers using this latest high potential NPCC application. Our NPCC application for asphalt represents an outstanding market opportunity.
>
> * * *
>
> In addition, we continue to explore opportunities in the international market by expanding our international sales and marketing department. We currently have 35 international customers in the testing phase, including nine in the Asia Pacific region, 12 in Europe, and 14 in North America. During the third quarter this year, the international sales accounted for only 1% of our net sales, mainly due to the

continuing impact of the financial crisis in these developed economies. We expect to see international sales pick up as the global economy shows some early recovery signs and manufacturers are bouncing back and will begin to recognize the cost savings and quality improvement they can get from using our products.

* * *

Our total net revenues from continuing operations in Q3 increased by 35.6%, to $34.4m, up from $25.4m a year ago. This growth was largely due to higher sales volume as a result of our expanded production capacity, improved capacity utilization to meet the growing market demand, as well as increases in average selling prices. Our gross profit increased 39% to $14m, from $10.1m in the same period in 2009. Gross margin increased by 1%, from 39.7% a year ago to 40.7% in Q3. The increase was mainly due to the increase in average selling prices on NPCC products, partially offset by an increase in raw material costs and other production expenses. SG&A was at $2.5m, up $0.6m from $1.9m in Q3 of '09.

* * *

Our cash position as of September exceeds total liabilities. Days sales outstanding, which is a measure of receivables collection effectiveness, was at 60 days in the nine months ended September 30, 2010. As of September 30, there was no overdue accounts receivable. Shareholders' equity rose to $196.4m from $170.6m at December 31, 2009. Net cash provided from operating activities increased to $31.4m, and that's up from $17.7m for the same period in 2009, primarily due to the increased sales levels.

* * *

We maintain our 2010 guidance for revenue and net income from continued operations to be in the range of $123m to $126m for revenues, and $25m to $27m for net income.

* * *

In closing, we believe the Company's overall strategy, which includes our planned capacity expansion over the next few years, is going to let us capture an increasing market share of the rapidly growing NPCC market. We take a lot of pride in developing forward-looking technologies that help our customers develop new products for their customers. And this is a fundamental platform for our growth. We remain very confident that ShengdaTech is well positioned to continue our record of highly favorable financial performance in the years to come.

**ANSWER**: Paragraph 179 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the

allegations against ShengdaTech, ShengdaTech admits that it held a conference call with analysts and investors on November 8, 2010 and that language substantially similar to the quoted language in Paragraph 179 is contained in the transcript of that conference call. ShengdaTech further states that the transcript of the November 8, 2010 conference call speaks for itself and denies any characterizations inconsistent therewith. ShengdaTech denies any remaining allegations against it contained in Paragraph 179.

180. On December 9, 2010, ShengdaTech issued a press release announcing plans to offer an aggregate of $90 million of senior convertible notes due 2015 in a private offering. The Company also announced that it intended to grant the initial note purchasers an option to purchase an additional $30 million of such notes.

**ANSWER**: ShengdaTech admits that on December 9, 2010 it issued a press release, states that the December 9, 2010 press release speaks for itself and denies any characterizations inconsistent therewith.

181. On December 10, 2010, ShengdaTech announced that it entered into a purchase agreement with Morgan Stanley & Co. relating to the Company's sale of a $130 million aggregate principal amount of the Company's 6.50% Senior Convertible Notes due 2015 in a private offering (the "2010 Note Offering"). ShengdaTech also stated that it intended to use the net proceeds from the 2010 Note Offering to repurchase $67 million of the Company's 6.0% Convertible Senior Notes due 2018 and to finance its NPCC production capacity expansion, research and development activities and other working capital requirements.

**ANSWER**: ShengdaTech admits that it filed an announcement on Form 8-K on December 10, 2010, states that the December 10, 2010 Form 8-K speaks for itself and denies any characterizations inconsistent therewith.

182. On December 15, 2010, the Company announced that it had issued a $130 million aggregate principal amount of the 2010 Notes in the 2010 Note Offering.

**ANSWER**: ShengdaTech admits that it filed an announcement on Form 8-K on December 15, 2010, states that the December 15, 2010 Form 8-K speaks for itself and denies any characterizations inconsistent therewith.

183. On December 17, 2010, the Company filed a Form 8-K attaching a list of investor questions and responses to address various inquiries from security holders relating to the 2010 Note Offering. With regard to the 2010 Note Offering, Defendants stated, in part, as follows:

> 1. ShengdaTech currently has approximately $120 million of cash on its balance sheet. Why did the Company decide to raise capital given such a strong cash position?
>
> A: ***As of September 30, 2010, ShengdaTech had approximately $121 million in cash; however approximately $98 million of this cash position was held in RMB in Chinese banks, which was generated accumulatively from continuing operations.***
>
> As disclosed in our public filings, it is cost prohibitive for the Company to convert the RMB cash balance into USD and make wire payments according to China's financial laws and regulations and RMB restriction policy enforced by China State Administration of Foreign Exchange ("SAFE"). The Company can only wire USD out of China in the name of a dividend from subsidiaries of an overseas holding company. However, this would result in the Company incurring a 34% income tax expense…
>
> 2. Why did the Company choose to raise capital through a convertible debt offering and not conduct an equity offering?
>
> A: The Company, ***its Board*** and financial advisors considered a number of alternatives for raising capital, including securing loans using our RMB bank deposits as collateral, an equity offering and a convertible debt offering. Given the near-term need for capital and prevailing market conditions, our financial advisors advised us that an equity offering would be difficult to achieve and advised a convertible debt offering. ***The Company, its Board and its financial advisors evaluated these options in detail before making a decision.*** [Emphasis added.]

**ANSWER**: ShengdaTech admits that it filed a Form 8-K on December 17, 2010, states that the December 17, 2010 Form 8-K speaks for itself and denies any characterizations inconsistent therewith.

184. The statements referenced above in ¶¶167-170, 172-175, 177-179, and 183 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a) that ShengdaTech's financial statements during 2010 were not fairly presented in conformity with U.S. GAAP and were materially false and misleading;

(b) that the Company was falsifying its reported sales;

(c) that the Company manipulated the amounts of goods it purchased from the Company's major suppliers;

(d) that the Company was improperly inflating its gross revenues;

(e) that ShengdaTech's financial statements were not fairly presented in conformity with U.S. GAAP and were materially false and misleading;

(f) that ShengdaTech was drastically overstating the size of the Company's customer base;

(g) that Defendants falsified information on VAT invoices;

(h) that Defendants misstated cash accounts held in Chinese banks;

(i) that the Company's cash accounts were materially overstated because they included CDs, which did not exist;

(j) that ShengdaTech was participating in undisclosed related party transactions;

(k) that ShengdaTech was operating with material deficiencies in the system of internal control over its financial reporting; and

(l) that based on the foregoing, investors were unable to ascertain the true financial condition of the Company.

**ANSWER**: Paragraph 184, including subsections (a) through (l), contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. ShengdaTech incorporates by reference its answers to Paragraphs 167-170, 172-175, 177-179, and 183. ShengdaTech denies any remaining allegations against it contained in Paragraph 184, including subsections (a) through (l).

185. On March 15, 2011, ShengdaTech issued a press release announcing that it had appointed the Special Committee to investigate "potentially serious discrepancies and unexplained issues relating to the Company and its subsidiaries' financial records identified by the Company's auditors" in the course of their examination of ShengdaTech's consolidated financial statements for the year ended December 31, 2010. The Company further announced that: (i) the Company's Audit Committee retained OMM as independent outside counsel, which had initiated an internal investigation; (ii) the SEC had been notified about the commencement of the internal investigation; and (iii) the Company would not file its 2010 Form 10-K in a timely manner.

**ANSWER**: ShengdaTech admits that on March 15, 2011 it issued a press release, states that the March 15, 2011 press release speaks for itself and denies any characterizations inconsistent therewith.

186. In response to this announcement, trading in ShengdaTech common stock was suspended.

**ANSWER**: ShengdaTech admits that trading in its common stock was suspended in 2011. Shengdatech is without sufficient knowledge or information to admit or deny the remaining allegations contained in Paragraph 186 and therefore denies same.

**Post Class Period Revelations**

187. On April 29, 2011, ShengdaTech filed a Form 8-K with the SEC reporting that the NASDAQ determined that the continued listing of the Company's securities was no longer warranted and that Defendant Guo, the Company's COO, acting CFO, and director, resigned. The Form 8-K also disclosed that on April 19, 2011, ShengdaTech's Board of Directors received a letter from the Company's independent auditor, KPMG HK, indicating that, in the view of KPMG HK, ***senior management of the Company had not taken, and the Company's Board of Directors had not caused senior management to take, timely and appropriate remedial actions with respect to discrepancies and/or issues relating to the Company's financial records that were identified during the course of the audit for the year ended December 31, 2010***, and that this failure to take remedial action was expected to cause KPMG HK's resignation from the audit engagement. [Emphasis added.]

**ANSWER**: ShengdaTech admits that it filed a Form 8-K on or around April 29, 2011, states that the April 29, 2011 Form 8-K speaks for itself and denies any characterizations inconsistent therewith.

188. On May 5, 2011, ShengdaTech filed a Form 8-K with the SEC reporting that on April 29, 2011, KPMG HK informed ShengdaTech of its resignation as the Company's independent auditor. KPMG HK had served as the Company's independent registered public accounting firm since November 11, 2008. The Form 8-K also reported that KPMG HK had previously informed the Company's Audit Committee of certain concerns arising during its incomplete audits of the Company's consolidated financial statements as of and for the year ended December 31, 2010, and the effectiveness of internal control over financial reporting as of December 31, 2010. These concerns included serious discrepancies and unexplained issues relating to, among others: (i) the Company's bank balances; (ii) transactions with major suppliers; (iii) VAT invoices and payments; (iv) sales and payments for sales by third parties; (v) sales to the Company's second largest customer; (vi) discrepancies between KPMG HK's direct calls to customers and confirmations returned to KPMG HK by mail; and (vii) concerns

raised by directly confirming customer sales and accounts receivable. As a result of the foregoing, KPMG HK informed the Company that disclosures should be made and action should be taken to prevent future reliance on their previously issued audit reports related to the consolidated balance sheets of ShengdaTech and its subsidiaries as of December 31, 2008 and 2009, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended and the effectiveness of internal control over financial reporting as of December 31, 2008 and 2009.

**ANSWER**: ShengdaTech admits that on May 5, 2011 it filed a Form 8-K with the SEC, states that the May 5, 2011 Form 8-K speaks for itself and denies any characterizations inconsistent therewith.

189. On June 10, 2011, ShengdaTech common stock began trading on the pink sheets under the symbol SDTHQ.PK. The Company's stock opened at $0.55 per share and closed at $0.25 per share, a loss of over 90% from its closing price on March 14, 2011.

**ANSWER**: Admitted.

190. In May 2011, the Special Committee retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to take over the work commenced by OMM and work with PwC to assist with the investigation. Skadden's investigation involved company visits, interviews, and the imaging and review of accounting records and other electronic data.

**ANSWER**: Admitted.

191. On August 19, 2011, Skadden presented its preliminary report and findings to the Special Committee. In its preliminary report, Skadden confirmed material irregularities and/or inaccuracies in the financial records of the Company. Among other things, the report called into serious question: (i) the accuracy of payments and sales allegedly made to and by the Company; and (ii) the undisclosed related party transactions the Company made with parties owned by Defendant X Chen.

**ANSWER**: ShengdaTech admits that as a result of the Special Committee investigation it learned certain information about the financial records of the Company. Further answering, ShengdaTech refers to the Liquidating Trust Complaint and states that the Liquidating Trust Complaint speaks for itself and denies any characterizations inconsistent therewith. The remaining allegations of Paragraph 191 are denied.

192. On August 19, 2011, ShengdaTech filed a voluntary petition in the United States Bankruptcy Court for the District of Nevada seeking relief under the provisions of Chapter 11 of Title 11 of the Bankruptcy Code.

**ANSWER**: Admitted.

193. The bankruptcy proceedings as well as the investigations by the SEC and the Special Committee are ongoing.

**ANSWER**: ShengdaTech admits that the bankruptcy proceedings are ongoing. Shengdatech is without sufficient knowledge or information to admit or deny the allegations contained in Paragraph 193 with respect to the SEC and therefore denies same. The remaining allegations of Paragraph 193 are denied.

**The Special Committee's Findings and Conclusions**

194. On March 3, 2011, KPMG HK provided written notice to the Audit Committee detailing information relating to, among other things, its inability to confirm sales amounts, sales terms, and outstanding balances, and undisclosed related party transactions. One day after KPMG HK informed the Audit Committee of the potential issues it discovered, the Company held a special meeting of the Board of Directors and, by Board resolution, created the Special Committee to oversee an internal investigation.

**ANSWER**: ShengdaTech admits that the Audit Committee received a written notice from KPMG on or about March 3, 2011, states that the written notice dated March 3, 2011 speaks for itself and denies any characterizations inconsistent therewith. The allegations contained in the second sentence of Paragraph 194 are admitted.

195. As part of the investigation, which was conducted after KPMG HK notified it about the issues relating to the Company's financial records, the Special Committee belatedly learned the following:

(a) that, although the Company's 2008 financial statements reported \$114.3 million in cash, which included approximately \$56.3 million that was reportedly held in the Company's Chinese subsidiaries' bank accounts, as of December 31, 2008, the actual balances for the Company's Chinese subsidiaries' were only approximately \$10.5 million as of December 31, 2008. Furthermore, over \$67 million was debited from the Company's subsidiaries' bank accounts from May 2008 through December 2008. *See Liquidating Trust* Complaint at ¶¶62, 63;

(b) that, although the Company's 2009 financial statements reported \$116 million in cash, which included approximately \$82.9 million that was reportedly held in the Company's Chinese subsidiaries' bank accounts, their actual bank account balances at the end of 2009 were only approximately \$2.8 million, and at least \$162 million was debited from these accounts during 2009. *Id*. at ¶63(b); and

(c) that, although the 2010 financials for the Company's Chinese subsidiaries reported cash holdings of $105.9 million in their accounts and an additional $73 million in Faith Bloom's bank accounts, as of the end of calendar year 2010, the Company's Chinese subsidiaries actual bank balances were only approximately $1.4 million and the Faith Bloom accounts contained only about $50,000. Furthermore, at least $117 million had been debited from the Company's Chinese subsidiaries' accounts during 2010, including $42 million in the second quarter of 2010 alone. *Id*. at ¶63(c).

**ANSWER**: ShengdaTech admits that as a result of the Special Committee investigation it learned certain information about the balances and activity in certain accounts of its direct and indirect subsidiaries. Further answering, ShengdaTech refers to the Liquidating Trust Complaint and states that the Liquidating Trust Complaint speaks for itself and denies any characterizations inconsistent therewith. The remaining allegations of Paragraph 195, including subsections (a) through (c), are denied.

196. The discrepancies between the Company's reported and actual cash balances suggest that Defendant X Chen, and possibly other members of ShengdaTech management, were "looting" the Company by debiting from these accounts for their own personal gain. *Id*. at ¶63.

**ANSWER**: Admitted.

197. The Special Committee was further informed that the managers of ShengdaTech's Chinese subsidiaries: (i) stalled or otherwise attempted to derail trips to the Company's financial institutions; (ii) refused to cooperate with OMM and PwC; (iii) attempted to steer the team to specific persons at the banks, rather than permit the OMM and PwC teams to speak with other identified individuals; and (iv) departed and refused to assist the OMM and PwC teams when the OMM and PwC teams declined to meet with particular bank employees chosen by the managers.

**ANSWER**: ShengdaTech admits that as a result of the Special Committee investigation it learned certain information about the Special Committee's efforts to conduct its investigation. Further answering, ShengdaTech refers to the Liquidating Trust Complaint and states that the Liquidating Trust Complaint speaks for itself and denies any characterizations inconsistent therewith. The remaining allegations of Paragraph 197 are denied.

198. The Special Committee also uncovered fictitious sales by contacting the customers of ShengdaTech's subsidiaries, a step that KPMG HK and the Director Defendants should have taken during the Class Period, but failed to take. Specifically, the Special Committee found that:

(a) six purported customers, who accounted for sales in excess of RMB 190 million, had never purchased ***any product*** from Shaanxi Haize and three of them had never even heard of the subsidiary at all. *Id*. at ¶64(a);

(b) one customers [sic] only made one purchase from Shaanxi Haize in 2009, in the amount of RMB 15,000. ShengdaTech possessed phony invoices from that customer in excess of RMB 3.5 million. *Id*. at ¶64(b);

(c) another customer was shown three invoices supposedly sent to it by Shaanxi Haize, but the customer confirmed that it had never received those invoices. *Id*. at ¶64(c);

(d) another customer stated that it transacted at most RMB 700,000 to 800,000 in business a year with Shaanxi Haize, but ShengdaTech's records showed invoices totaling over RMB 6 million in 2009 alone. *Id*. at ¶64(d);

(e) another customer stated that it had been purchasing from Shaanxi Haize since 2007 at an average rate of RMB 500,000 or 600,000 per year, while the average rate reported by the Company from 2006-2009 was grossly overstated at a rate of RMB 8,342,400 per year. *Id*. at ¶64(e) and

(f) over ten customers transacted less business with ShengdaTech than was recorded by the Company. *Id*. at ¶75. Moreover, certain of the Company's computers contained fake chops templates for eleven of the Company's customers or suppliers.

**ANSWER**: Paragraph 198, including subsections (a) through (f), contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits that as a result of the Special Investigation it learned certain information about sales to customers. Further answering, ShengdaTech refers to the Liquidating Trust Complaint that is cited as the basis for the allegations of Paragraph 198, including subsections (a) through (f), and states that the Liquidating Trust Complaint speaks for itself and denies any allegations or characterizations contained in Paragraph 198, including subsections (a) through (f), that are inconsistent therewith. ShengdaTech denies any remaining allegations against it contained in Paragraph 198, including subsections (a) through (f).

199. The Special Committee was also unable to authenticate the veracity of certain CDs. As part of the cash verification process, Defendant X Chen provided photocopies of CDs

allegedly held in the name of Faith Bloom as evidence that the Company had certain cash on hand. The Special Committee was unable to verify the authenticity of those CDs and despite making repeated requests for such information, Defendant X Chen was nonresponsive. The Special Committee learned that the bank, which issued the CDs, was also unable to verify them and, in fact, had no record of issuing them to Faith Bloom.

**ANSWER**: ShengdaTech admits that as a result of the Special Committee investigation it learned certain information about certain CDs. Further answering, ShengdaTech refers to the Liquidating Trust Complaint and states that the Liquidating Trust Complaint speaks for itself and denies any characterizations inconsistent therewith. The remaining allegations of Paragraph 199 are denied.

200. The market for ShengdaTech common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, ShengdaTech common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired ShengdaTech common stock relying upon the integrity of the market price of ShengdaTech common stock and market information relating to ShengdaTech, and have been damaged thereby.

**ANSWER**: The first two sentences of Paragraph 200 allege legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations contained therein. Shengdatech is without sufficient knowledge or information to admit or deny the allegations contained in the third sentence of Paragraph 200 with respect to Plaintiffs' purchase or acquisition of ShengdaTech common stock and/or any reliance associated therewith and therefore denies same. The remaining allegations of Paragraph 200 are denied.

201. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of ShengdaTech common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

**ANSWER**: Paragraph 201 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the

allegations against ShengdaTech, Paragraph 201 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 201. To the extent an answer may be required, to the extent certain of ShengdaTech's financial information may not have been accurately reported, Shengdatech denies that it was aware during the Class Period of any inaccuracies in its reported financial information and states that it exercised reasonable due diligence during the Class Period to ensure that its financial information was properly reported. ShengdaTech denies any remaining allegations against it contained in Paragraph 201.

202. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about ShengdaTech's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of ShengdaTech and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

**ANSWER**: Paragraph 202 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, Paragraph 202 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 202. To the extent an answer may be required, to the extent ShengdaTech's statements may have been materially false or misleading, ShengdaTech denies that it was aware during the Class Period that they were materially false or misleading and states that it exercised reasonable due diligence during the Class Period to ensure that its financial results were properly reported. ShengdaTech denies any remaining allegations against it contained in Paragraph 202.

## ADDITIONAL SCIENTER ALLEGATIONS

203. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

**ANSWER**: Paragraph 203 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, Paragraph 203 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 203. To the extent an answer may be required, ShengdaTech denies the allegations against it contained in Paragraph 203.

204. Additionally, the Individual Defendants were motivated to engage in a fraudulent course of conduct in order to allow the Company to sell convertible securities in two note offerings to unsuspecting investors at artificially inflated prices. Specifically, and as discussed more fully herein, the 2008 Note Offering and the 2010 Note Offering provided the Company with over $200 million in fresh capital.

**ANSWER**: Paragraph 204 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, ShengdaTech admits the second sentence of Paragraph 204.

205. The Individual Defendants were further motivated to engage in this fraudulent course of conduct so that certain insiders could sell their personal shares of ShengdaTech at artificially inflated prices during the Class Period. Significantly, the alleged improprieties noted herein enabled certain Company insiders, including Defendant X Chen's wife, and a relative of Defendant Guo, to exercise and sell large amounts of their ShengdaTech common stock during the Class Period. For example, Kong Fan Ying, the wife of Defendant X Chen, who realized a gain of more than $4.5 million, filed a plan to sell 790,000 ShengdaTech shares on May 26, 2010. Moreover, Yongming Guo, a relative of Defendant Guo, filed plans to sell shares of ShengdaTech stock on five separate occasions, for a total of 836,991 shares, realizing a gain of more than $5.29 million:

| Insider | Date | Shares | Proceeds |
|---|---|---|---|
| KONG FAN YING | 05/26/10 | 790,000 | $4,542,500 |
| | | | |
| YONGMING GUO | 08/22/07 | 300,000 | $1,392,000 |
| | 09/04/07 | 9,991 | $49,456 |
| | 10/10/07 | 286,000 | $2,297,381 |
| | 10/29/07 | 1,000 | $8,200 |
| | 12/11/07 | 240,000 | $1,548,000 |
| | | | $5,295,037 |
| | | | |
| | **Total:** | **1,626,991** | **$9,837,537** |

**KPMG HK** [sic]

**ANSWER**: The allegations of Paragraph 205 are not directed against ShengdaTech and therefore no answer is required.

206. KPMG HK recklessly failed to conduct itself as a prudent auditor should and blindly ignored the myriad of red flags that should have alerted it to the fraud that the Company was committing.

**ANSWER:** The allegations of Paragraph 206 are not directed against ShengdaTech and therefore no answer is required.

207. KPMG HK misled Plaintiffs and the Class by recklessly certifying and issuing audit opinions concerning the Company's financial statements.

**ANSWER**: The allegations of Paragraph 207 are not directed against ShengdaTech and therefore no answer is required.

208. Specifically, during its audit of the Company's 2009 financial statements, KPMG HK ignored numerous red flags. During the confirmation process, it received an unusual number of confirmation replies, which should have prompted further investigation. Further, KPMG HK was told by a person familiar with the market for ShengdaTech's products that he/she believed that the "Company's reported sales [] exceeded . . . the likely global market demand for those products." *Liquidating Trust* Complaint at ¶48(e). Finally, during the 2009 audit, KPMG HK "noticed several instances where customer names in the Company's accounting system did not match the names on invoices and/or related documents that purported to memorialize the Company's transactions." *Oaktree* Complaint at ¶91. All of these warnings were unheeded and KPMG HK issued a false and misleading audit opinion for 2009.

**ANSWER**: The allegations of Paragraph 208 are not directed against ShengdaTech and therefore no answer is required. ShengdaTech further states that the Liquidating Trust Complaint and the Oaktree Complaint speak for themselves and denies any characterizations inconsistent therewith.

209. However, KPMG HK's failures began prior to its audit of the Company's 2009 financial statements. By the time KPMG HK uncovered the fraud, it was too late. KPMG HK failed to verify ShengdaTech's bank account balances, discover that the Company's reported sales were extremely overstated, and realize that the Company's reported purchases of supplies were exaggerated, among other things.

**ANSWER**: The allegations of Paragraph 209 are not directed against ShengdaTech and therefore no answer is required.

210. Finally, and belatedly, on March 3, 2011, KPMG HK provided a draft letter to the Audit Committee, which described some of the issues KPMG HK had discovered: (i) that KPMG HK was unable to confirm sales amounts, sales terms, and outstanding balances; (ii) that "ShengdaTech management had misdirected, intercepted and/or otherwise interfered with [] confirmation requests and responses" (*Oaktree* Complaint at ¶78); and (iii) that ShengdaTech's second largest customer had not been at that address for at least five to six years, among other things.

**ANSWER**: The allegations of Paragraph 210 are not directed against ShengdaTech and therefore no answer is required.

211. On March 14, 2011, KPMG HK conducted a call with members of the Company's Audit Committee and informed them that: (i) Jiangsu Libao, a purported customer, confirmed that it had purchased zero product from the Company in 2010, yet the Company's records indicated that in 2010, ShengdaTech sold RMB 7,850,769 in product to Jiangsu Libao; and (ii) the Bank of China, Tai'an Branch stated that the account balances as of December 31, 2010 were RMB 89,949.48 and USD $67.61 and not the RMB 13,282,581.99 and USD $50,054.18 that the Company had recorded on its books through calendar year ending 2010.

**ANSWER**: The allegations of Paragraph 211 are not directed against ShengdaTech and therefore no answer is required.

212. In a document dated March 17, 2011, and entitled "Additional Matters Communicated to the Audit Committee," KPMG HK informed the Audit Committee of other improprieties, including: (i) that the Company submitted completely false accounts payable balances with two of the Company's purported top ten coal suppliers in 2010; (ii) that the

Company grossly overstated account balances at the Agricultural Bank of China, Qianxian Branch; (iii) that the Company submitted false chops for accounts at the Agricultural Bank of China, Qianxian Branch and at CMB - Jinan Branch; and (iv) that the names on two sales invoices and four purchase invoices did not match the name on the NTBS system.

**ANSWER**: The allegations of Paragraph 212 are not directed against ShengdaTech and therefore no answer is required.

213. Had KPMG HK taken the follow-up action in its 2008 and 2009 audits as it did, or was now forced to do, in its 2010 audit, the auditor would have discovered the same exact "serious discrepancies" that it ultimately discovered.

**ANSWER**: The allegations of Paragraph 213 are not directed against ShengdaTech and therefore no answer is required.

**Director Defendants**

214. The Director Defendants failed to check information that they had a duty to monitor, including information reflecting the true facts regarding ShengdaTech during the Class Period. Specifically, the Director Defendants were reckless in failing to check the falsity of the financial statements published in the Company's SEC filings, yet signed and certified those filings. Had the Director Defendants comprehensively and adequately monitored the Company, its core operations and its business, as they were obligated to, they would have noticed significant "red flags," which would have alerted them of the massive accounting fraud being perpetrated by the Company and its management. The Director Defendants failed to remediate these egregious "red flags," which included:

(a) that the Company's SEC filings were inconsistent with the combined AIC filings of ShengdaTech's indirect subsidiaries;

(b) that the Company was falsifying its reported sales;

(c) that the Company was improperly inflating its gross revenues;

(d) that the Company manipulated the amounts of goods it purchased from the Company's major suppliers;

(e) that ShengdaTech's financial statements during the Class Period were not fairly presented in conformity with U.S. GAAP and were materially false and misleading;

(f) that ShengdaTech was drastically overstating the size of the Company's customer base;

(g) that the Company's cash accounts were materially overstated because they included CDs, which did not exist;

(h) that Defendants misstated cash accounts held in Chinese banks;

(i) that Defendants falsified information on VAT invoices;

(j) that ShengdaTech was participating in undisclosed related party transactions; and

(k) that ShengdaTech was operating with material deficiencies in the system of internal control over its financial reporting.

**ANSWER**: The allegations of Paragraph 214, including subsections (a) through (k), are not directed against ShengdaTech and therefore no answer is required.

215. Further evidence of the Director Defendants' recklessness is contained in KPMG HK's resignation letter, which stated that "the Company's Board of Directors had not caused senior management to take, timely and appropriate remedial actions with respect to discrepancies and/or issues relating to the Company's financial records." [Emphasis added.]

**ANSWER**: The allegations of Paragraph 215 are not directed against ShengdaTech and therefore no answer is required.

216. Moreover, the Director Defendants were not "innocent bystanders" in the massive fraud perpetrated by the Company on its investors. Defendants Mudd, Saidman, and Zhang were each members of the Board's Audit, Compensation, and Nominating and Corporate Governance Committees and met several times a year. Each claimed to have "extensive knowledge of the Company." Specifically, Defendant Mudd, as a CPA, chairman of the Board's Audit Committee, and as an "audit committee financial expert" under SEC rules, failed to adequately check the falsity of the financial statements published in the Company's SEC filings. Had he comprehensively and adequately monitored the Company, its core operations and its business, as he was obligated to, Defendant Mudd would have noticed significant "red flags," which would have alerted him of the massive accounting fraud being perpetrated by the Company and its management.

**ANSWER**: The allegations of Paragraph 216 are not directed against ShengdaTech and therefore no answer is required.

217. The Director Defendants' involvement in the 2010 Note Offering further demonstrates the Director Defendants' intimate connection with the affairs of the Company. As stated above, the Company filed a Form 8-K attaching a list of investor questions and responses pertaining to the 2010 Note Offering.

**ANSWER**: The allegations of Paragraph 217 are not directed against ShengdaTech and therefore no answer is required.

218. In the Form 8-K, the Company clearly stated that: "[t]he Company, its Board and financial advisors considered a number of alternatives for raising capital, including securing loans using our RMB bank deposits as collateral, an equity offering and a convertible debt offering…. The Company, its Board and its financial advisors evaluated these options in detail before making a decision."

**ANSWER**: The allegations of Paragraph 218 are not directed against ShengdaTech and therefore no answer is required.

219. Since the Director Defendants were involved in weighing the utility of certain different financial strategic alternatives for the Company, evaluated those options, and were involved in the decision making process, it is clear that the Director Defendants were intimately involved with the affairs of the Company and that they breached their fiduciary duties by failing to spot the brazen accounting fraud perpetrated by the Company.

**ANSWER**: The allegations of Paragraph 219 are not directed against ShengdaTech and therefore no answer is required.

220. The Director Defendants were reckless and breached their fiduciary duties by failing to monitor the Company's business in accordance with the standards expected of directors of a publicly traded company. At least two of the Director Defendants sat on the Company's Audit Committee, yet the Audit Committee only actively monitored the Company's auditor after it was too late and only after the Company successfully misrepresented its financial condition over many years.

**ANSWER**: The allegations of Paragraph 220 are not directed against ShengdaTech and therefore no answer is required.

## LOSS CAUSATION/ECONOMIC LOSS

221. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of ShengdaTech common stock and operated as a fraud or deceit on Class Period purchasers of ShengdaTech common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were leaked to the market, the price of ShengdaTech common stock fell as a portion of the prior artificial inflation came out. As a result of their purchases of ShengdaTech common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

**ANSWER**: Paragraph 221 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the

allegations against ShengdaTech, Paragraph 221 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 221. To the extent a further answer may be required, ShengdaTech denies the allegations against it contained in Paragraph 221.

222. By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of ShengdaTech's business and prospects. Defendants' false and misleading statements had the intended effect and caused ShengdaTech common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $10.56 per share on June 27, 2008.

**ANSWER**: Paragraph 222 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, Paragraph 222 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 222. ShengdaTech admits that its common stock traded at prices as high as $10.56 per share on June 27, 2008. ShengdaTech denies any remaining allegations against it contained in Paragraph 222.

223. As a direct result of Defendants' prior misrepresentations and fraudulent conduct being leaked to the market, on March 15, 2011, trading in the Company's shares was suspended. The price of the Company's stock remained at $3.55 per share until June 10, 2011. On that date, ShengdaTech common stock began trading on the pink sheets under the symbol SDTHQ.PK. The Company's stock opened at $0.55 per share and closed at $0.25 per share, a loss of over 90% from its closing price on March 14, 2011. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of ShengdaTech common stock.

**ANSWER**: Paragraph 223 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, Paragraph 223 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 223. ShengdaTech admits trading in the Company's shares was suspended on March 15, 2011; that the price of the Company's stock remained at $3.55 per share until June 10, 2011; that trading in the Company's

common stock resumed trading on the pink sheets under the symbol SDTHQ.PK on June 10, 2011 and closed with a price per share of $0.25, and that $0.25 per share is less than 90% of $3.55 per share. To the extent a further answer may be required, ShengdaTech denies the remaining allegations against it contained in Paragraph 223.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

224. At all relevant times, the market for ShengdaTech common stock was an efficient market for the following reasons, among others:

(a) ShengdaTech common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b) as a regulated issuer, ShengdaTech filed periodic public reports with the SEC and the NASDAQ;

(c) ShengdaTech regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) ShengdaTech was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

**ANSWER**: Paragraph 224, including subsections (a) through (d), alleges legal conclusions to which no answer is required. To the extent an answer is required, ShengdaTech admits the factual allegations contained in subparagraphs (a) through (d) of Paragraph 224 but is without sufficient knowledge or information to admit or deny the remaining allegations contained in Paragraph 224 and therefore denies same.

225. As a result of the foregoing, the market for ShengdaTech common stock promptly digested current information regarding ShengdaTech from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of ShengdaTech common stock during the Class Period suffered similar injury through their purchase of ShengdaTech common stock at artificially inflated prices and a presumption of reliance applies.

**ANSWER**: Paragraph 225 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 225. To the extent that an answer may be required, ShengdaTech is without sufficient knowledge or information to admit or deny the allegations contained in Paragraph 225 and therefore denies same.

**No Safe Harbor**

226. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of ShengdaTech who knew that those statements were false when made.

**ANSWER**: Paragraph 226 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, Paragraph 226 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 226. To the extent an answer may be required, ShengdaTech denies any remaining allegations against it contained in Paragraph 226.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against ShengdaTech and the Individual Defendants**

227. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

**ANSWER**: ShengdaTech incorporates by reference its answer to each and every allegation contained above (Paragraphs 1 through 226 of the Complaint) as if fully set forth herein.

228. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the Class, as alleged herein; (ii) enable the Company to sell its common stock at artificially inflated prices; and (iii) cause Plaintiffs and the Class to purchase ShengdaTech's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

**ANSWER**: Paragraph 228 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, Paragraph 228 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 228. To the extent an answer may be required, ShengdaTech denies the allegations against it contained in Paragraph 228.

229. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for ShengdaTech common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

**ANSWER**: Paragraph 229, including subsections (a) through (c), contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, Paragraph 229, including subsections (a) through (c), alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 229, including subsections (a) through (c). To the extent an answer may be required, ShengdaTech denies any allegations

against it contained in Paragraph 229, including subsections (a) through (d), except ShengdaTech admits that the last sentence of Paragraph 229.

230. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of ShengdaTech as specified herein.

**ANSWER**: Paragraph 230 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, Paragraph 230 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 230. To the extent an answer may be required, ShengdaTech denies any allegations against it contained in Paragraph 230.

231. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ShengdaTech's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about ShengdaTech and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of ShengdaTech securities during the Class Period.

**ANSWER**: Paragraph 231 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, Paragraph 231 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 231. To the extent an answer may be required, ShengdaTech admits that Plaintiffs purport to sue ShengdaTech as set forth in the last sentence of Paragraph 231, but denies the remaining allegations against it contained in Paragraph 231.

232. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his/her responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public, which they knew or recklessly disregarded was materially false and misleading.

**ANSWER**: The allegations of Paragraph 232 are not directed against ShengdaTech and therefore no answer is required.

233. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing ShengdaTech's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

**ANSWER**: Paragraph 233 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, Paragraph 233 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 233. To the extent an answer may be required, ShengdaTech denies the allegations against it contained in Paragraph 233.

234. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of ShengdaTech common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of ShengdaTech common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that

was known to or recklessly disregarded by Defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the Class acquired ShengdaTech common stock during the Class Period at artificially high prices and were damaged thereby.

**ANSWER**: Paragraph 234 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 234. To the extent an answer may be required, ShengdaTech states that it is without sufficient knowledge or information to admit or deny the allegations contained in Paragraph 234 and therefore denies same.

235. At the time of said misrepresentations and omissions, Plaintiffs and the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the Class and the marketplace known the truth regarding the problems that ShengdaTech was experiencing, which were not disclosed by Defendants, Plaintiffs and the Class would not have purchased or otherwise acquired their ShengdaTech common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

**ANSWER**: ShengdaTech is without sufficient knowledge or information to admit or deny the remaining allegations contained in Paragraph 235 and therefore denies same.

236. By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**ANSWER**: Paragraph 236 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the allegations against ShengdaTech, Paragraph 236 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 236. To the extent an answer may be required, ShengdaTech denies the allegations against it contained in Paragraph 236.

237. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**ANSWER**: Paragraph 237 contains allegations against Defendants other than ShengdaTech which ShengdaTech is not required to and does not answer. With respect to the

allegations against ShengdaTech, Paragraph 237 alleges legal conclusions to which no answer is required and ShengdaTech therefore denies the allegations of Paragraph 237. To the extent that an answer may be required, ShengdaTech denies the allegations against it contained in Paragraph 237.

WHEREFORE, Defendant ShengdaTech prays that Plaintiffs take nothing by Count I of their Complaint, that judgment be entered in ShengdaTech's favor and against Plaintiffs, that ShengdaTech be awarded its costs, and that this Court enter such other and further relief as it deems appropriate.

**COUNT II**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against KPMG HK**

Count II is not directed at ShengdaTech and, therefore, no response is required.

**COUNT III**

**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

Count III is not directed at ShengdaTech and, therefore, no response is required.

## AFFIRMATIVE AND OTHER DEFENSES

Defendant ShengdaTech, Inc., by and through its attorneys, Greenberg Traurig, LLP, and for its Affirmative and Other Defenses to the Third Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint"), states as follows:

**FIRST DEFENSE**
**[Conduct of Others Outside of Scope of Agency]**

1. As and for a first, separate and affirmative defense to the Complaint, ShengdaTech alleges that to the extent the Individual Defendants made false or misleading

representations or otherwise engaged in any unlawful conduct, they were acting outside the scope of their employment and solely for their own benefit. As a result, ShengdaTech is not responsible for their conduct and their conduct may not be imputed to ShengdaTech.

**SECOND DEFENSE**
**[Failure to State a Cause of Action]**

2. As and for a further affirmative defense to the Complaint, ShengdaTech alleges that the Complaint fails to state a claim upon which relief may be granted against Shengdatech.

**THIRD DEFENSE**
**[Failure to Allege Fraud with Sufficient Particularity]**

3. As and for a further affirmative defense to the Complaint, ShengdaTech alleges that the Complaint is barred by Plaintiffs' failure to plead fraud against ShengdaTech with the requisite particularity.

**FOURTH DEFENSE**
**[Conduct of Others]**

4. As and for a further affirmative defense to the Complaint, ShengdaTech alleges that if Plaintiffs sustained damages, then those damages were either wholly or partially cause and/or contributed to by the conduct of others, whether that fault be the proximate result of intentional conduct, negligence, breach of contract, or any other type of fault, and for which ShengdaTech is not responsible. Such intentional conduct, negligence or fault of others bars recovery against ShengdaTech or comparatively reduces the percentage of fault or negligence, if any, of ShengdaTech.

**FIFTH DEFENSE**
**[No Causation]**

5. As and for a further affirmative defense to the Complaint, ShengdaTech alleges that Plaintiffs are not entitled to recover from ShengdaTech because they have not sustained any

injury, damage, or loss by reason of any conduct, action, error, or omission on the part of ShengdaTech.

**SIXTH DEFENSE**
**[Superseding Independent Intervening Proximate Cause]**

6. As and for a further affirmative defense to the Complaint, ShengdaTech alleges that no act or omission on its part was a substantial factor in bringing about the alleged damages to Plaintiffs, nor was any act or omission on the part of ShengdaTech a contributing cause of the alleged damages suffered by Plaintiffs, and any alleged acts or omissions of ShengdaTech were superseded by the alleged acts or omissions of other persons, firms, corporations or entities, including Defendants X Chen, Guo and KPMG HK, which were the independent, intervening, and proximate cause of any injuries or damages sustained by Plaintiffs. As Plaintiffs' alleged damages, if any, were proximately caused by intervening, superseding, and/or supervening acts for which ShengdaTech has no liability, Plaintiffs' claims are either barred or proportionately reduced.

**SEVENTH DEFENSE**
**[Statute of Limitations]**

7. As and for a further affirmative defense to the Complaint, ShengdaTech alleges that Plaintiffs' claims against ShengdaTech are barred in whole or in part by the applicable statute of limitations.

DATED: January 8, 2014

GREENBERG TRAURIG, LLP

By: /s/ Robert A. Horowitz
Robert A. Horowitz, Esq.
*Attorney for ShengdaTech*
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue
New York, NY 10166
Telephone:212/801-9200
horowitzr@gtlaw.com

**CERTIFICATE OF SERVICE**

I, Robert A. Horowitz, hereby certify that on January 8, 2014, I caused a true and correct copy of the attached ANSWER OF SHENGDATECH, INC. TO THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS to be served on all counsel of record via the CM/ECF system.

/s/ Robert A. Horowitz
Robert A. Horowitz, Esq.